## UNITED STATES DISTRICT COURT
## EASTER DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---

GRIFFEN LEE JONES, a Minor, by his Next
Friend, Andrea Jones;

MASON DAVID BOURGEAU;

GAVIN MICHAEL ALDRED, a Minor, and
SUMMER AUBREY ALDRED, a Minor, by their
Next Friend, Shauna Aldred;

LUCAS ANTHONY VENTLINE, a Minor, by
his Next Friend, April Ventline;

JOHN MICHAEL EDWARDS, a Minor, by his Next
Friend, Jennifer Caddick;

GISELLE ELIZABETH GILLIM, a Minor, by her
Next Friend, Mark Gillim;

ADDYSON LYNN FELTZ, a Minor, by her Next
Friend, Alicia Feltz;

GIANNA CRUZ FLEWELLING, a Minor, and BROOKLYN
GRIER FLEWELLING, a Minor, by their Next Friend,
Jack Flewelling;

AUTUMN WILLENA GREEN, a Minor, by her Next Friend,
Jacklyn Green;

JULEAL ALI CANNON, a Minor, by his Next Friend,
Christine Nelson;

KAYLA ANN MARIE POBLETTE, a Minor, by her Next
Friend, Jennifer Perez;

NATALIE ANNE SOULE, a Minor, by her Next Friend, Scott Soule;

Case No.:
U.S. District Judge:
U.S. Magistrate Judge:

**PLAINTIFFS'
COMPLAINT**

HENRIQUE PORTO VAZ, a Minor, by his Next Friend,
Cintia Stoehr;

CHRISTA ANN HULL, a Minor, by her Next Friend,
Heather Hull;

PAYTON MACKENZIE DIEM, a Minor, and TRISTAN WILLIAM
DIEM, a Minor, by their Next Friend, Kelli Diem;

JORDAN NICHOLE BUTLER, a Minor, by her Next Friend,
Nichole Butler,

      Plaintiffs,

v.

OXFORD COMMUNITY SCHOOL DISTRICT;
KENNETH WEAVER, Superintendent, in his official
capacity; STEVEN WOLF, Principal; NICHOLAS EJAK,
Dean of Students; and SHAWN HOPKINS, Student Counselor,

      Defendants.

_____

Manvir S. Grewal, Sr. (P48082)
Scott Weidenfeller (P56001)
GREWAL LAW, PLLC
Attorneys for Plaintiffs
345 E. Cady St.
3rd Floor
Northville, MI 48167
(517) 393-3000
sweidenfeller@4grewal.com
_____

**There are four other lawsuits, as are identified below,
that arise out of the same transaction or occurrence:**

**2:22-cv-11113-MAG-APP filed on 05/22/2022**

**2:22-cv-10805-TGB-KGA filed on 04/14/2022**

**2:22-cv-10407-SFC-CI filed on 02/24/2022**

**2:21-cv-12871-MAG-APP filed on 12/09/2021**

**COMPLAINT FOR EQUITABLE AND INJUNCTIVE RELIEF**

NOW COME Plaintiffs, GRIFFEN LEE JONES, a Minor, by his Next Friend, Andrea Jones; MASON DAVID BOURGEAU; GAVIN MICHAEL ALDRED, a Minor, by his Next Friend, Shauna Aldred; SUMMER AUBREY ALDRED, a Minor, by her Next Friend, Shauna Aldred; LUCAS ANTHONY VENTLINE, a Minor, by his Next Friend, April Ventline; JOHN MICHAEL EDWARDS, a Minor, by his Next Friend, Jennifer Caddick; GISELLE ELIZABETH GILLIM, a Minor, by her Next Friend, Mark Gillim; ADDYSON LYNN FELTZ, a Minor, by her Next Friend, Alicia Feltz; GIANNA CRUZ FLEWELLING, a Minor, by her Next Friend, Jack Flewelling; BROOKLYN GRIER FLEWELLING, a Minor, by her Next Friend, Jack Flewelling; AUTUMN WILLENA GREEN, a Minor, by her Next Friend, Jacklyn Green; JULEAL ALI CANNON, a Minor, by his Next Friend, Christine Nelson; KAYLA ANN MARIE POBLETTE, a Minor, by her Next Friend, Jennifer Perez; NATALIE ANNE SOULE, a Minor, by her Next Friend, Scott Soule; HENRIQUE PORTO VAZ, a Minor, by his Next Friend, Cintia Stoehr; CHRISTA ANN HULL, a Minor, by her Next Friend, Heather Hull; PAYTON MACKENZIE DIEM, a Minor, by her Next Friend, Kelli Diem; TRISTAN

WILLIAM DIEM, a Minor, by his Next Friend, Kelli Diem; and JORDAN NICHOLE BUTLER, a Minor, by her Next Friend, Nichole Butler, by and through their attorneys, Grewal Law, PLLC, and for their Complaint against Defendants state the following:

## INTRODUCTION

On the morning of November 30, 2021, John Doe ("Doe"), a tenth grader at Oxford High School, arrived at school in a suicidal state, posing a clear threat to himself and others. Doe was armed with a handgun and forty-eight (48) rounds of ammunition, which he kept hidden in his backpack. During Doe's first hour class, his English teacher reported to school officials that, during class, Doe had watched a video depicting a realistic shooting. Shortly thereafter, while in his second hour class, Doe's math teacher reported to school officials that, during class, Doe had drawn disturbing words and violent images onto a paper assignment, including: "The thoughts won't stop. Help me . . . blood everywhere . . . My life is useless . . . The world is dead." In the weeks leading up to November 30, 2021, Doe had demonstrated a concerning pattern of behavior, and, less than twenty-four (24) hours prior to the school shooting, a teacher had observed Doe searching the internet, during class, for information about bullets.

As Doe sat in his second hour math class on November 30, 2021, his assigned counselor, Shawn Hopkins ("Hopkins"), removed Doe from class, confiscated the

assignment that contained the disturbing words and violent illustrations, and lead Doe to the counseling office for a meeting with Dean of Students Nicholas Ejak ("Ejak"). At some point during that meeting, Ejak walked to Doe's math classroom, retrieved Doe's backpack, and returned to the counseling office with the backpack in hand.

Ejak and Hopkins, during their meeting with Doe, determined Doe was suicidal and was exhibiting signs of homicidal ideation. Later in the morning of November 30, 2021, Ejak and Hopkins met with Doe's parents and recommended they take Doe from school. Ejak and Hopkins further advised Doe's parents to retain immediate mental health counseling for Doe. Doe's parents refused to take Doe from school or to secure immediate mental health counseling, despite the suggestions of Ejak and Hopkins. At that point, Ejak and Hopkins had the authority to keep Doe confined in the safety and security of the counseling office. Rather, Ejak and Hopkins used their authority to return Doe's unsearched backpack, to grant a hall pass to Doe, and to allow Doe to attend his remaining class periods unaccompanied.

Less than two hours later, Doe carried his backpack into the boys' bathroom, emerged with his loaded handgun, and opened fire, tragically killing four students and seriously injuring seven others. All Plaintiffs survived the shooting.

Oxford Community School District ("Oxford CSD") and its officials later explained to the community that it was adhering to its formal policy of returning

students to class absent a "disciplinary" issue. Under Oxford CSD's formal policy, only in the presence of a "disciplinary" issue is it acceptable to either send home a student or hold a student in the confinement of the counseling office. Oxford CSD claims that, because Doe presented no such "disciplinary" issue, the only action it could take was to return Doe to class.

While Oxford CSD has denied knowing Doe was suicidal and harboring homicidal ideation, in truth, Oxford CSD knew of Doe's suicidal and possible homicidal ideation when school officials released him from the counseling office. Oxford CSD has advanced this "adherence to policy" explanation as a means to cover up its culpability for this avoidable tragedy. As the facts illustrate, however, school officials escalated the danger to all students by releasing Doe from the confinement of the counseling office after having gained knowledge of Doe's propensity to inflict harm upon himself or others. To date, Oxford CSD seeks to evade accountability and transparency by way of manufacturing the false "adherence to policy" narrative. In reality, the deliberate indifference of school officials as to Doe's troubled status as a suicidal youth, a student who had explicitly expressed homicidal ideation, caused and/or increased the risk of violence, destruction, and death on November 30, 2021.

By releasing Doe from the safe confinement of the counseling office into the greater school environment, school officials compounded the danger to all students

at Oxford High School. By returning Doe's unsearched backpack, which contained the deadly weapon and ammunition Doe used to carry out his suicidal and/or homicidal plans, school officials acted with deliberate indifference and created and/or increased the risk of a school shooting.

At least two official policies, practices, and/or customs of Oxford CSD drove school officials to act as they did: (1) Oxford CSD's official, misguided policy that, in the absence of a "disciplinary" issue, Ejak and Hopkins were required to return Doe back to class, despite having knowledge Doe was experiencing suicidal and homicidal ideation, and (2) Oxford CSD's failure to train Ejak and Hopkins to hold a student in the counseling office, or to otherwise restrict a student from returning to the classroom, where the student is experiencing suicidal and homicidal ideation and where returning the student to the classroom environment would create and/or increase the danger of deadly violence.

Although Plaintiffs survived the shooting, they have suffered irreparable harm. Every day since the tragedy that took place on November 30, 2021, students at Oxford High School, including Plaintiffs, have entered through the school doors assuming they will have to defend themselves should another violent attack ensue. Unable to engage in classes and tackle the daily social and mental hurdles that many often encounter in high school, students at Oxford High School have been forced to

uncover a level of resilience and a weight of constant fear that should be expected of no one.

Due to Oxford CSD's complete lack of transparency and clear refusal to hold itself accountable, Plaintiffs, under the most tragic of circumstances, bring this suit as a final attempt to salvage what time remains of their high school careers. Seeking transparency and a sense of security as they navigate the unknown, Plaintiffs bring this action, not for damages, but for prospective equitable and injunctive relief to restore their right to a full public education, a right that is protected as a property interest under the Due Process Clause of the Fourteenth Amendment.

Plaintiffs request this Honorable Court order the protection of Plaintiffs' interests by ordering a fully transparent and independent third-party investigation into the events that lead up to the tragedy on November 30, 2021, and by taking prospective measures to ensure Oxford CSD, as well as its administrators and staff, comply with the constitutional obligations to safeguard the safety of students at Oxford High School. Such prospective measures include, but are not limited to, Oxford CSD training its administrators to refrain from releasing suicidal students back into the classroom when they have probable cause to know that doing so will result in deadly violence and promising complete transparency in all future communications with parents and students at Oxford High School.

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and the laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 and § 1988.

2.      This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 42 U.S.C. § 1983.

3.      Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all facts alleged in this Complaint took place in Oakland County, Michigan, and the parties reside in the Eastern District of Michigan.

## PARTIES

4.      Griffen Lee Jones is currently 17 years old and, at the time of the tragic school shooting on November 30, 2021, was a junior at Oxford High School.

5.      Mason David Bourgeau is currently 18 years old and, at the time of the tragic school shooting on November 30, 2021, was a junior at Oxford High School.

6.      Gavin Michael Aldred is currently 17 years old and, at the time of the tragic school shooting on November 30, 2021, was a junior at Oxford High School.

7.      Summer Aubrey Aldred is currently 15 years old and, at the time of the tragic school shooting on November 30, 2021, was a freshman at Oxford High School.

9

8.     Lucas Anthony Ventline is currently 17 years old and, at the time of the tragic school shooting on November 30, 2021, was a senior at Oxford High School.

9.     John Michael Edwards is currently 15 years old and, at the time of the tragic school shooting on November 30, 2021, was a freshman at Oxford High School.

10.     Giselle Elisabeth Gillim is currently 15 years old and, at the time of the tragic school shooting on November 30, 2021, was a freshman at Oxford High School.

11.     Addyson Lynn Feltz is currently 15 years old and, at the time of the tragic school shooting on November 30, 2021, was a freshman at Oxford High School.

12.     Brooklyn Grier Flewelling is currently 15 years old and, at the time of the tragic school shooting on November 30, 2021, was a freshman at Oxford High School.

13.     Gianna Cruz Flewelling is currently 16 years old and, at the time of the tragic school shooting on November 30, 2021, was a sophomore at Oxford High School.

14.     Autumn Willena Green is currently 16 years old and, at the time of the tragic school shooting on November 30, 2021, was a sophomore at Oxford High School.

15.    Juleal Ali Cannon is currently 17 years old and, at the time of the tragic school shooting on November 30, 2021, was a senior at Oxford High School.

16.    Kayla Ann Marie Poblette is currently 15 years old and, at the time of the tragic school shooting on November 30, 2021, was a freshman at Oxford High School.

17.    Natalie Anne Soule is currently 17 years old and, at the time of the tragic school shooting on November 30, 2021, was a junior at Oxford High School.

18.    Henrique Porto Vaz is currently 17 years old and, at the time of the tragic school shooting on November 30, 2021, was a junior at Oxford High School.

19.    Christa Ann Hull is currently 17 years old and, at the time of the tragic school shooting on November 30, 2021, was a junior at Oxford High School.

20.    Tristan William Diem is currently 14 years old and, at the time of the tragic school shooting on November 30, 2021, was a freshman at Oxford High School.

21.    Payton Mackenzie Diem is currently 17 years old and, at the time of the tragic school shooting on November 30, 2021, was a senior at Oxford High School.

22.    Jordan Nichole Butler is currently 17 years old and, at the time of the tragic school shooting on November 30, 2021, was a senior at Oxford High School.

23.    All Plaintiffs reside in Oakland County, Michigan. As students enrolled at Oxford High School in the Oxford Community School District, all Plaintiffs have

a property interest, protected by the Due Process Clause of the Fourteenth Amendment, in a full public education, and they have standing to seek prospective equitable and injunctive relief from the Oxford Community School District's conduct to restore that property interest through court-ordered measures to bring Oxford Community School District's policies into compliance with the Constitution.

24.   All Plaintiffs reside in Oakland County, Michigan. As students enrolled at Oxford High School in the Oxford Community School District, all Plaintiffs have a clearly established right, protected by the Due Process Clause of the Fourteenth Amendment, to be free from danger created and/or increased by state actors, and they have standing to seek prospective equitable and injunctive relief from the conduct of all named Defendants to restore this right through court-ordered measures to implement safety policies and measures that are in compliance with the Constitution.

25.   Defendant Oxford Community School District ("Oxford CSD") is a municipal corporation, organized in the Township of Oxford, Michigan. Defendant Oxford CSD conducts all operations for Oxford High School, including but not limited to funding; staffing; training; supervising the staff, counselors, and teachers at Oxford High School; and maintaining the safety and security facilities for the education and welfare of students at Oxford High School.

26.     Plaintiffs are suing Defendant Oxford CSD pursuant to 42 U.S.C. § 1983 for its official policies, practices, and customs, which were the motivating force and cause-in-fact for the decision to return John Doe from the safety and security of the counseling office to the classroom on November 30, 2021.

27.     At all times relevant herein, Defendant Ken Weaver ("Weaver") is and was a citizen of the State of Michigan and is currently the Superintendent of Oxford Community School District. Plaintiffs are suing Defendant Weaver in his official capacity only. Plaintiffs are suing Defendant Weaver pursuant to 42 U.S.C. § 1983, for both prospective equitable and injunctive relief, as he is the highest-ranking official of Oxford Community School District and is responsible for ensuring the District's compliance with state and federal laws, including the Due Process Clause of the Fourteenth Amendment.

28.     At all times relevant herein, Defendant Steven Wolf ("Wolf") is and was a citizen of the State of Michigan and was acting under the color of state law within the course and scope of his employment as Principal of Oxford High School in the Oxford Community School District. Plaintiffs are suing Defendant Wolf pursuant to 42 U.S.C. § 1983 for actions taken under color of law.

29.     At all times relevant herein, Defendant Nicholas Ejak ("Ejak") is and was a citizen of the State of Michigan and was acting under the color of state law within the course and scope of his employment as Dean of Students of the Oxford

Community School District. Plaintiffs are suing Defendant Ejak pursuant to 42 U.S.C. § 1983 for actions taken under color of law.

30.     At all times relevant herein, Defendant Shawn Hopkins ("Hopkins") is and was a citizen of the State of Michigan and was acting under the color of state law within the course of his employment as a Counselor at Oxford High School in the Oxford Community School District. Plaintiffs are suing Defendant Hopkins pursuant to 42 U.S.C. § 1983 for actions taken under color of law.

## STATEMENT OF FACTS

**A. An essential element in the operation of a school district, as well as an integral role in the job function of school administrators, is the maintenance of school safety and the protection of students from deadly violence.**

31.     From 2009 to 2019, school shootings occurred in over 177 schools in the United States, resulting in 356 deaths.[1]  CNN's investigation into ten (10) years of shootings on K-12 campuses uncovered two truths: (1) school shootings are increasing, and (2) no type of community is spared.

32.     In 2021 alone, there were 202 incidents of gunfire on school grounds, resulting in 49 deaths and 126 injuries.[2]

---

[1] *Ten Years of School Shootings*, CNN (July 2019)
https://www.cnn.com/interactive/2019/07/us/ten-years-of-school-shootings-trnd/.
[2] *Gunfire on School Grounds in the United States*, EVERYTOWN RESEARCH & POLICY (2021)
https://everytownresearch.org/maps/gunfire-on-school-grounds/.

33.     It is well-established that, in previous mass shooting events, many shooters were suicidal before the attack commenced.[3]

34.     Specific to school shootings, a recent study of 134 schools and attempted school shootings found that 91% of the shooters were students or former students, 98% were males, 87% were in crisis prior to the shooting, and 80% were suicidal before the attack.[4]

35.     The State of Michigan, in recognition of the risks of school mass shootings and gun violence, has enacted legislation mandating school districts adopt school safety policies.  This legislation includes the Child Protection Law, MCL §777.621 (1975); Statewide School Safety Information Policy, MCL §380.1308 (1999); Mandatory incident reporting to state police for certain crimes occurring at school, MCL §380.1308a (2019); Liaison for school safety commission requirements, MCL §380.1241 (2019); Office of School Safety, MCL §28.681 (2019); Reporting of Crimes on the District's Website, MCL §38.1310a (2000); Student Safety Act, MCL §752.911 (2000); Save Our Students Act, MCL §380.1893 (2020); Searching Student Lockers, MCL §380.1306 (2000); and Student in Possession of a Dangerous Weapon, MCL §380.1313 (1987).

---

[3] Maggie Koerth, *Can We Prevent Mass Shootings By Preventing Suicide?* FIVETHIRTYEIGHT (Aug. 22, 2019), https://fivethirtyeight.com/features/can-we-prevent-mass-shootings-by-preventing-suicide/.
[4] *Key Findings: Analysis of School and Workplace Shootings*, THE VIOLENCE PROJECT, (2019 Data) https://www.theviolenceproject.org/mass-shooter-database-3/key-findings/.

36.     Tragically, gun violence in schools is a foreseeable risk that creates a duty in school officials to confront and deescalate known threats of violence at school, including school shootings.

37.     As a matter of state and federal law, an essential element within the duties of school administrators, teachers, and counselors is the minimization and/or elimination of the risk of gun violence within our schools.

**B. Defendants took affirmative acts that created and increased the danger of the school shooting at Oxford High School on November 30, 2021.**

38.     On November 30, 2021, John Doe ("Doe") was a fourteen-year-old tenth-grade student at Oxford High School.

39.     During the months leading up to the day of the school shooting, Oxford High School and Oxford CSD teachers, counselors, and administrators knew of Doe because of his various concerning behaviors, including but not limited to a depressed mood, a disheveled/unkempt appearance, minimal participation in his classes, and refusal to complete school assignments, which indicated psychiatric distress, suicidality, and the possibility of child abuse or neglect.

40.     In or around May 2021, Defendant videotaped himself torturing and killing animals, including a bird, which Doe decapitated. Doe proceeded to store the decapitated bird head inside of a jar.

41.     In or around August 2021, Doe videotaped himself holding a gun.  Doe then forwarded the video to an Oxford High School classmate, along with the

following message: "Now it's time to shoot up the school! JK JK JK."[5] At that time, in or around August 2021, the gun, a 22 caliber handgun, belonged to Doe's father.

42.     In or around Fall 2020, Doe's freshman year, Defendant Hopkins was assigned as Doe's school counselor at Oxford High School.[6]  Defendant Hopkins maintained the role of Doe's assigned counselor during Fall 2021, Doe's sophomore year at Oxford High School.

43.     Early in November 2021, Doe's Spanish teacher sent an email to Defendant Hopkins, explaining her concerns that Doe seemed "sad."[7]

44.     Defendant Hopkins conducted a check-in with Doe, advising Doe that Defendant Hopkins was available should Doe need to talk to someone.  In response, Doe looked at Defendant Hopkins and said, "okay."[8]

45.     Approximately four (4) weeks prior to the devastating school shooting, on November 4, 2021, a severed deer head was discovered on the grounds of Oxford High School.

---

[5] Transcript of Preliminary Examination, Vol. I, *The People of the State of Michigan v. James Robert Crumbley and Jennifer Lyn Crumbley*, (Nos. 21-006651-2; 2022-279989-90-FH) at 263:13-15.
at 45:24-46:4.
[6] Transcript of Preliminary Examination, Vol. II, *The People of the State of Michigan v. James Robert Crumbley and Jennifer Lyn Crumbley*, (Nos. 21-006651-2; 2022-279989-90-FH) at 108:7-11.
[7] *Id.* at 108:21-24.
[8] *Id.* at 109:1-7.

46.     At that time, Defendant Wolf sent an email to parents "to clarify some of the rumors that [had] started," advising there was "no present danger at Oxford High School." He then explained that, "*before* school began," administrators and staff "identified graffiti" written in "red acrylic paint," as well as "the head of a deer" that had "likely [been] struck from a vehicle." (Emphasis added).

47.     On social media platforms, such as TikTok, students at Oxford High School posted video footage of the red writing and of the deer head as a man, presumably a member of the administration or staff at Oxford High School, carried it across a courtyard at Oxford High School.

48.     This occurrence, despite the attempted assurances of student safety in Defendant Wolf's email and in large part due to the ambiguity that surrounded the abandonment of the severed deer head on school grounds, caused a level of concern and anxiety amongst students, parents, and teachers of Oxford High School.

49.     On November 11, 2021, Doe carried to Oxford High School a severed bird head, stored inside of a jar, and placed said jar inside the boys' bathroom.[9]

50.     Upon discovery of the above-mentioned jar, students reported the bird head to school administrators, including Oxford High School Principal, Defendant Wolf. Administrators of Defendant Oxford CSD concealed this information from both staff and parents within the Oxford CSD.

---

[9] *Id.* at 75:10-18.

51.     Doe wrote an entry in his journal, confirming that he was the individual who brought the severed bird head to Oxford High School.[10]  Cell phone records further document that Doe had recorded himself decapitating a bird.[11]

52.     Oxford High School has access to footage from internal surveillance cameras positioned throughout its hallways.[12]

53.     Had Defendant Oxford CSD conducted a reasonable investigation, it would have uncovered that Doe was the student responsible for the severed bird's head.

54.     The next day, November 12, 2021, Oxford High School administration sent an email to parents of Oxford High School students, stating: "Please know that we have received every concern shared with us and investigated all information provided . . . We want our parents and students to know that there has been no threat to our building nor our students."

55.     On or about November 16, 2021, multiple parents directly informed Defendant Principal Wolf of concerns about multiple severed animal heads at Oxford High School and about threats made to students on social media.

---

[10] *Id*. at 223:8-14.
[11] *Prelim. Exam. Tr*., vol. I, at 264:10-15.
[12] *Id.* at 223:24-224:1.

56.     Communications from parents to Defendant Wolf stated, in part: "I know it's been investigated but my kid doesn't feel safe at school . . . He didn't even want to go back to school today."

57.     In or around mid-November 2021, both students and parents at Oxford High School recognized the presence of a violent threat, but administrators of Defendant Oxford CSD dismissed the threat as not credible.

58.     Both students and parents at Oxford High School shared serious concerns about the multiple severed animal heads at Oxford High School and about posts and threats made to students on social media.

59.     On or about November 16, 2021, due to the above-mentioned concerns regarding student safety, many students voiced safety concerns to their parents, and, out of fear of violence and/or the occurrence of a shooting at Oxford High School, together students and parents made the decision that those students stay home from school that day.

60.     In response to reports from students, parents, and teachers, administrators of Defendant Oxford CSD persisted in their campaign to conceal and minimize threats to school safety.

61.     On November 16, 2021, Defendant Wolf emailed parents, stating: "I know I'm being redundant here, but there is absolutely no threat at the HS . . . large

assumptions were made from a few social media posts, then the assumptions evolved into exaggerated rumors."

62.     That same day, former-Superintendent Timothy Throne ("Throne") made an announcement on the school-wide loudspeaker at Oxford High School, instructing students to stop spreading rumors and to stop relying on information on social media, while also reassuring students that there were no threats that posed any danger to them at Oxford High School.

63.     At all relevant times, Throne, while acting as the Superintendent of Defendant Oxford CSD, discouraged students and parents from reporting, sharing, or otherwise discussing the threatening social media posts.

64.     At all relevant times, Defendant Wolf, while acting as the Principal of Oxford High School, directed the teachers and counselors to tell students to stop reporting, sharing, or otherwise discussing the threatening social media posts and the violent animal slaughter that was occurring at Oxford High School.

65.     Teachers and staff of Oxford High School did tell students to stop reporting, sharing, or otherwise discussing threatening social media posts and, on at least one occasion, threats of a school shooting at Oxford High School.

66.     At all relevant times, the respective actions of Throne and Defendant Wolf, in advising all students that there was no credible threat, demonstrated conduct

so reckless as to demonstrate a substantial lack of concern for whether an injury resulted.

67.    At all relevant times, students at Oxford High School were safer before Throne and Defendant Wolf respectively took action and advised each and every student there was no credible threat.  By virtue of their respective actions, Throne and Defendant Wolf each substantially increased the harm to all students at Oxford High School.

68.    At all relevant times, Doe's social media accounts were set to "public," allowing any person on the internet to view the contents, which largely depicted Doe's obsession with and unrestricted access to firearms.

69.    Upon information and belief, the content of Doe's social media accounts was known to fellow students, parents, and the Defendants prior to the shooting on November 30, 2021.

70.    On or around November 26, 2021, Doe received a Sig Sauer 9-millimeter semi-automatic handgun as a gift from his father.

71.    That same day, on or around November 26, 2021, Doe posted a picture of the gun to his public Instagram account with the caption: "[J]ust got my new beauty today [heart eyes emoji] Sig Sauer 9-millimeter. Any questions I will

answer."[13] This post was readily accessible to any person on the internet, including all Defendants.

72.    On November 27, 2021, Jennifer Crumbley posted a photo on her Facebook page of a target at the shooting range with the caption: "[M]om and son day testing out his new X-mas present."[14] This social media post referred to Doe firing his handgun.  Doe's mother's account was also set to "public," allowing any person on the internet to view the contents of her account, including the above-mentioned post from November 27, 2021.

73.    On the morning of November 29, 2021, one day before the school shooting, Doe's English teacher caught Doe using his cell phone, during school hours, to access the internet to search for information about ammunition.[15]

74.    Upon information and belief, Doe's conduct was in violation of a variety of school rules, procedures and policies, including Defendant Oxford CSD's "Technology Policy and Guidelines," as well as its "Acceptable Use Policy," which "[a]ll students sign [...] annually."[16]

75.    The "Acceptable Use Policy" is no longer accessible on Defendant Oxford CSD's website, even though, upon information and belief, any individual

---

[13] *Id.* at 193:10-18.
[14] *Prelim. Ex. Tr.,* vol. 1, at 208:16-20.
[15] *Prelim. Ex. Tr.*, vol. II, at 109:8-14.
[16] *Oxford Community Schools Student Code of Conduct*, Revised June 2021, page 23, https://cdn5-ss8.sharpschool.com/UserFiles/Servers/Server_733753/Image/2021-2022%20STUDENT%20CODE%20OF%20CONDUCT.pdf (last visited June 17, 2022).

was able to publicly access the policy prior to the school shooting on November 30, 2021.

76.   On the morning of November 29, 2021, Doe's Spanish teacher sent an email to Defendant Ejak and Pam Parker Fine ("Fine"), the Restorative Practices Coordinator of Defendant Oxford CSD, informing them both that Doe had been using his cell phone, during school hours, to access the internet to search for information about ammunition.[17]

77.   Doe's English teacher's above-mentioned email was then forwarded to Defendant Hopkins, Doe's assigned counselor.[18]

78.   Fine called Doe to her office. Fine then called Defendant Hopkins into her office to "be in the meeting as social/emotional support for [Doe]."[19]

79.   The duration of the meeting, which began at or around 9:00 a.m. on November 29, 2021, lasted approximately five minutes.[20]

80.   At that time, Defendant Hopkins and Fine provided limited support and/or guidance to Doe, as they informed Doe only that accessing the internet to search for ammunition on his cell phone during school hours was not "school appropriate behavior."[21]

---

[17] *Id.*
[18] *Id*. at 109:11-14.
[19] *Id.* at 109:16-19.
[20] *Id.* at 109:22-25.
[21] *Id.* at 110:1-11.

81.    In response, Doe explained to Defendant Hopkins and Fine that Doe had visited a gun range with his mother the previous weekend to shoot guns, that shooting guns was a hobby within Doe's family, and that Doe was merely researching information about his shooting hobby.[22]

82.    During the meeting, Doe was compliant, calm, understanding, and neither argumentative nor oppositional, demonstrating his obedience to authority.[23]

83.    At the conclusion of the meeting, Defendant Hopkins and Fine permitted Doe to return to class.[24]

84.    After the meeting, Fine called Doe's mother and left a voicemail message for Doe's mother.[25]

85.    In accordance with Defendant Oxford CSD's policy, Fine did not request a return call from Doe's mother because the situation did not present a disciplinary issue.[26]  Doe's mother did not return Fine's call.

86.    Later that day, Doe's mother sent a text to Doe, saying: "Seriously?? Looking up bullets in school??"  Doe responded: "Oh, yeah.  I already went to the

---

[22] *Id*. at 110:19-24.
[23] *Id*. at 110: 1-15.
[24] *Id*. at 111:21-23.
[25] *Id*. at 111:13-16.
[26] *Id*. at 137:12-17.

office for that."[27]  Doe's mother then asked: "Did you at least show them a pic of your new gun?"  Doe responded: "No."[28]

87.    Later that same evening, on November 29, 2021, Doe posted the following language to his public Twitter account: "Now I am become Death, the destroyer of worlds.  See you tomorrow Oxford."

88.    On the morning of November 30, 2021, the day of the school shooting, Doe returned to Oxford High School, carrying his gun and 48 rounds of ammunition in his backpack. Also in his backpack, Doe carried a personal journal, which contained 21 pages of his plans to carry out the school shooting.[29]

89.    In part, the journal stated: "First off, got my gun.  It's an SP2022 Sig Sauer 9-millimeter.  Second, the shooting is tomorrow, I have access to the gun and ammo."[30]  The journal also contained two separate drawings of bullets.  One drawing was labeled ".22," while the second drawing was labeled "9-millimeter."  Positioned next to the .22 drawing is the description "kill range, 25M, max"; depicted next to the 9-millimeter drawing is the description "kill range, 100M."[31] Also largely drawn within the pages of the journal is what appears to be a cup containing liquid, a severed bird head, and a demon drawn next to the cup.[32]

[27] *Prelim. Ex. Tr.,* vol. I, at 180: 17-25.
[28] *Id.* at 182: 12-18.
[29] *Prelim Ex. Tr.,* vol. II, at 223:2-224:20.
[30] *Id.* at 226:3-6.
[31] *Id.* at 226:10-16.
[32] *Id.* at 226:17-227:1.

90.     At approximately 8:30 a.m., a teacher in the English Department of Oxford High School sent an email to Defendant Hopkins, stating Doe was watching a video on his cell phone, during class time, that depicted a realistic shooting.[33]

91.     Doe's conduct in watching a video on his cell phone that depicted a realistic shooting, during school hours, was in violation of a variety of school rules, procedures, and policies.

92.     At approximately 8:50 a.m., Defendant Hopkins viewed the English teacher's above-mentioned email.[34]

93.     At approximately 8:59 a.m., Doe's math class participated in a test review.  On his math worksheet, Doe drew a picture of a Sig Sauer 9-millimeter handgun.  Underneath the gun, Doe wrote: "The thoughts won't stop.  Help me." To the right of those words, Doe drew a person with what appears to be two gunshot wounds, one placed in the chest and one in the abdomen, with blood coming from the person's mouth. On another area of the same worksheet, Doe wrote "blood everywhere" and drew a shell casing or bullet. On the bottom half of the worksheet, positioned below the above-mentioned writings and illustrations, Doe drew a laughing/crying emoji and wrote: "My life is useless" and "The world is dead." Upon

---

[33] *Id.* at 112:18-25.
[34] *Id.* at 112:25.

27

seeing these writings and illustrations, Doe's teacher took a picture of the worksheet and reported Doe's drawings.[35]

94.    Doe's drawings and statements were clearly violent and disturbing, were an obvious cry for help, and openly expressed Doe's thoughts of suicide and/or homicide.

95.    Later that morning, Doe altered his writings and illustrations on the worksheet.  After scratching out the drawings of the gun and of the person with two gunshot wounds, as well as scratching out the words "Help me," "Blood everywhere," "My life is useless," and "The world is dead," Doe added new, equally disturbing phrases to the worksheet. In an attempt to conceal the sinister content of his illustrations, Doe wrote: "Video game this is," "Harmless act," "I love my life so much!!!!," "OHS rocks!," and "Were [sic] all friends here."

96.    Defendant Ejak arrived to Defendant Hopkins' office at approximately 9:00 a.m. to inform Defendant Hopkins he had seen a picture of the writings and illustrations on Doe's math worksheet.[36]

97.    Thereafter, Defendant Hopkins walked to Doe's math classroom and removed Doe for a meeting in the counseling office.[37]

---

[35] *Id*. at 113:7-9.
[36] *Id.*
[37] *Id*. at 113:12-14.

98.     Defendant Hopkins took possession of the math worksheet from Doe's desk and escorted Doe to the counseling office, in which Defendant Ejak waited.[38]

99.     At this point, Doe's backpack remained in the classroom.

100.    Defendant Hopkins testified he was "concern[ed] about the student [Doe] because it was a couple of messages in a couple days, and the purpose of the meeting was to find out what our next steps would be."[39]

101.    At some point, either before or during the meeting, Defendant Ejak returned to the math classroom and retrieved Doe's backpack, which contained Doe's handgun and forty-eight (48) rounds of ammunition.[40]

102.    At no point did Defendants Ejak or Hopkins search Doe's backpack or locker to determine whether Doe was armed and dangerous.

103.    At no point did Defendants Ejak or Hopkins search Doe's backpack or locker to determine whether he had immediate access to a deadly weapon he could use to harm himself or others.

104.    During the meeting, Defendant Hopkins questioned Doe about the video of a realistic shooting he watched in class on the morning of November 30,

---

[38] *Id.* at 113:21-25.
[39] *Id*. at 115:2-5.
[40] *Id*. at 150:18-25.

2021. In response, Doe claimed the video he watched was of a video game, not an actual event.[41]

105.  Neither Defendants Ejak nor Hopkins attempted to watch the above-mentioned video to confirm the accuracy of Doe's representation of said video.[42]

106.  Defendants Ejak and Hopkins had actual knowledge of a safety threat and a concern for Doe's safety and well-being, given the events in the preceding months and days, which included Doe searching for bullets on his phone, informing Hopkins and Fine of his shooting hobby, viewing a video of a realistic shooting during English class, and drawing disturbing words and illustrations on his math assignment.

107.  During this meeting, Defendant Hopkins asked Doe about the disturbing words and illustrations he drew on his math assignment. Doe explained the drawings depicted a video game he wanted to design.  Doe gave no other explanation.[43]

108.  Defendant Hopkins knew Doe was not being truthful when Doe dismissed the words and illustrations as a video game design, as demonstrated by the fact Defendant Hopkins advised Doe that it "[did] not sound like a video game."[44]

---

[41] *Id* at 115:8-16.
[42] *Id.* at 139:8-15; 142:24-25; 153:8-10.
[43] *Id.* at 116:11-15.
[44] *Id.* at 116:15-20.

109.   Doe made no attempt to deny Defendant Hopkins's assertion that his drawings and words did not depict a video game. In that moment, Defendant Hopkins observed Doe's demeanor visibly change, and, as described by Defendant Hopkins, Doe "became sad . . . He started pausing more in his speech.  He then described some [upsetting] things that had happened recently in his life," including the death of a family dog, the death of a grandparent, the effect that COVID and virtual learning had on Doe, and the loss of a close friend who had to leave school.[45]

110.   At this point, Defendant Hopkins determined Doe was having suicidal ideations.[46]

111.   Defendant Hopkins proceeded to conduct a risk assessment, asking Doe if he was a threat to himself or others.[47]

112.   Doe simply stated, "I can see why this looks bad. I'm not going to do anything."[48]

113.   Rather than fully accept Doe's response, Defendant Hopkins appropriately concluded Doe was suicidal and "was a threat to himself in spite of his statement."[49]

---

[45] *Id.* at 116:22-117:10; 125:7-11.
[46] *Id.* at 117:14-16.
[47] *Id.* at 118:21-25.
[48] *Id.* at 125:1-3.
[49] *Id.* at 148:2-3.

114.    However, Defendant Hopkins failed to "ask any further questions about a plan."[50]

115.    In the year leading up to Defendant Hopkins's conversation with Doe, three (3) other students at Oxford High school who were assigned to Defendant Hopkins had made suicide attempts.[51]

116.    Defendant Hopkins then called Doe's mother, but Doe's mother did not answer the call. Defendant Hopkins left a voicemail message for Doe's mother.[52]

117.    Defendant Hopkins next called Doe's father, but it "was empty air when [he] called." Defendant Hopkins was not given the option to leave a voicemail message.[53]

118.    Doe's mother then returned Defendant Hopkins's call.[54]

119.    When he answered the call, Defendant Hopkins placed the call on speaker so that Doe, Defendant Ejak, and Defendant Hopkins could all listen to and/or speak with Doe's mother.[55]

120.    During the call with Doe's mother, Defendant Hopkins expressed he "was concerned about [Doe]."[56]

---

[50] *Id.* at 125:16.
[51] *Id.* at 119:5-10.
[52] *Id.* at 120:15-18; 121:7-8.
[53] *Id.* at 121:10-12.
[54] *Id.* at 121:9-14.
[55] *Id.* at 121:15-18.
[56] *Id.* at 122:23-24.

121. Defendant Hopkins then requested that Doe's mother come to Oxford High School for an in-person meeting.[57]

122. Doe's mother expressed she was at work and would try to get in contact with Doe's father.[58]

123. Doe's mother later called back, stating she would arrive at Oxford High School in a half hour. [59]

124. While awaiting the arrival of Doe's parents, Defendant Hopkins remained in the counseling office with Doe because Defendant Hopkins knew Doe was suicidal and "did not want to leave him alone."[60]

125. At approximately 10:30 a.m., Doe's mother and father both arrived at the Oxford High School.[61]

126. When Doe's parents arrived, Defendant Hopkins texted Defendant Ejak to return to Defendant Hopkins's office for a meeting.[62]

127. Upon their arrival, Doe's parents did not greet, touch, or hug Doe, and they did not seem friendly or show care and/or concern for their child, Doe. This

---

[57] *Id*. at 123: 9-10.
[58] *Id*. at 123:11-13.
[59] *Id.* at 123:20-24.
[60] *Id*. at 124:14-15.
[61] *Id.* at 124:7-13.
[62] *Id*. at 126: 4-5.

conduct struck Defendant Hopkins as abnormal, as it was different from that of other like meetings that he had conducted with a student and his or her parents.[63]

128.  During the meeting with Doe and his parents, Defendant Hopkins expressed his concerns for Doe's well-being, including Defendant Hopkins's conclusion that Doe was suicidal.[64]

129.  Neither Defendant Hopkins nor Defendant Ejak questioned Doe's parents about Doe's access to a gun, despite the fact Doe had searched for bullets on his phone, had discussed his shooting hobby with Defendants, had viewed a video of a realistic shooting during English class, had depicted a gun and a wounded person on his math worksheet, and had suicidal presentation.

130.  Defendant Hopkins provided Doe's family with a list of resources for mental health support and emphasized the need for Doe to start counseling immediately, "today if possible."[65]

131.  In specifying Doe should receive prompt assistance, "today if possible," Defendant Hopkins signified he knew of Doe's immediate threat to himself and to others.

---

[63] *Id.* at 126:11-22.
[64] *Id.* at 127:13-17.
[65] *Id.* at 128:3-10.

132.   In response to Defendant Hopkins's instructions, Doe's mother stated that "[t]oday is not possible. We have to return to work." [66]

133.   Defendant Hopkins testified he was "taken aback" because he had never previously experienced a student's parent(s) arrive to the school, appear at such a meeting, and deny the counselor's advice to take the student home as requested.[67]

134.   Defendant Hopkins then stated to Doe's parents that, within forty-eight (48) hours, he wanted Doe to be seen for mental health counseling, explaining that Defendant Hopkins would follow up to ensure Doe's parents had followed his instructions and had obtained counseling for Doe.[68]

135.   Defendant Hopkins warned Doe's parents that, should they fail to obtain counseling for Doe, Defendant Hopkins would report Doe's parents to Child Protective Services ("CPS").[69]

136.   In making this demand, Defendants Hopkins and Ejak evidenced their awareness that, at a minimum, Doe was a threat to himself and others and that any

---

[66] *Id.* at 128:17-18.
[67] *Id*. at 129:21-130:6.
[68] *Id*. at 130:4-7.
[69] Letter from Superintendent Throne to Oxford Wildcat Nation dated December 4, 2021, page 2, https://www.oxfordschools.org/for_parents___students/2021-22_district_communications/december_4__update_from_supt__throne (last accessed June 17, 2022).

failure to urgently address Doe's mental health condition was criminal abuse and/or neglect.

137.    Defendant Hopkins testified his "primary concern" was that he did not want Doe to be alone, but he did not feel confident Doe's parents would obtain counseling for Doe, as Defendant Hopkins had instructed them to do.[70]

138.    Defendants Ejak and Hopkins knew that the refusal of Doe's parents to address this emergent medical need was evidence of child abuse and/or neglect and was of the kind that needed to be reported immediately under Michigan's Child Protection Act, MCL § 722.623, et seq.

139.    Based on the facts and circumstances known to them at the time, as outlined above, Defendants Ejak and Hopkins knew Doe was suicidal.

140.    Further, Defendants Ejak and Hopkins knew or should have known that Doe had expressed homicidal ideation and that he presented a substantial risk of deadly harm to others.

141.    According to Defendant Hopkins, the meeting ended abruptly with Doe's mother asking, "are we done?"[71]

142.    In response, Defendant Hopkins looked to and asked Defendant Ejak "if there was any disciplinary reason why [the] student could not return to class."[72]

---

[70] *Prelim Ex. Tr.,* vol. II, at 130:11-18.
[71] *Id.* at 132:1-3.
[72] *Id.* at 132:5-7.

143.   Ejak responded "no."[73]

144.   However, Doe's conduct—in using his cell phone during school hours to access the internet to look up information about ammunition on November 29, 2021, and in using his cell phone again during school hours to watch a video of a realistic shooting on November 30, 2021—was in violation of a variety of school rules, procedures, and policies.

145.   Defendant Hopkins then responded to Doe's mother, stating, "I guess so."[74]

146.   In his testimony, Defendant Hopkins affirmed he "could have stated that" Doe "has to leave."[75]

147.   Defendant Hopkins testified Doe was "showing signs of needing help, of needing support," but that Doe "got the opposite" from him parents.[76]

148.   The meeting between Defendant Ejak, Defendant Hopkins, Doe's parents, and Doe lasted "[l]ess than 15 minutes."[77]

149.   Despite having spoken with Doe the day prior and having learned of Doe's access to firearms and Doe's shooting hobby, and after also having gained knowledge of Doe's suicidal and homicidal ideations, Defendants Ejak and Hopkins,

---

[73] *Id.* at 132:8-9.
[74] *Id.* at 132:13-14.
[75] *Id.* at 148:18-21.
[76] *Id.* at 132:24-133:2.
[77] *Id.* at 131:4-5.

upon deliberation on the next course of action, determined Doe could return to class, which Doe did do, and wrote a "pass back to class" for Doe.[78]

150.   In doing so, Defendants Ejak and Hopkins returned Doe's backpack to Doe without searching its contents.[79]

151.   At the time they returned Doe's backpack, Defendants Ejak and Hopkins had just cause to either inspect the contents of the backpack or, if they felt such just cause did not exist, to withhold the backpack from Doe until proper authority could be provided for them to inspect the backpack themselves or to have law enforcement inspect the backpack.

152.   Defendants Ejak and Hopkins made the deliberate decision to return Doe to the classroom with possession of Doe's unsearched backpack, despite having knowledge that the meeting with Doe's parents worsened Doe's emotional and psychiatric condition, that Doe was obsessed with firearms and gun violence, that Doe had recently searched for bullets the day prior, that Doe had watched videos depicting realistic shootings earlier that same morning, and that Doe's writings and illustrations earlier that same morning had depicted graphic gun violence and death. The deliberate decisions of Defendants Ejak and Hopkins shocks the conscience and demonstrates deliberate indifference to the safety of students at Oxford High School.

---

[78] *Id.* at 132:17-18.
[79] *Id*. at 151:20-25; 153:5-7.

153.   Because Defendant Hopkins "wanted to make sure [Doe] was never alone," he "checked to make sure that [Doe] was being marked present for his classes."[80]

154.   Defendants Ejak and Hopkins knew that threatening to call Child Protective Services within forty-eight (48) hours, and that threatening to remove Doe from his parents' home, without taking any real action, would create the danger and/or increase the likelihood that, if Doe had violence in mind, Doe would act before losing the opportunity to do so.

155.   Defendants Ejak and Hopkins knew that, because Doe was suicidal and because the facts established probable cause to know Doe posed a threat to himself and others, Doe should be supervised in a safe setting and should not be left alone.

156.   Defendants Ejak and Hopkins, as school administrators, had the authority to maintain Doe in a safe, secure, restricted environment in the counseling office based on the disciplinary reason that Doe's conduct—in using his cell phone during school hours to access the internet to look up information about ammunition on November 29, 2021, and in using his cell phone during school hours to watch a video of a realistic shooting on November 30, 2021—was in violation of a variety of school rules, procedures, and policies.

---

[80] *Id.* at 134:2-12.

157.    Defendants Ejak and Hopkins, as school administrators, had the authority to maintain Doe in a safe, secure, and restricted environment in the counseling office, in which space, and based on the assessment that he was suicidal, adults could have supervised Doe, and Doe would not have had access to weapons that he could use to harm himself or others.

158.    Instead, Defendants Ejak and Hopkins used their authority and affirmatively acted to return Doe to class with his backpack, despite having knowledge Doe was suicidal and that Doe posed a substantial threat to himself and others.

159.    Defendants Ejak and Hopkins misused their authority by sending Doe back through the school to his third period class, alone, and by allowing Doe to return to class with his unsearched backpack, which contained Doe's handgun and forty-eight (48) rounds of ammunition.

160.    Defendants Ejak and Hopkins deliberately conducted the meeting with Doe and his parents to the exclusion of the police school liaison officer, thereby preventing the police school liaison officer from being present at the meeting and from taking action to prevent the mayhem that followed.

161.    Because Defendant Hopkins knew Doe was suicidal, Defendant Hopkins used the school's attendance reporting system to remotely track Doe

through the day and to see if Doe had been checked in as "present" for his third and fourth period classes.[81]

162.   Defendants Ejak and Hopkins, despite knowing Doe was suicidal and was a threat to himself, despite his statement to the contrary,[82] concealed those facts from Doe's teachers, as well as from the school's police liaison officer, and further concealed from Doe's teachers and the school's police liaison officer both the fact Doe should not be left alone and the threat Doe posed to himself and others.[83]

163.   Less than two hours after Defendants Ejak and Hopkins released Doe from the safe, secure, restricted environment in the counseling office, Doe carried his backpack into a bathroom and loaded his handgun.

164.   Doe first shot a student inside the bathroom before emerging into the hallway of Oxford High School, at which time he began to fire his handgun and shoot at students.

165.   Doe would ultimately kill four students and seriously injure seven others.

166.   All Plaintiffs were present at Oxford High School on the day of November 30, 2021, and at the time of the shooting.

---

[81] *Prelim Ex. Tr.*, vol. II, at 134:2-12.
[82] *Id.* at 148:2-6.
[83] *Id*. at 158:19-22.

167.   All Plaintiffs survived the horrific shooting, by way of hiding in the classrooms and bathrooms, running through the hallways, and/or fleeing the premises of Oxford High School.

168.   At approximately 12:52 p.m., the authorities were notified of an active shooter at Oxford High School.

169.   Upon information and belief, law enforcement halted Doe's shooting rampage when they apprehended Doe.

170.   Many students, including several Plaintiffs, were classmates and close friends with the victims of the school shooting on November 30, 2021.

171.   Many students, including several Plaintiffs, who were present in the hallway in which the tragic massacre took place, witnessed friends and classmates as they were shot, injured, and/or killed.

172.   Law enforcement escorted many students, including several Plaintiffs, who were hiding in classrooms and bathrooms as the tragic massacre took place, out of the building and advised students to stare at the wall as they walked by the bodies of the victims of the fatal school shooting.

173.   All Plaintiffs incurred and continue to live with severe emotional damage and psychological harm that resulted in physical manifestations, such as fright, shock, and terror; conscious pain and suffering; emotional distress; mental

anguish; Post-Traumatic Stress Disorder; depression and anxiety; disruption of their lives; and humiliation and/or mortification.

174.   On December 1, 2021, Doe was arraigned and charged as an adult with one count of terrorism causing death, four counts of first-degree murder, seven counts of assault with intent to murder, and twelve counts of possession of a firearm in the commission of a felony.

175.   The environment before Defendants Ejak and Hopkins affirmatively acted to release Doe to the classroom was a status quo of safety, as Doe was safely and securely restricted to the counseling office, was under the direct supervision of school administrators, and did not have access to weapons.

176.   Defendants Ejak and Hopkins had the official authority to act as "gatekeepers" in deciding whether to release Doe from the safe, secure, and restricted environment in the counseling office and to return Doe to the classroom with his backpack.

177.   Defendants Ejak and Hopkins used their authority to return Doe to the classroom, causing a departure from the status quo of safety, thus creating and increasing a risk of violence that did not exist prior to the affirmative acts of Defendants Ejak and Hopkins.

178.   The affirmative acts of Defendants Ejak and Hopkins, which departed from the status quo of safety, rendered the occupants of Oxford High School,

including all Plaintiffs, more vulnerable to danger than they would have been had Defendants Ejak and Hopkins not affirmatively acted to return Doe to the classroom from the safe, secure, and restricted environment in the counseling office.

179.   Moreover, the meetings, which Defendants Ejak and Hopkins conducted on the morning November 30, 2021, worsened the situation and affirmatively increased and accelerated the danger of harm to the occupants of Oxford High School, including all Plaintiffs.

180.   The meetings, which Defendants Ejak and Hopkins conducted on the morning of November 30, 2021, worsened the situation and were a contributing cause-in-fact of the shooting because the meetings placed direct pressure on Doe, who was experiencing a mental health crisis and whom Defendants Ejak and Hopkins knew to be in a state of suicidal and homicidal ideation.

181.   Furthermore, the meetings, which Defendants Ejak and Hopkins conducted on the morning of November 30, 2021, directly subjected Doe to the shame, fear, humiliation, and/or embarrassment by way of Doe's parents choosing to ignore, ridicule, and/or embarrass Doe in the presence of Defendants Ejak and Hopkins, thus increasing the risk of Doe acting with violence upon his release from the safe, secure, and restricted environment in the counseling office to the greater school environment.

182.   The decision of Defendants Ejak and Hopkins to conduct the meetings with Doe's parents, while in Doe's presence, was inappropriate and certain to exacerbate Doe's feelings of distress and anger.

183.   The actions of Defendants Ejak and Hopkins in threatening to call CPS on Doe's parents, while in Doe's presence, and thereby threatening the removal of Doe from his home, exacerbated Doe's distress and mistreatment at the hands of Doe's parents, which thereby created and increased the danger that Doe would act on his violent ideations upon the affirmative acts of Defendants Ejak and Hopkins to release Doe from the safe, secure, and restricted environment in the counseling office to the greater school environment.

184.   The affirmative acts of Defendants Ejak and Hopkins to return Doe's unsearched backpack, which contained Doe's handgun and forty-eight (48) rounds of ammunition, to Doe and to release Doe into the greater school environment placed the occupants of Oxford High School, including all Plaintiffs, directly in harm's way and provided Doe with the weapon and ammunition he used to commit the deadly shooting.

185.   By giving Doe the unsearched backpack, which contained Doe's handgun and forty-eight (48) rounds of ammunition, and by releasing Doe from the safe, secure, and restricted environment in the counseling office to the greater school environment, Defendants Ejak and Hopkins affirmatively set into motion the

45

shooting that ensued, acting with deliberate indifference to the substantial and obvious threat of a school shooting and with recklessness demonstrating deliberate indifference and a substantial lack of concern for whether an injury resulted, either to Doe or to the occupants of Oxford High School.

186.   Defendants Ejak and Hopkins affirmatively acted to conceal information by not informing either Doe's teachers or the police school liaison officer of the situation, including the fact Doe was suicidal, which thereby created and increased the danger that Doe would act on his violent ideations.

187.   The fact Defendants Ejak and Hopkins took the above-mentioned affirmative actions, despite their knowledge that Doe was suicidal and was expressing specific violent ideations about gun violence, is shocking to the conscience.

188.   Based on the knowledge the Oxford Defendants possessed, prior to the occurrence of the violent shootings on November 30, 2021, the fact Doe would carry out acts of violence against all occupants of Oxford High School, including all Plaintiffs, was foreseeable to the Oxford Defendants.

189.   The affirmative actions of Defendants were reckless, grossly negligent, shocked the conscience, and placed all occupants of Oxford High School, including all Plaintiffs, at substantial risk of serious and immediate harm.

190.    Defendants knew that their actions would endanger the lives of Oxford High School students, including those of all Plaintiffs, and the lives of other occupants of Oxford High School on November 30, 2021.

**C. Defendant Oxford CSD, in accordance with its illegal policies, practices, and customs, engaged in a concerted cover story to deflect responsibility for the Oxford High School Shooting.**

191.    Since the day of this tragic shooting, Defendant Oxford CSD and its administrators have tirelessly manufactured a cover story to justify the decision to release Doe from the counseling office—where he was safely and securely restricted, where his movement and actions were restricted, where he was under the direct supervision of school administrators, and where he did not have access to weapons— and to allow Doe to return to class, despite having knowledge Doe was experiencing a mental health crisis, was obsessed with guns and gun violence, had access to firearms, and was determined to be a threat to himself and others.

192.    Defendant Oxford CSD has specifically sought to avoid accountability by claiming it has a formal policy and practice of returning students to class unless there exists a "disciplinary" issue.

193.    Under this policy, Defendant Oxford CSD claims that only when a "disciplinary" issue presents itself can the administrators send a student home or hold a student in the counseling office.

47

194.   In the present case, Defendant Oxford CSD alleges that because Doe did not present a "disciplinary" issue Defendant Oxford CSD had no choice but to return Doe to class.

195.   This policy, in addition to Defendant Oxford CSD's continuous use of false justifications, demonstrates egregious deliberate indifference to the danger presented to a school when administrators return a student whom school administrators knew to be suicidal and who presented a clear threat, such as Doe, to the greater school environment.

196.   Furthermore, upon information and belief, even if the school policy sounded in appropriate justifications, Doe's conduct did present a "disciplinary" issue when he used his cell phone during school hours to access the internet to look up information about ammunition on November 29, 2021, and when he used his cell phone during school hours to watch a video of a realistic shooting on the same day as the meetings, November 30, 2021, in violation of a variety of school rules, procedures, and policies

197.   Defendant Oxford CSD has consistently maintained its development of this false narrative in an effort to avoid accountability.  On December 2, 2021, former Superintendent Throne issued a video message to the Oxford Community, suggesting that, while the "front office" did have contact with Doe before the attack, Defendant Oxford CSD and its administrators could not detain Doe because, and in

accordance with school policy, discipline was not warranted. Specifically, Throne stated, "I want you to know there's been a lot of talk about the student who was apprehended. That he was called up to office and all that kind of stuff. No discipline was warranted.  There are no discipline records [for Doe] at the High School.  Yes, this student did have contact with our front office.  And yes, his parents were on campus on November 30th."[84]

198.   Throne's above statement was deliberately misleading because of what it fails to communicate.  Throne knew that, on the morning of the shooting, school staff and administrators deemed Doe to be suicidal; Throne knew that, upon gaining knowledge of Doe's suicidal ideations, school staff and administrators affirmatively acted to release Doe from the counseling office where he was safely and securely restricted, where his movement and actions were restricted, where he was under the direct supervision of school administrators, and where he did not have access to weapons; and Throne knew that staff and administrators of Defendant Oxford CSD affirmatively acted to return Doe to class, despite having knowledge Doe was experiencing a mental health crisis, was obsessed with guns and gun violence, had

---

[84] Tim Throne, *Superintendent of Oxford Community Schools, December 2, 2021 Message to Oxford Community*, ABC12 (December 2, 2021), https://www.abc12.com/tim-throne-superintendent-of-oxford-community-schools-december-2-2021-message-to-oxford-community/video_8b3c9912-5436-11ec-a344-5f875adc8e6e.html (last visited May 27, 2022).

access to firearms, and was determined by staff and administrators of Defendant Oxford CSD to be a threat to himself and others.

199.   On or about December 4, 2021, Throne wrote a letter to the parents of students at Oxford High School.  At this point, Defendant Oxford CSD's misleading narrative became completely contrived.  In describing the unfolding of events that occurred on the morning of November 30, 2021, while Doe was present in Defendant Hopkin's office, Throne stated that at "no time did the counselors believe the student might harm others based on his behavior, responses and demeanor, which appeared calm."  At the time he made this statement, Throne knew it was false. Even so, Throne continued in his letter, stating, "[w]hile both of his parents were present, counselors asked specific probing questions regarding the potential for self-harm or harm to others. His answers, which were affirmed by his parents during the interview, led counselors to again conclude he did not intend on committing either self-harm or harm to others.  The student's parents never advised the school district that he had direct access to a firearm or that they had recently purchased a firearm for him."[85]

---

[85] Letter from Superintendent Throne to Oxford Wildcat Nation dated December 4, 2021, page 2, https://www.oxfordschools.org/for_parents___students/2021-22_district_communications/december_4__update_from_supt__throne (last accessed June 17, 2022).

200. Again, the above assertion was false. In stark contrast to the contents of Throne's letter, Defendant Hopkins determined Doe was suicidal on November 30, 2021, and was fully aware Doe was experiencing a mental health crisis, was obsessed with guns and gun violence, had access to firearms, and was a threat to himself and others. Throne's above statement was deliberately misleading because, when Throne made these assertions, he knew they were false.

201. On page one of Throne's letter from December 4, 2021, Throne claims he "asked for a third-party investigation be [sic] conducted so we leave no stone unturned, including any and all interaction the student had with staff and students." Towards the end of his letter, Throne reiterated the above statement, claiming, "[a]gain I have personally asked for a third-party review of all the events of the past week because our community and our families deserve a full, transparent accounting of what occurred."[86]

202. On December 4, 2021, Attorney General Dana Nessel sent an email to then-Superintendent Throne, offering to perform a complimentary review and an independent investigation of the events leading up to the tragic shooting on

---

[86] *Id.*

November 30, 2021, and stating her department was the "perfect agency" to conduct the investigation.[87]

203.   Attorney General Nessel explained she "didn't want to see the school district bring in a private law firm … where they are the client," elaborating that such reviews are "not fully independent investigations."[88]

204.   The next day, on December 6, 2021, Defendant Oxford CSD announced it was not going to accept Attorney General Nessel's offer for a complimentary independent investigation.

205.   In or around January 2022, the National Center for School Safety ("NCSS"), located in Ann Arbor, Michigan, offered to assist Oxford High School. NCSS is a national program "focused on improving school safety and preventing school violence."[89]

206.   Despite parents and students at Oxford High School having plead with administrators and members of the school board to accept offers from programs that focus on threat assessments, Defendant Oxford CSD failed to respond to NCSS's complimentary offer.

---

[87] *Nessel offers to conduct AG investigation into Oxford school shooting*, The Detroit News, https://www.detroitnews.com/story/news/local/oakland-county/2021/12/05/oxford-high-school-shooting-nessel-ag-review/8878611002/ (last visited June 17, 2022).
[88] *Id.*
[89] *National Center for School Safety*, https://www.nc2s.org (last visited June 17, 2022).

207.   On January 24, 2022, Oxford High School reopened for in-person learning. In preparation for the return of its students, Defendant Oxford CSD replaced the carpet, added a fresh layer of paint, and blocked off the boys' bathroom in which the school shooting began on November 30, 2021.

208.   On January 24, 2022, students at Oxford High School, including Plaintiffs, returned to the same building, passed under the same doors, and walked through the same hallway in which the tragic shooting took place on November 30, 2021.

209.   To date, each time students at Oxford High School attend class, they return to the same building, pass under the same doors, and walk through the same hallway in which the tragic shooting took place on November 30, 2021.

210.   On April 19, 2022, Attorney General Dana Nessel sent a letter to the Oxford Board of Education, renewing her "offer to perform an independent investigation of the events that transpired on November 30th," the costs of which would be "borne solely by [her] office." Attorney General Nessel requested a response to be communicated by May 20, 2022.[90]

---

[90] Letter from Attorney General Dana Nessel to Oxford Board of Education dated April 10, 2022, page 1, https://www.michigan.gov/ag/-/media/Project/Websites/AG/releases/2022/April/LtrOxfordBdEd41922_751181_7.pdf?rev=4629422cbadc49858106eed32f24c9ca&hash=15936B35B43CCB9215F09543B6383AEF (last accessed June 17, 2022).

211.   On or around May 10, 2022, Defendant Oxford CSD rejected Attorney General Nessel's offer for a complimentary independent investigation, claiming a third-party review "of the tragedy and associated events of November 2021 [would] not occur until the criminal and civil litigations are complete," explaining "it would be ill-advised for [the Oxford school board] to start a third-party review about what happened that day when [they] don't know all the facts."[91]

212.   During the Oxford school board meeting on May 10, 2022, students and parents voiced their frustrations with Defendant Oxford CSD's decision to refuse Attorney General Nessel's above-mentioned offers and with its lack of transparency.[92]

213.   On May 17, 2022, after denying two complimentary offers and hearing the concerns of its students and parents, Defendant Oxford CSD "agreed upon outside firms for a third-party review of the events surrounding the Oxford High School shooting in November." The Oxford school board "unanimously voted to hire Varnum, a Grand Rapids-based law firm, and Guidepost Solutions to conduct the review."[93]

---

[91] *Oxford school board rejects AG's 2nd offer to investigate deadly shooting*, WXYZ-TV Detroit, https:// www.youtube.com/watch?v=yqNWF91qO5s (last accessed June 17, 2022).
[92] *Id.*
[93] *Oxford Community Schools hires outside firms for third-party review of shooting*, Michigan Radio (May 18, 2022), https://www.michiganradio.org/education/2022-05-18/oxford-community-schools-hires-outside-firms-for-third-party-review-of-shooting (last visited June 17, 2022).

214.   Students and parents at Oxford High School join Attorney General Nessel in her concerns that Defendant Oxford CSD's decision to hire outside firms, only after refusing multiple complimentary offers of independent third-party reviews, will allow them to "maintain attorney-client privilege with elected members" and will, therefore, have "the ability to stop short of full transparency."[94]

215.   On June 13, 2022, Attorney General Nessel sent a letter to Defendant Oxford CSD, requesting that it "reconsider its rejections of her offer to review the events leading up to the" school shooting on November 30, 2021.[95] In her letter, Attorney General Nessel further offered Defendant Oxford CSD "the use of a dog trained to detect explosives and firearms along with a handler at the high school next school year."[96]

216.   On or around June 15, 2022, Defendant Oxford CSD "reportedly rejected Nessel's third offer to revive the events leading up" to the school shooting.[97] Unsurprisingly, Defendant Oxford CSD also "turned down [Attorney General

---

[94] *Id.*

[95] *Nessel offers Oxford schools weapon-detecting dog, renews effort to review mass shooting*, The Detroit News (June 13, 2022), https://www.detroitnews.com/story/news/local/oakland-county/2022/06/13/nessel-offers-oxford-schools-weapon-detecting-dog-review-shooting/7614773001/ (last visited June 17, 2022).

[96] *Id.*

[97] *Michigan AG Nessel: Oxford School Board Rejects Offer To Provide Weapon Detection Dog*, CBS Detroit (June 15, 2022), https://www.detroit.cbslocal.com/2022/06/15/michigan-ag-nessel-oxford-school-board-rejects-offer-to-provide-weapon-detection-dog/ (last visited June 16, 2022).

Nessel's] offer of a free school safety dog, trained and handled by some of the best professionals in the business."[98]

217.   To date, Defendant Oxford CSD has not fulfilled its pledge of full transparency to the students and parents at Oxford High School and to the greater Oxford Community.

## COUNT I: PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF FOR VIOLATION OF CIVIL RIGHTS UNDER 14TH AMENDMENT DUE PROCESS AND 42 U.S.C. § 1983, § 1988 ALL PLAINTIFFS AGAINST DEFENDANTS OXFORD CSD AND WEAVER

218.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

219.   As citizens and/or legal residents of the United States, Plaintiffs were entitled to all rights, privileges, and immunities accorded to all citizens and/or legal residents of the State of Michigan and of the United States.

220.   The Fourteenth Amendment of the United States Constitution, as enforced under 42 U.S.C. § 1983, forbids state actors from depriving any person of life, liberty, or property without due process of law.

221.   Based on the provisions of Michigan law regarding public education, the students of Defendant Oxford CSD, including all Plaintiffs, have a

---

[98] *Id.*

constitutionally protected right to a public education, which is protected as a property interest under the Due Process Clause of the Fourteenth Amendment.

222.   Defendants Oxford CSD and Superintendent Weaver must exercise their authority in the operations of the Oxford Community School District to be consistent with constitutional safeguards.

223.   As alleged in this Complaint, Defendants took affirmative state actions that, in accordance with official policy of Defendant Oxford CSD, created the danger of deadly violence at Oxford High School and that caused the shooting at Oxford High School on November 30, 2021, to occur.

224.   All Plaintiffs were students at Oxford High School and were attending and going about their usual days as students at Oxford High School when the shooting began on November 30, 2021.

225.   Oxford High School remained closed, and its surviving students, including all Plaintiffs, were completely deprived of their constitutional right to a public education from November 30, 2021, until January 24, 2022.

226.   Since the reopening of Oxford High School, on January 24, 2022, Defendant Oxford CSD, as well as Throne, the former Superintendent, and Defendant Weaver, the current Superintendent, have failed to remedy the unconstitutional policies and customs that caused the shooting to occur, therefore,

depriving the students at Oxford High School, including all Plaintiffs, of the full and equal enjoyment of their property right to a public education.

227. To date, Defendant Oxford CSD has failed to take any measures to restore the property right of the students at Oxford High School, including all Plaintiffs, to the full and equal enjoyment of a public education at Oxford High School.

228. Defendant Oxford CSD's failure to fully restore the property right of students at Oxford High School, including all Plaintiffs, to a public education include but are not limited to the following:

   a. After the shooting, through then-Superintendent Throne, Defendant Oxford CSD promised it would complete a thorough and independent investigation to review its actions and the events leading to the shooting. Since then, Defendant Oxford CSD has denied Attorney General Nessel's offers of a complimentary transparent third-party review; has ignored offers from other organizations, such as NCSS, to provide assistance for the return to school and for the implementation of safety policies and/or procedures; and, while it has hired a private firm, Defendant Oxford CSD has failed to conduct a transparent third-party investigation, as promised;

   b. Defendant Oxford CSD maintains its unconstitutional policy of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy is maintained, Defendant Oxford CSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;

c. Defendant Oxford CSD maintains a policy of failing to train administrators that they can restrict suicidal students from returning to the classroom;

d. Defendant Oxford CSD maintains a policy of failing to train administrators on how to complete a thorough and effective risk assessment for suicidal students;

e. Defendant Oxford CSD maintains a policy of permitting its staff and administrators to refrain from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

f. Since the shooting, Defendant Oxford CSD has engaged in a concerted cover story of its actions leading to the shooting. This includes, and is not limited to, asserting in court proceedings and in that media that it properly returned Doe to the classroom on November 30, 2021, despite knowing he was suicidal, because his case did not present a "disciplinary issue" that would warrant keeping him in the counseling office that day; and

g. Since the shooting, Defendant Oxford CSD has engaged in a concerted cover story of the percentage of and frequency at which students at Oxford High School attend school since the return of in-person classes on January 24, 2022, as many students, including all Plaintiffs, continue to live with the fear of another school shooting.

229.   Due to the failure of Defendants Oxford CSD and Weaver to restore the full property interest of students to a public education, Plaintiffs have suffered and will continue in the future to suffer irreparable harm, including but not limited to: (a) fright, shock, and terror; (b) loss of trust; (c) conscious pain and suffering; (d) emotional distress; (e) mental anguish; (f) Post-Traumatic Stress Disorder; (g)

depression and anxiety; (h) disruption of their lives; and (i) humiliation and/or mortification.

230.   To redress and remedy these unconstitutional practices, Plaintiffs request the following prospective and injunctive relief:

a.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately conduct an independent and fully transparent third-party investigation of the events that transpired prior to the school shooting on November 30, 2021;

b.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately cease its policy, practice, and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

c.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately reform its policy of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy is maintained, Defendant Oxford CSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;

d.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately reform its policy, practice, and/or custom of offering information that falls short of full transparency to parents and students, especially when such information concerns potential threats of safety and violence to the students and occupants at Oxford High School;

e.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately reform its policy, practice,

and/or custom of permitting its staff and administrators to refrain from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

f.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators and staff by way of contacting an organization, such as NCSS, to provide assistance for the return to school and for the implementation of safety policies and/or procedures before the start of the coming 2022-2023 school year at Oxford High School;

g.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators to understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat of harm to themselves or others;

h.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators on how to conduct a proper risk assessment when students are suicidal;

i.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators to ask students and family members whether a students owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

j.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators and other staff as to when and how to conduct a legal search of student belongings, including backpacks and lockers;

k.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to publicly retract all statements made in the course of its cover story after the shooting, including a retraction of all statements suggesting that Defendants Hopkins and Ejak acted properly in releasing Doe from the counseling office and returning

him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

l. All other prospective equitable and injunctive relief this Honorable Court deems necessary to restore Plaintiffs' property rights to a full public education, as protected by the Due Process Clause of the Fourteenth Amendment.

**COUNT II:**
**PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF FOR**
**MONELL LIABILITY UNDER 42 U.S.C. § 1983, § 1988**
**STATE-CREATED DANGER**
**DEFEDANT OXFORD CSD**

231. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

232. As citizens and/or legal residents of the United States, Plaintiffs were entitled to all rights, privileges, and immunities accorded to all citizens and/or legal residents of the State of Michigan and of the United States.

233. Pursuant to the Fourteenth Amendment of the United States Constitution, as enforced under the 42 U.S.C. § 1983, and at all times relevant to the Complaint, Plaintiffs had a clearly established right to be free from danger created and/or increased by the Defendants Ejak and Hopkins.

234. At all times relevant to this Complaint, Defendant Oxford CSD failed to adequately train, discipline, and supervise former-Superintendent Throne and Defendants Wolf, Ejak, and Hopkins, promulgating and maintaining de facto

unconstitutional customs, policies, and/or practices, rendering Defendant Oxford CSD liable for the constitutional violations alleged herein under *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978).

235.   At all times relevant to this Complaint, Defendant Oxford CSD knew or should have known that the policies, procedures, training, supervision, and discipline of Throne and Defendants Wolf, Ejak, and Hopkins were inadequate for the responsibility Defendant Oxford CSD owed to the students at Oxford High School, including all Plaintiffs.

236.   At all times relevant to this Complaint, Defendant Oxford CSD knew or should have  known that the policies, procedures, training, supervision, and discipline of  Throne and Defendants Wolf, Ejak, and Hopkins failed to  establish, implement, and/or execute adequate policies, procedures, rules, and/or regulations  to ensure that the actions or omissions of its above-mentioned teachers, counselors, and other staff members did not create or increase the risk to which  Plaintiffs would be exposed from private acts of violence.

237.   At all times relevant to this Complaint, Defendant Oxford CSD failed to establish, implement, and/or execute adequate policies, procedures, rules, and regulations to ensure that its teachers, counselors, and other staff members refrain from taking actions that create or increase a risk of harm to all students at Oxford High School, including Plaintiffs.

238.   At all times relevant to this Complaint, Defendant Oxford CSD knew or should have known of a history, custom, propensity, and/or pattern for Throne and Defendants Wolf, Ejak, Hopkins, and other employees of Oxford High School to fail to properly identify a student with suicidal and homicidal tendencies and to act in such a way that created a risk of harm to students at Oxford High School and/or increased a risk of harm to students at Oxford High School, including Plaintiffs.

239.   Defendant Oxford CSD explicitly and implicitly authorized, approved, and/or knowingly acquiesced in the deliberate indifference of its teachers, counselors, and other staff members as to the strong likelihood that constitutional violations, such as those apparent in the instant case, would occur, and Defendant Oxford CSD pursued policies, practices, and/or customs that were a direct and proximate cause of the deprivations of the constitutional rights of all students at Oxford High School, including Plaintiffs.

240.   At all times relevant to this Complaint, Defendant Oxford CSD knew that its policies, procedures, customs, propensities, and/or patterns of supervising a student with suicidal and homicidal tendencies would deprive citizens and/or legal residents, such as Plaintiffs, of their constitutional rights.

241.   At all times relevant to this Complaint, Defendant Oxford CSD knew that its policies, procedures, customs, propensities, and/or patterns allowed or provided discretion to principals, counselors, teachers, and other staff to return a

student with suicidal and homicidal tendencies to his classroom such that their actions created a risk of harm and/or an increased risk of harm to the students at Oxford High School, including Plaintiffs, prior to involving the liaison police officer and/or other local law enforcement and/or obtaining permission from the same.

242. Defendant Oxford CSD and its administrators and policymakers, including former-Superintendent Throne, Principal Wolf, and Dean of Students Ejak, adopted and maintained policies, procedures, customs, propensities, practices, and/or patterns that were the moving force behind, and the cause-in-fact of, the school shooting on November 30, 2021. These policies, procedures, customs, propensities, practices, and/or patterns include but are not limited to the following:

    a. An official policy, practice, and/or custom of preventing staff and administrators from maintaining administrative supervision over students in the counseling office, and of restricting students from returning to the classroom, unless there exists a "disciplinary issue" to justify doing so;

    b. A policy, practice, and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

    c. A policy, practice, and/or custom of failing to train staff or administrators, including Defendants Ejak and Hopkins, to secure or hold a student in the counseling office, or to otherwise restrict a student from returning to the classroom, where the student is suicidal or is displaying homicidal tendencies, where the student presents a threat of harm to himself/herself or others, and where returning the suicidal student to the classroom environment would create or increase the danger of deadly violence;

d. A policy, practice, and/or custom of failing to train staff or administrators, including Defendant Ejak and Hopkins, in the proper manner in which to interview and/or question a student who is known to be suicidal or who is known to display homicidal tendencies, including but not limited to questions about whether the student owns a deadly weapon, including a firearm, whether the student has access to a deadly weapon, including a firearm, and whether the student has possession of a deadly weapon, including a firearm;

e. A policy, practice, and/or custom of permitting its staff and administrators to refrain from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

f. A policy, practice, and/or custom of failing to train staff or administrators, including Defendant Ejak and Hopkins, in proper methods for completing a risk assessment;

g. A policy, practice, and/or custom of permitting its staff and administrators, including Ejak and Hopkins, disregard and divert student mental health crises when those crises do not fit within Defendant Oxford CSD's definition of a "disciplinary" issue;

h. A policy, practice, and/or custom of permitting its staff and administrators, including Ejak and Hopkins, to refrain from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

i. A policy, practice, and/or custom of discouraging teachers, counselors, and administrators from reporting suspected acts of child abuse or neglect, despite their status as mandatory reporters;

j. A policy, practice, and/or custom of requiring additional and unnecessary procedures to approve a teacher, counselor, or administrator's request to file a report of suspected child abuse or neglect;

k. A policy, practice, and/or custom of requiring additional and unnecessary procedures to contact law enforcement, regarding a threat of violence at school;

l. A policy, practice, and/or custom of adopting and maintaining inadequate and improper search policies; and

m. Any other policy, practice, and/or custom that may become known throughout the course of this litigation.

243. By inadequately training and/or supervising its principals, counselors, and teachers, and by having a custom or policy of deliberate indifference to the constitutional rights of their citizens and/or legal residents and students, Defendant Oxford CSD encouraged and cultivated the conduct that violated Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution, and pursuant to 42 U.S.C. § 1983, thereby increasing the risk that Plaintiffs would be exposed to Doe's acts of violence.

244. As a direct and/or proximate result of the above-described conduct of Defendant Oxford CSD, Plaintiffs have suffered and will continue in the future to suffer irreparable harm, including but not limited to: (a) fright, shock, and terror; (b) loss of trust; (c) conscious pain and suffering; (d) emotional distress; (e) mental anguish; (f) Post-Traumatic Stress Disorder; (g) depression and anxiety; (h) disruption of their lives; and (i) humiliation and/or mortification.

245. To redress and remedy these unconstitutional policies, practices, and/or customs, Plaintiffs request the following prospective and injunctive relief:

a. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately conduct an independent and fully transparent third-party investigation of the events that transpired prior to the school shooting on November 30, 2021;

b. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately cease its policy, practice, and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

c. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately reform its policy of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy is maintained, Defendant Oxford CSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;

d. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately reform its policy, practice, and/or custom of offering information that falls short of full transparency to parents and students, especially when such information concerns potential threats of safety and violence to the students and occupants at Oxford High School;

e. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately reform its policy, practice, and/or custom of permitting its staff and administrators to refrain from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

f. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators and staff by way of contacting an organization, such

as NCSS, to provide assistance for the return to school and for the implementation of safety policies and/or procedures before the start of the coming 2022-2023 school year at Oxford High School;

g.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators to understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat of harm to themselves or others;

h.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators on how to conduct a proper risk assessment when students are suicidal;

i.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators to ask students and family members whether a students owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

j.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators and other staff as to when and how to conduct a legal search of student belongings, including backpacks and lockers;

k.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to publicly retract all statements made in the course of its cover story after the shooting, including a retraction of all statements suggesting that Defendants Hopkins and Ejak acted properly in releasing Doe from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

l.  All other prospective equitable and injunctive relief this Honorable Court deems necessary to restore Plaintiffs' clearly established rights to be free from danger created and/or increased by Defendants

Ejak and Hopkins, as protected by the Due Process Clause of the Fourteenth Amendment.

## COUNT III: PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF FOR VIOLATION OF CIVIL RIGHTS UNDER 14TH AMENDMENT AND 42 U.S.C. § 1983, § 1988
## STATE-CREATED DANGER – DELIBERATE INDIFFERENCE DEFENDANTS EJAK AND HOPKINS

246.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

247.   As citizens and/or legal residents of the United States, Plaintiffs were entitled to all rights, privileges, and immunities accorded to all citizens and/or legal residents of the State of Michigan and of the United States.

248.   Pursuant to the Fourteenth Amendment of the United States Constitution, as enforced under the 42 U.S.C. § 1983, and at all times relevant to the Complaint, Plaintiffs had a clearly established right to be free from danger created and/or increased by the Defendants Ejak and Hopkins.

249.   Any reasonable person would be aware of this clearly established constitutional right.

250.   Defendants Ejak and Hopkins, with knowledge of this clearly established right, and acting in deliberate indifference, violated the right of all Plaintiffs to be free from violence without due process, as secured by the Fourteenth Amendment's Due Process Clause, by taking affirmative acts under color of law to disrupt the status quo and create a danger of severe injury that did not exist in the

status quo prior to those affirmative state actions, and by taking affirmative acts that caused severe injuries to Plaintiffs, which would not have happened but-for the affirmative state actions of Defendants Ejak and Hopkins.

251.   At all times relevant to this Complaint, Defendants Ejak and Hopkins were acting under the color of state law and created or increased a state-created danger by substantially increasing the risk of harm to Plaintiffs and in reckless disregard to Plaintiffs, thereby increasing the risk that Plaintiffs would be exposed to Doe's acts of violence.

252.   The actions of Defendants Ejak and Hopkins, under the Fourteenth Amendment to the United States Constitution and pursuant to 42 U.S.C. § 1983 and § 1988, were performed under the color of state law and were objectively unreasonable.

253.   The actions of Defendants Ejak and Hopkins, under the Fourteenth Amendment to the United States Constitution and pursuant to 42 U.S.C. § 1983 and § 1988, were performed knowingly, deliberately, and/or indifferently to Plaintiffs and in reckless disregard to their safety.

254.   Defendants Ejak and Hopkins were acting under the color of state law as employees of Defendant Oxford CSD, a public school district, when they deprived Plaintiffs of their clearly established rights, privileges, and immunities in violation

of the Fourteenth Amendment to the United States Constitution and pursuant to 42 U.S.C. § 1983 and § 1988.

255. Defendants Ejak and Hopkins exhibited deliberate indifference, pursuant to the Fourteenth Amendment to the United States Constitution, by taking affirmative action(s), which resulted in all students at Oxford High School, including Plaintiffs, being less safe than they were before the actions of Defendants Ejak and Hopkins. The actions of Defendants Ejak and Hopkins created the danger and increased the risk of harm that the students at Oxford High School, including Plaintiffs, would be exposed to private acts of violence, to wit:

    a. Deliberately, intentionally, and recklessly returning Doe to class on November 30, 2021, despite having knowledge of Doe's concerning suicidal or homicidal behavior;

    b. Deliberately, intentionally, and recklessly returning Doe to class on November 30, 2021, where he had access to a loaded Sig Sauer 9-millimeter semi-automatic handgun;

    c. Deliberately, intentionally, and recklessly deciding to refrain from involving the liaison police officer or other local law enforcement in investigation, despite Doe's concerning behavior;

    d. Deliberately, intentionally, and recklessly deciding to refrain from searching Doe's backpack, which contained the shooting weapon and/or involve appropriate police authorities so that a proper and lawful search of Doe's backpack could be performed;

    e. Deliberately, intentionally, and recklessly refraining from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

f.  Deliberately, intentionally, and recklessly deciding to refrain from reporting to proper police authorities Doe's internet search history for ammunition the day before the shooting;

g.  Deliberately, intentionally, and recklessly deciding to refrain from reporting the child abuse and neglect of Doe to Child Protective Services;

h.  Interviewing Doe in front and in the presence of Doe's parents, knowing that such an interview would accelerate any violence Doe had planned;

i.  Failing to insist on removing Doe from school property after credible threat of Doe's suicidal and/or homicidal ideation;

j.  Deliberately choosing to refrain from having appropriate mental health intervention for Doe prior to returning Doe to the classroom with a Sig Sauer 9-millimeter semi-automatic handgun;

k.  Demonstrating conduct so reckless as to show a substantial lack of concern for whether any injury would result;

l.  Wrongfully causing Plaintiffs to suffer extreme emotional distress;

m. Enforcing the deficient and faulty policies, procedures, and practices, as are set forth in Count II, infra, as well as all others previously described in this Complaint; and

n.  Other acts or omissions to be revealed through discovery.

256.  All of the above alleged conduct substantially increased the risk of harm to Plaintiffs, who were safer before Defendants Ejak and Hopkins took the affirmative acts described herein.

257.  As a direct and/or proximate result of the above-described conduct of Defendants Ejak and Hopkins, Plaintiffs have suffered and will continue in the

future to suffer irreparable harm, including but not limited to: (a) fright, shock, and

terror; (b) loss of trust; (c) conscious pain and suffering;  (d) emotional distress; (e)

mental anguish; (f) Post-Traumatic Stress Disorder; (g) depression and anxiety; (h)

disruption of their lives; and (i) humiliation and/or mortification.

258.   To redress and remedy these unconstitutional practices, Plaintiffs

request the following prospective and injunctive relief:

      a.  An order requiring Defendants Ejak and Hopkins to cooperate fully upon implementation of an independent and fully transparent third-party investigation of the events that transpired prior to the school shooting on November 30, 2021;

      b.  An order requiring Defendants Ejak and Hopkins to immediately cease their practice and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

      c.  An order requiring Defendants Ejak and Hopkins to immediately cease their practice and/or custom of holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as Defendants Ejak and Hopkins maintain this practice and/or custom, they will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;

      d.  An order requiring Defendants Ejak and Hopkins to immediately cease their practice and/or custom of refraining from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

e. An order requiring Defendants Ejak and Hopkins to immediately cease their practice and/or custom of offering information that falls short of full transparency to parents and students, especially when such information concerns potential threats of safety and violence to the students and occupants at Oxford High School;

f. An order requiring Defendants Ejak and Hopkins to immediately undergo proper training to provide assistance for the return to school and for the implementation of safety policies and/or procedures before the start of the coming 2022-2023 school year at Oxford High School;

g. An order requiring Defendants Ejak and Hopkins to immediately undergo proper training to understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat of harm to themselves or others;

h. An order requiring Defendants Ejak and Hopkins to immediately undergo proper training on how to conduct a proper risk assessment when students are suicidal;

i. An order requiring Defendants Ejak and Hopkins to immediately undergo proper training to ask students and family members whether a students owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

j. An order requiring Defendants Ejak and Hopkins to immediately undergo proper training as to when and how to conduct a legal search of student belongings, including backpacks and lockers;

k. An order requiring Defendants Ejak and Hopkins to publicly retract all statements made in the course of the cover story after the shooting, including a retraction of all statements suggesting that Defendants Hopkins and Ejak acted properly in releasing Doe from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

l.   All other prospective equitable and injunctive relief this Honorable Court deems necessary to restore Plaintiffs' clearly established rights to be free from danger created and/or increased by Defendants Ejak and Hopkins, as protected by the Due Process Clause of the Fourteenth Amendment.

**COUNT IV: PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF FOR VIOLATION OF CIVIL RIGHTS UNDER 14TH AMENDMENT AND 42 U.S.C. § 1983, § 1988 STATE-CREATED DANGER – DELIBERATE INDIFFERENCE DEFENDANT WOLF**

259.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

260.   As citizens and/or legal residents of the United States, Plaintiffs were entitled to all rights, privileges, and immunities accorded to all citizens and/or legal residents of the State of Michigan and of the United States.

261.   Pursuant to the Fourteenth Amendment of the United States Constitution, as enforced under the 42 U.S.C. § 1983, and at all times relevant to the Complaint, Plaintiffs had a clearly established right to be free from danger created and/or increased by the Defendant Wolf.

262.   Any reasonable person would be aware of this clearly established constitutional right.

263.   Defendant Wolf, with knowledge of this clearly established right, and acting in deliberate indifference, violated the right of all Plaintiffs to be free from violence without due process, as secured by the Fourteenth Amendment's Due

Process Clause, by taking affirmative acts under color of law to disrupt the status quo and create a danger of severe injury that did not exist in the status quo prior to those affirmative state actions, and by taking affirmative acts that caused severe injuries to Plaintiffs, which would not have happened but-for the affirmative state actions of Defendant Wolf.

264.   At all times relevant to this Complaint, Defendant Wolf was acting under the color of state law as an employee of Defendant Oxford CSD, a public school district, when he, among other things, acted to maintain school safety; to investigate violent behavior within and threats of violence directed at the public school district; to take action and make decisions regarding school practices and procedures, both formal and informal; and to conduct himself as a school administrator.

265.   The actions of Defendant Wolf, under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983 and §1988, were all performed under the color of state law and were objectively unreasonable and performed knowingly, deliberately, and/or indifferently to Plaintiffs in reckless disregard to the safety of Plaintiffs.

266.   Defendant Wolf was acting under the color of state law when he deprived Plaintiffs of their clearly established rights, privileges, and immunities in

violation of the Fourteenth Amendment of the Constitution of the United States and of 42 U.S.C. §1983 and §1988.

267.  Defendant Wolf knew that there were active threats of violence that compromised student safety at Oxford High School throughout the weeks and months leading up to the school shooting on November 30, 2021, and that those active threats had not been formally or fully investigated.

268.  As a school administrator, Defendant Wolf had the authority and obligation to maintain school safety and to investigate fully and completely all violence within the Oxford School District and all threats to the safety of the Oxford School District's students, including a full and complete investigation into the identity of the person who had left severed animal heads on the property and within the buildings of the Oxford High School.

269.  Defendant Wolf took affirmative action(s) that created and substantially increased the danger that Doe's conduct would escalate to actual violence, thus causing severe and grievous injuries to Plaintiffs.

270.  The affirmative actions and conduct of Defendant Wolf in the weeks leading up to the school shooting on November 30, 2021, which created and/or increased the risk of harm to the students at Oxford High School, including Plaintiffs, in reckless disregard for their safety, non-exhaustively include:

> a.  Deliberately, intentionally, and recklessly concealing facts from appropriate law enforcement as to the severed bird head Doe placed

in the boys' bathroom mere weeks before the shooting on November 30, 2021;

b. Deliberately, intentionally, and recklessly concealing facts from the students and parents at Oxford High School of ongoing violence at the school, and, instead, falsely assuring the students and parents at Oxford High School that there were no threats to school safety that should be of concern within the days and weeks leading up to the shooting;

c. Deliberately discouraging students at Oxford High School from taking seriously the threats students had perceived, regarding their safety, and instructing students to stop talking about and/or sharing the threatening information they find on social media;

d. Promoting a policy, practice, and/or custom of misrepresentation, minimization or avoidance, and non-escalation of suspected or known risks of school violence; and

e. Any and all additional breaches that created or increased the danger of violence at Oxford High School that may become known through the course of this litigation.

271.   The foregoing non-exhaustive list of described actions and conduct of Defendant Wolf was a proximate cause of the Plaintiffs' injuries.

272.   At all relevant times, the actions of Defendant Wolf, by advising all students at Oxford High School, including Plaintiffs, that no credible threat existed, demonstrated conduct so reckless as to demonstrate a substantial lack of concern for whether an injury would result.

273.   At all times relevant herein, Plaintiffs were safer before Defendant Wolf took action and advised all students at Oxford High School, including

Plaintiffs, that there was no credible threat. By virtue of his actions, Defendant Wolf each substantially increased the harm to Plaintiffs.

274.   Had Defendant Wolf conducted a reasonable investigation into the threats of violence made towards Oxford High School and against its students, including the severed bird head that had been left in the boys' bathroom, Defendant Wolf would have found that Doe was the perpetrator of the above-mentioned threats and was the individual who severed the bird's head, as such information was readily accessible on Doe's publicly accessible media accounts and pages. At that time, Oxford High School would have removed Doe from school, and the mass school shooting that took place on November 30, 2021, would never have occurred and Plaintiffs would not have sustained the severe injuries they sustained on that day.

275.   The affirmative acts of Defendant Wolf created a state-created danger that substantially increased the special danger of harm to Plaintiffs and all other students at Oxford High School, as can be distinguished from a risk that would have affected the public at large.

276.   The conduct of Defendant Wolf was objectively unreasonable, and he performed such conduct knowingly, deliberately, and with deliberate indifference to the safety of Plaintiffs, causing all students and occupants at Oxford High

School to be less safe than they were before Defendant Wolf took the affirmative actions as described above.

277.   But for the affirmative acts of Defendant Wolf, Doe would not have committed the school shooting at Oxford High School on November 30, 2021.

278.   The fact Defendant Wolf decided to refrain from reporting the severed bird head incident to law enforcement and from investigating the active threats of violence that were made towards Oxford High School and against its students— and, instead, Defendant Wolf affirmatively acted to provide a knowingly false sense of security to the students and parents at Oxford High School and, even more shockingly, to tell the students at Oxford High School they were not to talk about or discuss threats made on social media—is shocking to the conscience.

279.   The affirmative acts of Defendant Wolf specifically presented the students at Oxford High School, including Plaintiffs, with a specific risk of dangers.

280.   In comparison with the public, at large, the students at Oxford High School, including Plaintiffs, were specifically at-risk and exposed to the dangers presented due to the affirmative acts of Defendant Wolf in allowing Doe to matriculate through the school environment.

281.   As a direct and/or proximate result of the above-described conduct of Defendant Wolf, Plaintiffs have suffered and will continue in the future to suffer

irreparable harm, including but not limited to: (a) fright, shock, and terror; (b) loss of trust; (c) conscious pain and suffering;  (d) emotional distress; (e) mental anguish; (f) Post-Traumatic Stress Disorder; (g) depression and anxiety; (h) disruption of their lives; and (i) humiliation and/or mortification.

282.   To redress and remedy these unconstitutional practices, Plaintiffs request the following prospective and injunctive relief:

    a.  An order requiring Defendant Wolf to cooperate fully upon implementation of an independent and fully transparent third-party investigation of the events that transpired prior to the school shooting on November 30, 2021;

    b.  An order requiring Defendant Wolf to immediately cease his practice and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

    c.  An order requiring Defendant Wolf to immediately cease his practice and/or custom of holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as Defendant Wolf maintains this practice and/or custom, he will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;

    d.  An order requiring Defendant Wolf to immediately cease his practice and/or custom of refraining from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

e.  An order requiring Defendant Wolf to immediately cease his practice and/or custom of offering information that falls short of full transparency to parents and students, especially when such information concerns potential threats of safety and violence to the students and occupants at Oxford High School;

f.  An order requiring Defendant Wolf to immediately undergo proper training to provide assistance for the return to school and for the implementation of safety policies and/or procedures before the start of the coming 2022-2023 school year at Oxford High School;

g.  An order requiring Defendant Wolf to immediately undergo proper training to understand that he can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat of harm to themselves or others;

h.  An order requiring Defendant Wolf to immediately undergo proper training on how to conduct a proper risk assessment when students are suicidal;

i.  An order requiring Defendant Wolf to immediately undergo proper training to ask students and family members whether a students owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

j.  An order requiring Defendant Wolf to immediately undergo proper training as to when and how to conduct a legal search of student belongings, including backpacks and lockers;

k.  An order requiring Defendant Wolf to publicly retract all statements made in the course of the cover story after the shooting, including a retraction of all statements suggesting that Defendants Ejak and Hopkins acted properly in releasing Doe from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

l.   All other prospective equitable and injunctive relief this Honorable Court deems necessary to restore Plaintiffs' clearly established rights to be free from danger created and/or increased by Defendant Wolf, as protected by the Due Process Clause of the Fourteenth Amendment.

## COUNT V: PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF FOR VIOLATION OF CIVIL RIGHTS UNDER 14TH AMENDMENT AND 42 U.S.C. § 1983, § 1988
## STATE-CREATED DANGER – SUPERVISORY LIABILITY
## DEFENDANT WOLF

283.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

284.   At all times relevant to this Complaint, Defendant Wolf was the principal at Oxford High School and, as such, directly supervised and oversaw the actions of Defendants Ejak and Hopkins and encouraged the specific incident of misconduct or directly participated in the specific incident of misconduct by failing to expel, discipline, and/or provide proper  supervision for Doe and failing to inform the liaison police officer or local law enforcement about  Doe's violent plans.

285.   By inadequately training and/or supervising their teachers, counselors, and dean of students; by having a custom or policy of indifference to the constitutional rights of their citizens and/or legal residents; and/or by failing to adequately supervise the school shooter, Doe, Defendant Wolf encouraged and cultivated the conduct that then caused a violation of Plaintiffs' rights under the Fourteenth Amendments of the United States Constitution.

84

286.   By   failing   to   expel,   discipline,   search,   and/or   provide
proper supervision   for   Doe,   Defendant   Wolf   authorized,   approved,   and/or
knowingly   acquiesced   in   the   unconstitutional   conduct   of   Defendants   Ejak and
Hopkins.

287.   As citizens and/or legal residents of the United States, Plaintiffs were
entitled to all rights, privileges, and immunities accorded to all citizens and/or legal
residents of the State of Michigan and of the United States.

288.   Pursuant   to   the   Fourteenth   Amendment   of   the   United   States
Constitution, as enforced under the 42 U.S.C. § 1983, and at all times relevant to the
Complaint, Plaintiffs had a clearly established right to be free from danger created
and/or increased by the Defendants Wolf, Ejak and Hopkins.

289.   The actions and omissions of Defendants Wolf, Ejak, and Hopkins,
under the Fourteenth Amendment to the United States Constitution and pursuant to
42 U.S.C. §1983 and §1988, were all performed under the color of state law and
were   objectively   unreasonable   and   performed   knowingly,   deliberately,   and
indifferently to Plaintiffs and in reckless disregard for their safety.

290.   Defendants Wolf, Ejak, and Hopkins were acting under the color of
state law when they deprived Plaintiffs of their clearly established rights, privileges,
and immunities in violation of the Fourteenth Amendment of the Constitution of the
United States and of 42 U.S.C. §1983 and §1988.

291.  Defendants Wolf, Ejak, and Hopkins exhibited deliberate indifference, pursuant to the Fourteenth Amendment to the United States Constitution, to a citizen's right to be free from acts that create and/or increase the risk of harm that an individual will be exposed to private acts of violence, to wit:

a.  Deliberately, intentionally, and recklessly returning Doe to class on November 30, 2021, despite having knowledge of Doe's concerning suicidal or homicidal behavior;

b.  Deliberately, intentionally, and recklessly returning Doe to class on November 30, 2021, where he had access to a loaded Sig Sauer 9-millimeter semi-automatic handgun;

c.  Deliberately, intentionally, and recklessly deciding to refrain from involving the liaison police officer or other local law enforcement in investigation, despite Doe's concerning behavior;

d.  Deliberately, intentionally, and recklessly deciding to refrain from searching Doe's backpack, which contained the shooting weapon and/or involve appropriate police authorities so that a proper and lawful search of Doe's backpack could be performed;

e.  Deliberately, intentionally, and recklessly refraining from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

f.  Deliberately, intentionally, and recklessly deciding to refrain from reporting Doe's internet search history for ammunition to proper police authorities the day before the shooting;

g.  Deliberately, intentionally, and recklessly deciding to refrain from reporting the child abuse and neglect of Doe to Child Protective Services;

h. Interviewing Doe in front and in the presence of Doe's parents, knowing that such an interview would accelerate any violence Doe had planned;

i. Failing to insist on removing Doe from school property after credible threat of Doe's suicidal and/or homicidal ideation.

j. Deliberately choosing to refrain from having appropriate mental health intervention for Doe prior to returning Doe to the classroom with a Sig Sauer 9-millimeter semi-automatic handgun;

k. Demonstrating conduct so reckless as to show a substantial lack of concern for whether any injury would result;

l. Wrongfully causing Plaintiffs to suffer extreme emotional distress;

m. Enforcing the deficient and faulty policies, procedures, and practices, as are set forth in Count II, infra, as well as all others previously described in this Complaint; and

n. Other acts or omissions to be revealed through discovery.

292.    As a direct and/or proximate result of the above-described conduct of Defendant Wolf, Plaintiffs have suffered and will continue in the future to suffer irreparable harm, including but not limited to: (a) fright, shock, and terror; (b) loss of trust; (c) conscious pain and suffering;  (d) emotional distress; (e) mental anguish; (f) Post-Traumatic Stress Disorder; (g) depression and anxiety; (h) disruption of their lives; and (i) humiliation and/or mortification.

293.    To redress and remedy these unconstitutional practices, Plaintiffs request the following prospective and injunctive relief:

a. An order requiring Defendant Wolf to cooperate fully upon implementation of an independent and fully transparent third-party

investigation of the events that transpired prior to the school shooting on November 30, 2021;

b. An order requiring Defendant Wolf to immediately cease his practice and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

c. An order requiring Defendant Wolf to immediately cease his practice and/or custom of holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as Defendant Wolf maintains this practice and/or custom, he will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;

d. An order requiring Defendant Wolf to immediately cease his practice and/or custom of refraining from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

e. An order requiring Defendant Wolf to immediately cease his practice and/or custom of offering information that falls short of full transparency to parents and students, especially when such information concerns potential threats of safety and violence to the students and occupants at Oxford High School;

f. An order requiring Defendant Wolf to immediately undergo proper training to provide assistance for the return to school and for the implementation of safety policies and/or procedures before the start of the coming 2022-2023 school year at Oxford High School;

g. An order requiring Defendant Wolf to immediately undergo proper training to understand that he can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal

or if there is probable cause to believe that they are a threat of harm to themselves or others;

h. An order requiring Defendant Wolf to immediately undergo proper training on how to conduct a proper risk assessment when students are suicidal;

i. An order requiring Defendant Wolf to immediately undergo proper training to ask students and family members whether a students owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

j. An order requiring Defendant Wolf to immediately undergo proper training as to when and how to conduct a legal search of student belongings, including backpacks and lockers;

k. An order requiring Defendant Wolf to publicly retract all statements made in the course of the cover story after the shooting, including a retraction of all statements suggesting that Defendants Ejak and Hopkins acted properly in releasing Doe from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

l. All other prospective equitable and injunctive relief this Honorable Court deems necessary to restore Plaintiffs' clearly established rights to be free from danger created and/or increased by Defendant Wolf, as protected by the Due Process Clause of the Fourteenth Amendment.

## RELIEF REQUESTED

294.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

295.   The conduct, actions, and/or inactions of Defendants, as alleged in the above-stated counts and causes of action, constitute violations of Plaintiffs'

89

Constitutional and Federal rights, and the Eastern District of Michigan Southern Division has jurisdiction to hear and adjudicate said claims.

296.   In whole or in part, as a result of some or all of the above-mentioned actions and/or inactions of Defendants, Plaintiffs have suffered and continue to suffer irreparable harm due to the above-mentioned violations.

297.   Accordingly, Plaintiffs respectfully request this Honorable Court grant the following relief in accordance with 42 U.S.C. § 1983 and § 1988:

    a.  An order of all prospective equitable and injunctive relief described in Counts I, II, III, IV, and V of this Complaint;

    b.  An award of actual attorney fees and costs pursuant to 42 U.S.C. § 1988; and

    c.  Any further legal and/or other relief that this Court deems equitable or just.

                        Respectfully Submitted,
                        GREWAL LAW, PLLC

Dated: June 17, 2022        By: */s/ Scott Weidenfeller*      
                        Scott Weidenfeller (P56001)
                        Grewal Law, PLLC
                        Attorney for Plaintiffs
                        345 E. Cady St., 3rd Floor
                        Northville, MI 48167
                        (517) 393-3000
                        sweidenfeller@4grewal.com