# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MASON BOURGEAU; G.J., a minor,
and E.J., a minor, by their Next Friend,
Andrea Jones; and A.F., a minor, by
her Next Friend, Alicia Feltz;                  Case No.: 2:22-cv-11360

        Plaintiffs,                            District Judge Mark A. Goldsmith
                                                Magistrate Judge Anthony P. Patti

v.

OXFORD COMMUNITY SCHOOL                         **[PROPOSED] AMENDED CLASS**
DISTRICT; KENNETH WEAVER,                        **ACTION COMPLAINT FOR**
Superintendent, in his official                  **EQUITABLE AND INJUNCTIVE**
capacity; STEVEN WOLF, Principal;                **RELIEF**
NICHOLAS EJAK, Dean of Students;
and SHAWN HOPKINS, Student
Counselor,

        Defendants.

**There are at least nine other lawsuits, as are identified below,
that arise out of the same transaction or occurrence:**

**2:21-cv-12871-MAG-APP filed on 12/09/2021**
**2:22-cv-10407-MAG-APP filed on 02/24/2022**
**2:22-cv-10805-MAJ-APP filed on 04/14/2022**
**2:22-cv-11113-MAG-APP filed on 05/22/2022**
**2:22-cv-11250-MAG-DRG filed on 06/07/2022**
**2:22-cv-11251-MAG-APP filed on 06/7/2022**
**2:22-cv-11398-MAG-APP filed on 06/23/2022**
**2:22-cv-11448-MAG-APP filed on 06/28/2022**
**2:22-cv-11959-MAG-APP filed on 08/21/2022**

<u>**[PROPOSED] AMENDED CLASS ACTION COMPLAINT FOR**</u>
<u>**EQUITABLE AND INJUNCTIVE RELIEF**</u>

NOW COME Plaintiffs, MASON BOURGEAU; G.J., a minor, and E.J., a minor, by their Next Friend, Andrea Jones; and A.F., a minor, by her Next Friend, Alicia Feltz, individually and on behalf of a putative Class of similarly situated students of the Oxford Community School District, by and through their attorneys, Grewal Law, PLLC, and Marino Law, PLLC, and for their Amended Class Action Complaint against Defendants state the following:

## INTRODUCTION

On the morning of November 30, 2021, John Doe ("Doe"), a tenth grader at Oxford High School, arrived at school in a suicidal state, posing a clear threat to himself and others. Doe was armed with a handgun and forty-eight (48) rounds of ammunition, which he kept hidden in his backpack. During Doe's first hour class, his English teacher reported to school officials that, during class, Doe had watched a video on his cell phone depicting a realistic shooting. Shortly thereafter, while in his second hour class, Doe's math teacher reported to school officials that, during class, Doe had drawn violent images and written disturbing words on a paper assignment, including: "The thoughts won't stop. Help me . . . blood everywhere . . . My life is useless . . . The world is dead." In the weeks leading up to November 30, 2021, Doe had demonstrated a concerning pattern of behavior, and, less than twenty-

four (24) hours prior to the school shooting, a teacher had observed Doe searching the internet, during class, for information about bullets.

As Doe sat in his second hour math class on November 30, 2021, his assigned counselor, Shawn Hopkins ("Hopkins"), removed Doe from class, confiscated the assignment that contained the disturbing words and violent illustrations, and led Doe to the counseling office for a meeting with Dean of Students Nicholas Ejak ("Ejak"). At some point during that meeting, Ejak walked to Doe's math classroom, retrieved Doe's backpack, and returned to the counseling office with the backpack in hand.

Ejak and Hopkins, during their meeting with Doe, determined Doe was suicidal and was exhibiting signs of homicidal ideation. Later in the morning of November 30, 2021, Ejak and Hopkins met with Doe's parents and recommended they take Doe from school. Ejak and Hopkins further advised Doe's parents to retain immediate mental health counseling for Doe. Doe's parents refused to take Doe from school or to secure immediate mental health counseling, despite the suggestions of Ejak and Hopkins. At that point, Ejak and Hopkins had the authority to keep Doe confined in the safety and security of the counseling office. Rather, Ejak and Hopkins used their authority to return Doe's unsearched backpack, to grant a hall pass to Doe, and to allow Doe to attend his remaining class periods unaccompanied.

Less than two hours later, Doe carried his backpack into the boys' bathroom, emerged with his loaded handgun, and opened fire, tragically killing four students and seriously injuring seven others. All Plaintiffs survived the shooting.

Oxford Community School District ("Oxford CSD") and its officials later explained to the community that it was adhering to its formal policy of returning students to class absent a "disciplinary" issue. Under Oxford CSD's formal policy, only in the presence of a "disciplinary" issue is it acceptable to either send home a student or hold a student in the confinement of the counseling office. Oxford CSD claims that, because Doe presented no such "disciplinary" issue, the only action it could take was to return Doe to class.

While Oxford CSD has denied knowing Doe was suicidal and harboring homicidal ideation, in truth, Oxford CSD knew of Doe's suicidal and possible homicidal ideation when school officials released him from the counseling office. Oxford CSD has advanced this "adherence to policy" explanation as a means to cover up its culpability for this avoidable tragedy. As the facts illustrate, however, school officials escalated the danger to all students by releasing Doe from the confinement of the counseling office, with his unsearched backpack, after having gained knowledge of Doe's propensity to inflict harm upon himself or others. To date, Oxford CSD seeks to evade accountability and transparency by way of manufacturing the false "adherence to policy" narrative. In reality, the deliberate

4

indifference of school officials as to Doe's troubled status as a suicidal youth, a student who had explicitly expressed homicidal ideation, caused and/or increased the risk of violence, destruction, and death on November 30, 2021.

By releasing Doe from the safe confinement of the counseling office into the greater school environment, school officials compounded the danger to all students at Oxford High School. By returning Doe's unsearched backpack, which contained the deadly weapon and ammunition Doe used to carry out his suicidal and/or homicidal plans, school officials acted with deliberate indifference and created and/or increased the risk of a school shooting.

At least two official policies, practices, and/or customs of Oxford CSD drove school officials to act as they did: (1) Oxford CSD's official, misguided policy that, in the absence of a "disciplinary" issue, Ejak and Hopkins were required to return Doe back to class, despite having knowledge Doe was experiencing suicidal and homicidal ideation; and (2) Oxford CSD's failure to train Ejak and Hopkins to hold a student in the counseling office, or to otherwise restrict a student from returning to the classroom, where the student is experiencing suicidal and homicidal ideation and where returning the student to the classroom environment would create and/or increase the danger of deadly violence.

Although named Plaintiffs and putative Class members survived the shooting, they have suffered irreparable harm. Every day since the tragedy that took place on

November 30, 2021, students, including Plaintiffs, have entered through the school doors assuming they will have to defend themselves should another violent attack ensue. Unable to engage in classes and tackle the daily social and mental hurdles that many often encounter in school, students of Oxford CSD, particularly those at Oxford High School, have been forced to uncover a level of resilience and bear a weight of constant fear that should be expected of no one.

Due to Oxford CSD's complete lack of transparency and clear refusal to hold itself accountable, Plaintiffs, under the most tragic of circumstances, bring this suit as a final attempt to salvage what time remains of their school careers. Seeking transparency and a sense of security as they navigate the unknown, Plaintiffs bring this action, not for damages, but for prospective equitable and injunctive relief to restore their right to a full public education, a right that is protected as a property interest under the Due Process Clause of the Fourteenth Amendment.

Plaintiffs request this Honorable Court order the protection of Plaintiffs' interests by ordering a fully transparent and independent third-party investigation into the events that led up to the tragedy on November 30, 2021, and by taking prospective measures to ensure Oxford CSD, as well as its administrators and staff, comply with the constitutional obligations to safeguard the safety of students in the District. Such prospective measures include, but are not limited to, Oxford CSD training its administrators to refrain from releasing suicidal students back into the

classroom when they have probable cause or reason to know that doing so could result in deadly violence, updating policies and procedures accordingly and training all faculty and staff in compliance, making improvements to the physical plant of Oxford CSD buildings, and promising complete transparency in all future communications with parents and students at Oxford High School.

## JURISDICTION AND VENUE

1.     This action arises under the United States Constitution and the laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 and § 1988.

2.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 42 U.S.C. §§ 1983 and 1988.

3.     Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all facts alleged in this Complaint took place in Oakland County, Michigan, and the parties reside in the Eastern District of Michigan.

## PARTIES

4.     Mason Bourgeau is currently 18 years old and, at the time of the tragic school shooting on November 30, 2021, was a junior at Oxford High School.

5.     G.J. is currently 17 years old and, at the time of the tragic school shooting on November 30, 2021, was a junior at Oxford High School.

6.     E.J. is currently 13 years old and, at the time of the tragic shooting on November 30, 2021, was in seventh grade at Oxford Middle School.

7.     A.F. is currently 15 years old and, at the time of the tragic school shooting on November 30, 2021, was a freshman at Oxford High School.

8.     All named Plaintiffs reside in the Eastern District of Michigan, in Oakland County, Michigan.

9.     The members of the putative Class are students enrolled in the Oxford Community School District.

10.    As students enrolled in the Oxford Community School District, named Plaintiffs and the members of the putative Class have a property interest, protected by the Due Process Clause of the Fourteenth Amendment, in a full public education, and they have standing to seek prospective equitable and injunctive relief from the Oxford Community School District's conduct to restore that property interest through court-ordered measures to bring Oxford Community School District's policies into compliance with the Constitution.

11.    As students enrolled in the Oxford Community School District, named Plaintiffs and the members of the putative Class have a clearly established right, protected by the Due Process Clause of the Fourteenth Amendment, to be free from danger created and/or increased by state actors, and they have standing to seek prospective equitable and injunctive relief from the conduct of all named Defendants

8

to restore this right through court-ordered measures to implement safety policies and measures that are in compliance with the Constitution.

12.     Defendant Oxford CSD is a municipal corporation, organized in the Township of Oxford, Oakland County, Michigan, and located in the Eastern District of Michigan. Defendant Oxford CSD conducts all operations for Oxford High School, including but not limited to funding; staffing; training; supervising the staff, counselors, and teachers at Oxford High School; and maintaining the safety and security of facilities for the education and welfare of all students in Oxford CSD.

13.     As of Fall of 2021, the Oxford CSD "consist[ed] of one early learning school, five elementary schools, one middle school, a high school that includes an early college pathway, two alternative schools, and one virtual academy."[1]

14.     Plaintiffs are suing Defendant Oxford CSD pursuant to 42 U.S.C. § 1983 for its official policies, practices, and customs, which were the motivating force and cause-in-fact for the decision to return John Doe from the safety and security of the counseling office to the classroom on November 30, 2021.

15.     At all times relevant herein, Defendant Ken Weaver ("Weaver") is and was a citizen of the State of Michigan and is currently the Superintendent of Oxford Community School District. Plaintiffs are suing Defendant Weaver in his official

---

[1] Oxford Community Schools, "About Our District," https://www.oxfordschools.org/district/about_our_district (last visited Nov. 28, 2022). **Exhibit A.**

9

capacity only. Plaintiffs are suing Defendant Weaver pursuant to 42 U.S.C. § 1983, for both prospective equitable and injunctive relief, as he is the highest-ranking official of Oxford Community School District and is responsible for ensuring the District's compliance with state and federal laws, including the Due Process Clause of the Fourteenth Amendment.

16.    At all times relevant herein, Defendant Steven Wolf ("Wolf") is and was a citizen of the State of Michigan and was acting under the color of state law within the course and scope of his employment as Principal of Oxford High School in the Oxford Community School District. Plaintiffs are suing Defendant Wolf pursuant to 42 U.S.C. § 1983 for actions taken under color of law.

17.    At all times relevant herein, Defendant Nicholas Ejak ("Ejak") is and was a citizen of the State of Michigan and was acting under the color of state law within the course and scope of his employment as Dean of Students of the Oxford Community School District. Plaintiffs are suing Defendant Ejak pursuant to 42 U.S.C. § 1983 for actions taken under color of law.

18.    At all times relevant herein, Defendant Shawn Hopkins ("Hopkins") is and was a citizen of the State of Michigan and was acting under the color of state law within the course of his employment as a Counselor at Oxford High School in the Oxford Community School District. Plaintiffs are suing Defendant Hopkins pursuant to 42 U.S.C. § 1983 for actions taken under color of law.

## STATEMENT OF FACTS

**A. An essential element in the operation of a school district, as well as an integral role in the job function of school administrators, is the maintenance of school safety and the protection of students from deadly violence.**

19.     From 2009 to 2019, school shootings occurred in over 177 schools in the United States, resulting in 356 deaths.[2]  CNN's investigation into ten (10) years of shootings on K-12 campuses uncovered two truths: (1) school shootings are increasing, and (2) no type of community is spared.

20.     In 2021 alone, there were 202 incidents of gunfire on school grounds, resulting in 49 deaths and 126 injuries.[3]

21.     It is well-established that, in previous mass shooting events, many shooters were suicidal before the attack commenced.[4]

22.     Specific to school shootings, a recent study of 134 schools and attempted school shootings found that 91% of the shooters were students or former students, 98% were males, 87% were in crisis prior to the shooting, and 80% were suicidal before the attack.[5]

---

[2] *Ten Years of School Shootings*, CNN (July 2019) https://www.cnn.com/interactive/2019/07/us/ten-years-of-school-shootings-trnd/.

[3] *Gunfire on School Grounds in the United States*, EVERYTOWN RESEARCH & POLICY (2021) https://everytownresearch.org/maps/gunfire-on-school-grounds/.

[4] Maggie Koerth, *Can We Prevent Mass Shootings by Preventing Suicide?* FIVETHIRTYEIGHT (Aug. 22, 2019), https://fivethirtyeight.com/features/can-we-prevent-mass-shootings-by-preventing-suicide/.

[5] *Key Findings: Analysis of School and Workplace Shootings*, THE VIOLENCE PROJECT, (2019 Data) https://www.theviolenceproject.org/mass-shooter-database-3/key-findings/.

23.    The State of Michigan, in recognition of the risks of school mass shootings and gun violence, has enacted legislation mandating school districts adopt school safety policies.  This legislation includes the Child Protection Law, MCL §777.621 (1975); Statewide School Safety Information Policy, MCL §380.1308 (1999); Mandatory incident reporting to state police for certain crimes occurring at school, MCL §380.1308a (2019); Liaison for school safety commission requirements, MCL §380.1241 (2019); Office of School Safety, MCL §28.681 (2019); Reporting of Crimes on the District's Website, MCL §38.1310a (2000); Student Safety Act, MCL §752.911 (2000); Save Our Students Act, MCL §380.1893 (2020); Searching Student Lockers, MCL §380.1306 (2000); and Student in Possession of a Dangerous Weapon, MCL §380.1313 (1987).

24.    Tragically, gun violence in schools is a foreseeable risk that creates a duty in school officials to confront and deescalate known threats of violence at school, including school shootings.

25.    As a matter of state and federal law, an essential element within the duties of school administrators, teachers, and counselors is the minimization and/or elimination of the risk of gun violence within our schools.

**B. Defendants took affirmative acts that created and increased the danger of the school shooting at Oxford High School on November 30, 2021.**

26.    On November 30, 2021, John Doe ("Doe") was a fourteen-year-old tenth-grade student at Oxford High School.

12

27.     During the months leading up to the day of the school shooting, Oxford High School and Oxford CSD teachers, counselors, and administrators knew of Doe because of his various concerning behaviors, including but not limited to a depressed mood, a disheveled/unkempt appearance, minimal participation in his classes, and refusal to complete school assignments, which indicated psychiatric distress, suicidality, and the possibility of child abuse or neglect.

28.     In or around May 2021, Defendant videotaped himself torturing and killing animals, including a bird, which Doe decapitated.  Doe proceeded to store the decapitated bird head inside of a jar, which he brought to school on November 11, 2021.

29.     In or around August 2021, Doe videotaped himself holding a .22 caliber handgun that belonged to his father.  Doe then forwarded the video to an Oxford High School classmate, along with the following message: "Now it's time to shoot up the school! JK JK JK."[6]

30.     In or around Fall 2020, Doe's freshman year, Defendant Hopkins was assigned as Doe's school counselor at Oxford High School.[7]  Defendant Hopkins

---

[6] Transcript of Preliminary Examination, Vol. I, *The People of the State of Michigan v. James Robert Crumbley and Jennifer Lyn Crumbley*, (Nos. 21-006651-2; 2022-279989-90-FH) at 263:13-15; Transcript of Preliminary Examination, Vol. II, *The People of the State of Michigan v. James Robert Crumbley and Jennifer Lyn Crumbley*, (Nos. 21-006651-2; 2022-279989-90-FH) at 45:24-46:4.
[7] *Prelim. Exam. Tr.*, vol. II, at 108:7-11.

maintained the role of Doe's assigned counselor during Fall 2021, Doe's sophomore year at Oxford High School.

31.     Early in November 2021, Doe's Spanish teacher sent an email to Defendant Hopkins, explaining her concerns that Doe seemed "sad."[8]

32.     Defendant Hopkins conducted a check-in with Doe, advising Doe that Defendant Hopkins was available should Doe need to talk to someone.  In response, Doe looked at Defendant Hopkins and said, "okay."[9]

33.     Approximately four (4) weeks prior to the devastating school shooting, on November 4, 2021, a severed deer head was discovered on the grounds of Oxford High School.

34.     At that time, Defendant Wolf sent an email to parents "to clarify some of the rumors that [had] started," advising there was "no present danger at Oxford High School." He then explained that, "*before* school began," administrators and staff "identified graffiti" written in "red acrylic paint," as well as "the head of a deer" that had "likely [been] struck from a vehicle." (Emphasis added).

35.     On social media platforms, such as TikTok, students at Oxford High School posted video footage of the red writing and of the deer head as a man,

_____

[8] *Id.* at 108:21-24.
[9] *Id.* at 109:1-7.

14

presumably a member of the administration or staff at Oxford High School, carried it across a courtyard at Oxford High School.

36.    This occurrence, despite the attempted assurances of student safety in Defendant Wolf's email, and in large part due to the ambiguity that surrounded the abandonment of the severed deer head on school grounds, caused a level of concern and anxiety amongst students, parents, and teachers of Oxford High School.

37.    On November 11, 2021, Doe carried to Oxford High School a severed bird head, stored inside of a jar, and placed said jar inside the boys' bathroom.[10]

38.    Upon discovery of the above-mentioned jar, students reported the bird head to school administrators, including Oxford High School Principal, Defendant Wolf. Administrators of Defendant Oxford CSD concealed this information from both staff and parents within the Oxford CSD.

39.    Doe wrote an entry in his journal, confirming that he was the individual who brought the severed bird head to Oxford High School.[11]   Cell phone records further document that Doe had recorded himself decapitating a bird.[12]

40.    Oxford High School has access to footage from internal surveillance cameras positioned throughout its hallways.[13]

_____

[10] *Id.* at 75:10-18.
[11] *Id*. at 223:8-14.
[12] *Prelim. Exam. Tr.*, vol. I, at 264:10-15.
[13] *Id.* at 223:24-224:1.

41.     Had Defendant Oxford CSD conducted a reasonable investigation, it would have uncovered that Doe was the student responsible for the severed bird's head.

42.     The next day, November 12, 2021, Oxford High School administration sent an email to parents of Oxford High School students, stating: "Please know that we have received every concern shared with us and investigated all information provided . . . We want our parents and students to know that there has been no threat to our building nor our students."

43.     On or about November 16, 2021, multiple parents directly informed Defendant Principal Wolf of concerns about multiple severed animal heads at Oxford High School and about threats made to students on social media.

44.     Communications from one parent to Defendant Wolf stated, in part: "I know it's been investigated but my kid doesn't feel safe at school . . . He didn't even want to go back to school today."

45.     In or around mid-November 2021, both students and parents at Oxford High School recognized the presence of a violent threat, but administrators of Defendant Oxford CSD dismissed the threat as not credible.

46.     Both students and parents at Oxford High School shared serious concerns about the multiple severed animal heads at Oxford High School and about posts and threats made to students on social media.

47.     On or about November 16, 2021, due to the above-mentioned concerns regarding student safety, many students voiced safety concerns to their parents, and, out of fear of violence and/or the occurrence of a shooting at Oxford High School, together students and parents made the decision that those students would stay home from school that day.

48.     In response to reports from students, parents, and teachers, administrators of Defendant Oxford CSD persisted in their campaign to conceal and minimize threats to school safety.

49.     On November 16, 2021, Defendant Wolf emailed parents, stating: "I know I'm being redundant here, but there is absolutely no threat at the HS . . . large assumptions were made from a few social media posts, then the assumptions evolved into exaggerated rumors."

50.     That same day, former Superintendent Timothy Throne ("Throne") made an announcement on the school-wide loudspeaker at Oxford High School, instructing students to stop spreading rumors and to stop relying on information on social media, while also reassuring students that there were no threats that posed any danger to them at Oxford High School.

51.     At all relevant times, Throne, while acting as the Superintendent of Defendant Oxford CSD, discouraged students and parents from reporting, sharing, or otherwise discussing the threatening social media posts.

52.     At all relevant times, Defendant Wolf, while acting as the Principal of Oxford High School, directed the teachers and counselors to tell students to stop reporting, sharing, or otherwise discussing the threatening social media posts and the violent animal slaughter that was occurring at Oxford High School.

53.     Teachers and staff of Oxford High School did tell students to stop reporting, sharing, or otherwise discussing threatening social media posts and, on at least one occasion, threats of a school shooting at Oxford High School.

54.     At all relevant times, the respective actions of Throne and Defendant Wolf, in advising all students that there was no credible threat, demonstrated conduct so reckless as to demonstrate a substantial lack of concern for whether an injury resulted.

55.     At all relevant times, students at Oxford High School were safer before Throne and Defendant Wolf respectively took action and advised each and every student there was no credible threat.  By virtue of their respective actions, Throne and Defendant Wolf each substantially increased the harm to all students at Oxford High School.

56.     At all relevant times, Doe's social media accounts were set to "public," allowing any person on the internet to view the contents, which largely depicted Doe's obsession with and unrestricted access to firearms.

57.     Upon information and belief, the content of Doe's social media accounts was known to fellow students, parents, and the Defendants prior to the shooting on November 30, 2021.

58.     On or around November 26, 2021, Doe received a Sig Sauer 9-millimeter semi-automatic handgun as a gift from his father.[14]

59.     That same day, on or around November 26, 2021, Doe posted a picture of the gun to his public Instagram account with the caption: "[J]ust got my new beauty today [heart eyes emoji] Sig Sauer 9-millimeter. Any questions I will answer."[15] This post was readily accessible to any person on the internet, including all Defendants.

60.     On November 27, 2021, Doe's mother, Jennifer Crumbley, posted a photo on her Facebook page of a target at the shooting range with the caption: "[M]om and son day testing out his new X-mas present."[16] This social media post referred to Doe firing his handgun.  Doe's mother's account was also set to "public," allowing any person on the internet to view the contents of her account, including the above-mentioned post from November 27, 2021.

---

[14] During his guilty plea hearing on October 24, 2022, Doe claimed that he asked his father to buy the Sig Sauer and gave his father money to purchase it. *Oxford shooter Ethan Crumbley pleads guilty to murder, terrorism charges*, LiveNOW from FOX, https://www.youtube.com/watch?v=BLF1wFLNsHc (00:11:30-00:11:38).
[15] *Id.* at 193:10-18.
[16] *Prelim. Ex. Tr.,* vol. 1, at 208:16-20.

61.   On the morning of November 29, 2021, one day before the school shooting, Doe's English teacher caught Doe using his cell phone, during school hours, to access the internet to search for information about ammunition.[17]

62.   Upon information and belief, Doe's conduct was in violation of a variety of school rules, procedures and policies, including Defendant Oxford CSD's "Technology Policy and Guidelines," as well as its "Acceptable Use Policy," which "[a]ll students sign […] annually."[18]

63.   The "Acceptable Use Policy," in effect before and on the day of the school shooting, was thereafter removed from Defendant Oxford CSD's website, even though, upon information and belief, any individual was able to publicly access the policy prior to the school shooting on November 30, 2021.

64.   On the morning of November 29, 2021, Doe's English teacher sent an email to Defendant Ejak and Pam Parker Fine ("Fine"), the Restorative Practices Coordinator of Defendant Oxford CSD, informing them both that Doe had been using his cell phone, during school hours, to access the internet to search for information about ammunition.[19]

---

[17] *Prelim. Ex. Tr.*, vol. II, at 109:8-14.
[18] *Oxford Community Schools Student Code of Conduct*, Revised June 2021, page 23, https://cdn5-ss8.sharpschool.com/UserFiles/Servers/Server_733753/Image/2021-2022%20STUDENT%20CODE%20OF%20CONDUCT.pdf (last visited June 17, 2022) (no longer available online).
[19] *Prelim. Exam. Tr.*, vol. II, at 109:8-14.

65.     Doe's English teacher's above-mentioned email was then forwarded to Defendant Hopkins, Doe's assigned counselor.[20]

66.     Fine called Doe to her office. Fine then called Defendant Hopkins into her office to "be in the meeting as social/emotional support for [Doe]."[21]

67.     The meeting, which began at or around 9:00 a.m. on November 29, 2021, lasted approximately five minutes.[22]

68.     At that time, Defendant Hopkins and Fine provided limited support and/or guidance to Doe, as they informed Doe only that accessing the internet to search for ammunition on his cell phone during school hours was not "school appropriate behavior."[23]

69.     In response, Doe explained to Defendant Hopkins and Fine that Doe had visited a gun range with his mother the previous weekend to shoot guns, that shooting guns was a hobby within Doe's family, and that Doe was merely researching information about his shooting hobby.[24]

70.     During the meeting, Doe was compliant, calm, understanding, and neither argumentative nor oppositional, demonstrating his obedience to authority.[25]

---

[20] *Id*. at 109:11-14.
[21] *Id.* at 109:16-19.
[22] *Id.* at 109:22-25.
[23] *Id.* at 110:1-11.
[24] *Id*. at 110:19-24.
[25] *Id*. at 110:1-15.

71.     At the conclusion of the meeting, Defendant Hopkins and Fine permitted Doe to return to class.[26]

72.     After the meeting, Fine called Doe's mother and left a voicemail message for Doe's mother.[27]

73.     In accordance with Defendant Oxford CSD's policy, Fine did not request a return call from Doe's mother because Fine believed the situation did not present a "disciplinary" issue.[28]  Doe's mother did not return Fine's call.

74.     Later that day, Doe's mother sent a text to Doe, saying: "Seriously?? Looking up bullets in school??"  Doe responded: "Oh, yeah.  I already went to the office for that."[29]  Doe's mother then asked: "Did you at least show them a pic of your new gun?"  Doe responded: "No."[30]

75.     Later that same evening, on November 29, 2021, Doe posted the following language to his public Twitter account: "Now I am become Death, the destroyer of worlds.  See you tomorrow Oxford."

76.     On the morning of November 30, 2021, the day of the school shooting, Doe returned to Oxford High School, carrying his gun and 48 rounds of ammunition

---

[26] *Id*. at 111:21-23.
[27] *Id*. at 111:13-16.
[28] *Id*. at 137:12-17.
[29] *Prelim. Ex. Tr.,* vol. I, at 180:17-25.
[30] *Id.* at 182:12-18.

in his backpack. Also in his backpack, Doe carried a personal journal, which contained 21 pages of his plans to carry out the school shooting.[31]

77.    In part, the journal stated: "First off, got my gun.  It's an SP2022 Sig Sauer 9-millimeter.  Second, the shooting is tomorrow, I have access to the gun and ammo."[32]  The journal also contained two separate drawings of bullets.  One drawing was labeled ".22," while the second drawing was labeled "9-millimeter."  Positioned next to the .22 drawing is the description "kill range, 25M, max"; depicted next to the 9-millimeter drawing is the description "kill range, 100M."[33] Also largely drawn within the pages of the journal is what appears to be a cup containing liquid, a severed bird head, and a demon drawn next to the cup.[34]

78.    At approximately 8:30 a.m., a teacher in the English Department of Oxford High School sent an email to Defendant Hopkins, stating Doe was watching a video on his cell phone, during class time, that depicted a realistic shooting.[35]

79.    Doe's conduct in watching a video on his cell phone that depicted a realistic shooting, during school hours, was in violation of a variety of school rules, procedures, and policies.

---

[31] *Prelim Ex. Tr.,* vol. II, at 223:2-224:20.
[32] *Id.* at 226:3-6.
[33] *Id.* at 226:10-16.
[34] *Id.* at 226:17-227:1.
[35] *Id*. at 112:18-25.

80.     At approximately 8:50 a.m., Defendant Hopkins viewed the English teacher's above-mentioned email.[36]

81.     At approximately 8:59 a.m., Doe's math class participated in a test review.  On his math worksheet, Doe drew a picture of a Sig Sauer 9-millimeter handgun.  Underneath the gun, Doe wrote: "The thoughts won't stop.  Help me." To the right of those words, Doe drew a person with what appears to be two gunshot wounds, one placed in the chest and one in the abdomen, with blood coming from the person's mouth. On another area of the same worksheet, Doe wrote "blood everywhere" and drew a shell casing or bullet. On the bottom half of the worksheet, positioned below the above-mentioned writings and illustrations, Doe drew a laughing/crying emoji and wrote: "My life is useless" and "The world is dead." Upon seeing these writings and illustrations, Doe's teacher took a picture of the worksheet and reported Doe's drawings.[37]

82.     Doe's drawings and statements were clearly violent and disturbing, were an obvious cry for help, and openly expressed Doe's thoughts of suicide and/or homicide.

83.     Later that morning, Doe altered his writings and illustrations on the worksheet.  After scratching out the drawings of the gun and of the person with two

---

[36] *Id.* at 112:25.
[37] *Id*. at 113:7-9.

24

gunshot wounds, as well as scratching out the words "Help me," "Blood everywhere," "My life is useless," and "The world is dead," Doe added new, equally disturbing phrases to the worksheet. In an attempt to conceal the sinister content of his illustrations, Doe wrote: "Video game this is," "Harmless act," "I love my life so much!!!!," "OHS rocks!," and "Were [sic] all friends here."

84.     Defendant Ejak arrived to Defendant Hopkins' office at approximately 9:00 a.m. to inform Defendant Hopkins he had seen a picture of the writings and illustrations on Doe's math worksheet.[38]

85.     Thereafter, Defendant Hopkins walked to Doe's math classroom and removed Doe for a meeting in the counseling office.[39]

86.     Defendant Hopkins took possession of the math worksheet from Doe's desk and escorted Doe to the counseling office, in which Defendant Ejak waited.[40]

87.     At this point, Doe's backpack remained in the classroom.

88.     Defendant Hopkins testified he was "concern[ed] about the student [Doe] because it was a couple of messages in a couple days, and the purpose of the meeting was to find out what our next steps would be."[41]

---

[38] *Id.*
[39] *Id.* at 113:12-14.
[40] *Id.* at 113:21-25.
[41] *Id.* at 115:2-5.

89.     At some point, either before or during the meeting, Defendant Ejak returned to the math classroom and retrieved Doe's backpack, which contained Doe's handgun and forty-eight (48) rounds of ammunition.[42]

90.     At no point did Defendants Ejak or Hopkins search Doe's backpack or locker to determine whether Doe was armed and dangerous.

91.     At no point did Defendants Ejak or Hopkins search Doe's backpack or locker to determine whether he had immediate access to a deadly weapon he could use to harm himself or others.

92.     During the meeting, Defendant Hopkins questioned Doe about the video of a realistic shooting he watched in class on the morning of November 30, 2021. In response, Doe claimed the video he watched was of a video game, not an actual event.[43]

93.     Neither Defendants Ejak nor Hopkins attempted to watch the above-mentioned video to confirm the accuracy of Doe's representation of said video.[44]

94.     Defendants Ejak and Hopkins had actual knowledge of a safety threat and a concern for Doe's safety and well-being, given the events in the preceding months and days, which were known to them, and which included Doe searching for bullets on his phone, informing Hopkins and Fine of his shooting hobby, viewing a

---

[42] *Id*. at 150:18-25.
[43] *Id* at 115:8-16.
[44] *Id.* at 139:8-15; 142:24-25; 153:8-10.

26

video of a realistic shooting during English class, and drawing disturbing words and illustrations on his math assignment.

95.    During this meeting, Defendant Hopkins asked Doe about the disturbing words and illustrations he drew on his math assignment. Doe explained the drawings depicted a video game he wanted to design.  Doe gave no other explanation.[45]

96.    Defendant Hopkins knew Doe was not being truthful when Doe dismissed the words and illustrations as a video game design, as demonstrated by the fact Defendant Hopkins advised Doe that it "[did] not sound like a video game."[46]

97.    Doe made no attempt to deny Defendant Hopkins's assertion that his drawings and words did not depict a video game. In that moment, Defendant Hopkins observed Doe's demeanor visibly change, and, as described by Defendant Hopkins, Doe "became sad . . . He started pausing more in his speech.  He then described some [upsetting] things that had happened recently in his life," including the death of a family dog, the death of a grandparent, the effect that COVID and virtual learning had on Doe, and the loss of a close friend who had to leave school.[47]

---

[45] *Id*. at 116:11-15.
[46] *Id.* at 116:15-20.
[47] *Id.* at 116:22-117:10; 125:7-11.

98.    At this point, Defendant Hopkins determined Doe was having suicidal ideations.[48]

99.    Defendant Hopkins proceeded to conduct a risk assessment, asking Doe if he was a threat to himself or others.[49]

100.   Doe simply stated, "I can see why this looks bad. I'm not going to do anything."[50]

101.   Rather than fully accept Doe's response, Defendant Hopkins appropriately concluded Doe was suicidal and "was a threat to himself in spite of his statement."[51]

102.   However, Defendant Hopkins failed to "ask any further questions about a plan."[52]

103.   In the year leading up to Defendant Hopkins's conversation with Doe, three (3) other students at Oxford High school who were assigned to Defendant Hopkins had made suicide attempts.[53]

104.    Defendant Hopkins then called Doe's mother, but Doe's mother did not answer the call. Defendant Hopkins left a voicemail message for Doe's mother.[54]

---

[48] *Id.* at 117:14-16.
[49] *Id.* at 118:21-25.
[50] *Id.* at 125:1-3.
[51] *Id.* at 148:2-3.
[52] *Id.* at 125:16.
[53] *Id.* at 119:5-10.
[54] *Id.* at 120:15-18; 121:7-8.

105.    Defendant Hopkins next called Doe's father, but it "was empty air when [he] called." Defendant Hopkins was not given the option to leave a voicemail message.[55]

106.    Doe's mother then returned Defendant Hopkins's call.[56]

107.    When he answered the call, Defendant Hopkins placed the call on speaker so that Doe, Defendant Ejak, and Defendant Hopkins could all listen to and/or speak with Doe's mother.[57]

108.    During the call with Doe's mother, Defendant Hopkins expressed he "was concerned about [Doe]."[58]

109.    Defendant Hopkins then requested that Doe's mother come to Oxford High School for an in-person meeting.[59]

110.    Doe's mother expressed she was at work and would try to get in contact with Doe's father.[60]

111.    Doe's mother later called back, stating she would arrive at Oxford High School in a half hour. [61]

---

[55] *Id.* at 121:10-12.
[56] *Id.* at 121:9-14.
[57] *Id.* at 121:15-18.
[58] *Id.* at 122:23-24.
[59] *Id*. at 123: 9-10.
[60] *Id*. at 123:11-13.
[61] *Id.* at 123:20-24.

112.  While awaiting the arrival of Doe's parents, Defendant Hopkins remained in the counseling office with Doe because Defendant Hopkins knew Doe was suicidal and "did not want to leave him alone."[62]

113.  At approximately 10:30 a.m., Doe's mother and father both arrived at the Oxford High School.[63]

114.  When Doe's parents arrived, Defendant Hopkins texted Defendant Ejak to return to Defendant Hopkins's office for a meeting.[64]

115.  Upon their arrival, Doe's parents did not greet, touch, or hug Doe, and they did not seem friendly or show care and/or concern for their child, Doe. This conduct struck Defendant Hopkins as abnormal, as it was different from that of other like meetings that he had conducted with a student and his or her parents.[65]

116.  During the meeting with Doe and his parents, Defendant Hopkins expressed his concerns for Doe's well-being, including Defendant Hopkins's conclusion that Doe was suicidal.[66]

117.  Neither Defendant Hopkins nor Defendant Ejak questioned Doe's parents about Doe's access to a gun, despite the fact Doe had searched for bullets on his phone, had discussed his shooting hobby with Defendants, had viewed a video

---

[62] *Id*. at 124:14-15.
[63] *Id.* at 124:7-13.
[64] *Id*. at 126: 4-5.
[65] *Id.* at 126:11-22.
[66] *Id.* at 127:13-17.

of a realistic shooting during English class, had depicted a gun and a wounded person on his math worksheet, and had suicidal presentation.

118. Defendant Hopkins provided Doe's family with a list of resources for mental health support and emphasized the need for Doe to start counseling immediately, "today if possible."[67]

119. In specifying Doe should receive prompt assistance, "today if possible," Defendant Hopkins signified he knew of Doe's immediate threat to himself and to others.

120. In response to Defendant Hopkins's instructions, Doe's mother stated that "[t]oday is not possible. We have to return to work." [68]

121. Defendant Hopkins testified he was "taken aback" because he had never previously experienced a student's parent(s) arrive to the school, appear at such a meeting, and deny the counselor's advice to take the student home as requested.[69]

122. Defendant Hopkins then stated to Doe's parents that, within forty-eight (48) hours, he wanted Doe to be seen for mental health counseling, explaining that

---

[67] *Id.* at 128:3-10.
[68] *Id.* at 128:17-18.
[69] *Id*. at 129:21-130:6.

Defendant Hopkins would follow up to ensure Doe's parents had followed his instructions and had obtained counseling for Doe.[70]

123.   Defendant Hopkins warned Doe's parents that, should they fail to obtain counseling for Doe, Defendant Hopkins would report Doe's parents to Child Protective Services ("CPS").[71]

124.   In making this demand, Defendants Hopkins and Ejak evidenced their awareness that, at a minimum, Doe was a threat to himself and others and that any failure to urgently address Doe's mental health condition was criminal abuse and/or neglect.

125.   Defendant Hopkins testified his "primary concern" was that he did not want Doe to be alone, but he did not feel confident Doe's parents would obtain counseling for Doe, as Defendant Hopkins had instructed them to do.[72]

126.   Defendants Ejak and Hopkins knew that the refusal of Doe's parents to address this emergent medical need was evidence of child abuse and/or neglect and was of the kind that needed to be reported "immediate[ly]" under Michigan's Child Protection Act, MCL § 722.623(1)(a), *et seq.*

---

[70] *Id*. at 130:4-7.
[71] Oxford Community Schools, "December 4, Update from Supt. Throne" (Letter from Superintendent Throne to Oxford Wildcat Nation, dated December 4, 2021), at page 2, https://www.oxfordschools.org/for_parents___students/2021-22_district_communications/december_4__update_from_supt__throne (last visited Nov. 28, 2022). **Exhibit B.**
[72] *Prelim Ex. Tr.,* vol. II, at 130:11-18.

127. Based on the facts and circumstances known to them at the time, as outlined above, Defendants Ejak and Hopkins knew Doe was suicidal.

128. Further, Defendants Ejak and Hopkins knew or should have known that Doe had expressed homicidal ideation and that he presented a substantial risk of deadly harm to others.

129. According to Defendant Hopkins, the meeting ended abruptly with Doe's mother asking, "are we done?"[73]

130. In response, Defendant Hopkins looked to and asked Defendant Ejak "if there was any disciplinary reason why [the] student could not return to class."[74]

131. Ejak responded "no."[75]

132. However, Doe's conduct—in using his cell phone during school hours to access the internet to look up information about ammunition on November 29, 2021, and in using his cell phone again during school hours to watch a video of a realistic shooting on November 30, 2021—was in violation of a variety of school rules, procedures, and policies.

133. Defendant Hopkins then responded to Doe's mother, stating, "I guess so."[76]

---

[73] *Id.* at 132:1-3.
[74] *Id.* at 132:5-7.
[75] *Id.* at 132:8-9.
[76] *Id.* at 132:13-14.

134.   In his testimony, Defendant Hopkins affirmed he "could have stated that" Doe "has to leave."[77]

135.   Defendant Hopkins testified Doe was "showing signs of needing help, of needing support," but that Doe "got the opposite" from his parents.[78]

136.   The meeting between Defendant Ejak, Defendant Hopkins, Doe's parents, and Doe lasted "[l]ess than 15 minutes."[79]

137.   Despite having spoken with Doe the day prior and having learned of Doe's access to firearms and Doe's shooting hobby, and after also having gained knowledge of Doe's suicidal and homicidal ideations, Defendants Ejak and Hopkins, upon deliberation on the next course of action, determined Doe could return to class, which Doe did do, and wrote a "pass back to class" for Doe.[80]

138.   In doing so, Defendants Ejak and Hopkins returned Doe's backpack to Doe without searching its contents.[81]  Further, neither Defendant Ejak nor Defendant Hopkins searched Doe's locker or person.

139.   At the time they returned Doe's backpack, Defendants Ejak and Hopkins had just cause to either inspect the contents of the backpack or, if they felt such just cause did not exist, to withhold the backpack from Doe until proper

---

[77] *Id.* at 148:18-21.
[78] *Id.* at 132:24-133:2.
[79] *Id.* at 131:4-5.
[80] *Id.* at 132:17-18.
[81] *Id.* at 151:20-25; 153:5-7.

authority could be provided for them to inspect the backpack themselves or to have law enforcement inspect the backpack.

140.   Defendants Ejak and Hopkins made the deliberate decision to return Doe to the classroom with possession of Doe's unsearched backpack, despite having knowledge that the meeting with Doe's parents worsened Doe's emotional and psychiatric condition, that Doe was obsessed with firearms and gun violence, that Doe had recently searched for bullets the day prior, that Doe had watched videos depicting realistic shootings earlier that same morning, and that Doe's writings and illustrations earlier that same morning had depicted graphic gun violence and death. The deliberate decisions of Defendants Ejak and Hopkins shocks the conscience and demonstrates deliberate indifference to the safety of students at Oxford High School.

141.   Because Defendant Hopkins "wanted to make sure [Doe] was never alone," he "checked to make sure that [Doe] was being marked present for his classes."[82]

142.   Defendants Ejak and Hopkins knew that threatening to call Child Protective Services within forty-eight (48) hours, and that threatening to remove Doe from his parents' home, without taking any real action, would create the danger and/or increase the likelihood that, if Doe had violence in mind, Doe would act before losing the opportunity to do so.

---

[82] *Id.* at 134:2-12.

143.   Defendants Ejak and Hopkins knew that, because Doe was suicidal and because the facts established probable cause to know Doe posed a threat to himself and others, Doe should be supervised in a safe setting and should not be left alone.

144.   Defendants Ejak and Hopkins, as school administrators, had the authority to maintain Doe in a safe, secure, restricted environment in the counseling office based on the disciplinary reason that Doe's conduct—in using his cell phone during school hours to access the internet to look up information about ammunition on November 29, 2021, and in using his cell phone during school hours to watch a video of a realistic shooting on November 30, 2021—was in violation of a variety of school rules, procedures, and policies.

145.   Defendants Ejak and Hopkins, as school administrators, had the authority to maintain Doe in a safe, secure, and restricted environment in the counseling office, in which space, and based on the assessment that he was suicidal, adults could have supervised Doe, and Doe would not have had access to weapons that he could use to harm himself or others.

146.   Instead, Defendants Ejak and Hopkins used their authority and affirmatively acted to return Doe to class with his unsearched backpack, despite having knowledge Doe was suicidal and that Doe posed a substantial threat to himself and others.

36

147.   Defendants Ejak and Hopkins misused their authority by sending Doe back through the school to his third period class, alone, and by allowing Doe to return to class with his unsearched backpack, which contained Doe's handgun and forty-eight (48) rounds of ammunition.

148.   Defendants Ejak and Hopkins deliberately conducted the meeting with Doe and his parents to the exclusion of the police school liaison officer, thereby preventing the police school liaison officer from being present at the meeting and from taking action to prevent the mayhem that followed.

149.   Because Defendant Hopkins knew Doe was suicidal, Defendant Hopkins used the school's attendance reporting system to remotely track Doe through the day and to see if Doe had been checked in as "present" for his third and fourth period classes.[83]

150.   Defendants Ejak and Hopkins, despite knowing Doe was suicidal and was a threat to himself, despite his statement to the contrary,[84] concealed those facts from Doe's teachers, as well as from the school's police liaison officer, and further concealed from Doe's teachers and the school's police liaison officer both the fact Doe should not be left alone and the threat Doe posed to himself and others.[85]

---

[83] *Prelim Ex. Tr.*, vol. II, at 134:2-12.
[84] *Id.* at 148:2-6.
[85] *Id.* at 158:19-22.

151.   Less than two hours after Defendants Ejak and Hopkins released Doe from the safe, secure, restricted environment in the counseling office, Doe carried his backpack into a bathroom and loaded his handgun.

152.   Doe emerged from the bathroom into the hallway of Oxford High School, at which time he began to fire his handgun and shoot at students.

153.   Doe would ultimately kill four students and seriously injure seven others.

154.   Named Plaintiffs enrolled in high school were present at Oxford High School on the day of November 30, 2021, and at the time of the shooting.

155.   Named Plaintiffs and the members of the putative Class enrolled in high school escaped the horrific shooting by way of hiding in the classrooms and bathrooms, running through the hallways, and/or fleeing the premises of Oxford High School.

156.   At approximately 12:52 p.m., the authorities were notified of an active shooter at Oxford High School.

157.   Upon information and belief, law enforcement halted Doe's shooting rampage when they apprehended Doe.

158.   Certain Plaintiffs and many members of the putative Class were classmates and/or close friends with the victims of the school shooting on November 30, 2021.

159.   Many members of the putative Class, who were present in the hallway in which the tragic massacre took place, witnessed friends and classmates as they were shot, injured, and/or killed.

160.   Law enforcement escorted many members of the putative Class, including several Plaintiffs, who were hiding in classrooms as the tragic massacre took place, out of the building.

161.   Defendant Oxford CSD published an update to the community on November 30, 2021, following the school shooting, stating "[a]ll schools in the district, including [Oxford Early Learning Center], will be closed for the remainder of the week."[86] Further, Defendant Oxford CSD published a "Schedule for the Upcoming Week" on December 5, 2021, which explained "[Oxford Early Learning Center] tuition programs only will re-open to families" on Wednesday, December 8, 2021; "DK-8 students only will return for a half-day" on Friday, December 10, 2021, and all DK-8, Bridges, and Crossroads "[s]tudents will return for a full day" on Monday, December 13, 2021; and, for those "students and staff" involved in Oxford Virtual Academy, as well as all students enrolled in "Oxford Hybrid, primary and

---

[86] Oxford Community Schools, "November 30, Update on Tragedy and District Plan" https://www.oxfordschools.org/for_parents___students/2021-22_district_communications/november_30__update_on_tragedy_and_district_plan (last visited Nov. 28, 2022). **Exhibit C.**

secondary levels," classes "will resume in person and online" on Thursday, December 9, 2021.[87]

162.   Named Plaintiffs and the members of the putative Class incurred and continue to live with severe emotional damage and psychological harm that resulted in physical manifestations, such as fright, shock, and terror; conscious pain and suffering; emotional distress; mental anguish; Post-Traumatic Stress Disorder; depression and anxiety; disruption of their lives; and humiliation and/or mortification.

163.   On December 1, 2021, Doe was arraigned and charged as an adult with one count of terrorism causing death, four counts of first-degree murder, seven counts of assault with intent to murder, and twelve counts of possession of a firearm in the commission of a felony.

164.   The environment before Defendants Ejak and Hopkins affirmatively acted to release Doe to the classroom was a status quo of safety, as Doe was safely and securely restricted to the counseling office, was under the direct supervision of school administrators, and did not have access to weapons.

---

[87] Oxford Community Schools, "December 5, Schedule for the Upcoming Week" https://www.oxfordschools.org/for_parents___students/2021-22_district_communications/december_5__schedule_for_the_upcoming_week (last visited Nov. 28, 2022). **Exhibit D.**

165. Defendants Ejak and Hopkins had the official authority to act as "gatekeepers" in deciding whether to release Doe from the safe, secure, and restricted environment in the counseling office and to return Doe to the classroom with his backpack.

166. Defendants Ejak and Hopkins used their authority to return Doe to the classroom, causing a departure from the status quo of safety, thus creating and increasing a risk of violence that did not exist prior to the affirmative acts of Defendants Ejak and Hopkins.

167. The affirmative acts of Defendants Ejak and Hopkins, which departed from the status quo of safety, rendered the occupants of Oxford High School, including named Plaintiffs and putative Class members more vulnerable to danger than they would have been had Defendants Ejak and Hopkins not affirmatively acted to return Doe to the classroom from the safe, secure, and restricted environment in the counseling office.

168. Moreover, the way in which Defendants Ejak and Hopkins conducted the meetings on the morning of November 30, 2021, worsened the situation and affirmatively increased and accelerated the danger of harm to the occupants of Oxford High School and the Oxford CSD, including named Plaintiffs and members of the putative Class.

41

169.   The meetings, which Defendants Ejak and Hopkins conducted on the morning of November 30, 2021, worsened the situation and were a contributing cause-in-fact of the shooting because the meetings placed direct pressure on Doe, who was experiencing a mental health crisis and whom Defendants Ejak and Hopkins knew to be in a state of suicidal and homicidal ideation.

170.   Furthermore, the meetings, which Defendants Ejak and Hopkins conducted on the morning of November 30, 2021, directly subjected Doe to the shame, fear, humiliation, and/or embarrassment by way of Doe's parents choosing to ignore, ridicule, and/or embarrass Doe in the presence of Defendants Ejak and Hopkins, thus increasing the risk of Doe acting with violence upon his release from the safe, secure, and restricted environment in the counseling office to the greater school environment.

171.   The decision of Defendants Ejak and Hopkins to conduct the meetings with Doe's parents, while in Doe's presence, was inappropriate and certain to exacerbate Doe's feelings of distress and anger.

172.   The actions of Defendants Ejak and Hopkins in threatening to call CPS on Doe's parents, while in Doe's presence, and thereby threatening the removal of Doe from his home, exacerbated Doe's distress and mistreatment at the hands of Doe's parents, which thereby created and increased the danger that Doe would act on his violent ideations upon the affirmative acts of Defendants Ejak and Hopkins

to release Doe from the safe, secure, and restricted environment in the counseling office to the greater school environment.

173. The affirmative acts of Defendants Ejak and Hopkins to return Doe's unsearched backpack, which contained Doe's handgun and forty-eight (48) rounds of ammunition, to Doe and to release Doe into the greater school environment placed the occupants of Oxford High School, including named Plaintiffs and putative Class members, directly in harm's way and provided Doe with the weapon and ammunition he used to commit the deadly shooting.

174. By giving Doe the unsearched backpack, which contained Doe's handgun and forty-eight (48) rounds of ammunition, and by releasing Doe from the safe, secure, and restricted environment in the counseling office to the greater school environment, Defendants Ejak and Hopkins affirmatively set into motion the shooting that ensued, acting with deliberate indifference to the substantial and obvious threat of a school shooting and with recklessness demonstrating deliberate indifference and a substantial lack of concern for whether an injury resulted, either to Doe or to the occupants of Oxford High School, including named Plaintiffs.

175. Defendants Ejak and Hopkins affirmatively acted to conceal information by not informing either Doe's teachers or the police school liaison officer of the situation, including the fact Doe was suicidal, which thereby created and increased the danger that Doe would act on his violent ideations.

43

176.   The fact Defendants Ejak and Hopkins took the above-mentioned affirmative actions, despite their knowledge that Doe was suicidal and was expressing specific violent ideations about gun violence, is shocking to the conscience.

177.   Based on the knowledge the Oxford Defendants possessed prior to the occurrence of the violent shootings on November 30, 2021, the fact Doe would carry out acts of violence against all occupants of Oxford High School, including named Plaintiffs and putative Class members, was foreseeable to the Oxford Defendants.

178.   The affirmative actions of Defendants were reckless, grossly negligent, shocked the conscience, and placed all occupants of Oxford High School, including named Plaintiffs and putative Class members, at substantial risk of serious and immediate harm.

179.   Defendants knew that their actions would endanger the lives of Oxford High School students, including those of named Plaintiffs, members of the putative Class, and the lives of other occupants of Oxford High School on November 30, 2021.

**C. Defendant Oxford CSD, in accordance with its illegal policies, practices, and customs, engaged in a concerted cover story to deflect responsibility for the Oxford High School Shooting.**

180.   Since the day of this tragic shooting, Defendant Oxford CSD and its administrators have tirelessly manufactured and maintained a cover story to justify

the decision to release Doe from the counseling office—where he was safely and securely restricted, where his movement and actions were restricted, where he was under the direct supervision of school administrators, and where he did not have access to weapons—and to allow Doe to return to class, despite having knowledge Doe was experiencing a mental health crisis, was obsessed with guns and gun violence, had access to firearms, and was determined to be a threat to himself and others.

181.   Defendant Oxford CSD has specifically sought to avoid accountability by claiming it has a formal policy and practice of returning students to class unless there exists a "disciplinary" issue.

182.   Under this policy, Defendant Oxford CSD claims that only when a "disciplinary" issue presents itself can the administrators send a student home or hold a student in the counseling office.

183.   In the present case, Defendant Oxford CSD alleges that because Doe did not present a "disciplinary" issue, Defendant Oxford CSD had no choice but to return Doe to class.

184.   This policy, in addition to Defendant Oxford CSD's continuous use of false justifications, demonstrates egregious deliberate indifference to the danger presented to a school when administrators return a student whom school

administrators knew to be suicidal and who presented a clear threat, such as Doe, to the greater school environment.

185.   Furthermore, upon information and belief, even if the school policy sounded in appropriate justifications, Doe's conduct did present a "disciplinary" issue when he used his cell phone during school hours to access the internet to look up information about ammunition on November 29, 2021, and when he used his cell phone during school hours to watch a video of a realistic shooting on the same day as the meetings, November 30, 2021, in violation of a variety of school rules, procedures, and policies.

186.   Defendant Oxford CSD has consistently maintained its development of this false narrative in an effort to avoid accountability.  On December 2, 2021, former Superintendent Throne issued a video message to the Oxford Community, suggesting that, while the "front office" did have contact with Doe before the attack, Defendant Oxford CSD and its administrators could not detain Doe because, and in accordance with school policy, discipline was not warranted. Specifically, Throne stated, "I want you to know there's been a lot of talk about the student who was apprehended. That he was called up to office and all that kind of stuff. No discipline was warranted.  There are no discipline records [for Doe] at the High School.  Yes,

this student did have contact with our front office.  And yes, his parents were on campus on November 30th."[88]

187.   Throne's above statement was deliberately misleading because of what it fails to communicate.  Throne knew that, on the morning of the shooting, school staff and administrators deemed Doe to be suicidal; Throne knew that, upon gaining knowledge of Doe's suicidal ideations, school staff and administrators affirmatively acted to release Doe from the counseling office where he was safely and securely restricted, where his movement and actions were restricted, where he was under the direct supervision of school administrators, and where he did not have access to weapons; and Throne knew that staff and administrators of Defendant Oxford CSD affirmatively acted to return Doe to class, despite having knowledge Doe was experiencing a mental health crisis, was obsessed with guns and gun violence, had access to firearms, and was determined by staff and administrators of Defendant Oxford CSD to be a threat to himself and others.

188.   On or about December 4, 2021, Throne wrote a letter to the parents of students at Oxford High School.  At this point, Defendant Oxford CSD's misleading narrative became completely contrived.  In describing the unfolding of events that

---

[88] Tim Throne, *Superintendent of Oxford Community Schools, December 2, 2021 Message to Oxford Community*, ABC12 (December 2, 2021 video), https://www.abc12.com/tim-throne-superintendent-of-oxford-community-schools-december-2-2021-message-to-oxford-community/video_8b3c9912-5436-11ec-a344-5f875adc8e6e.html (last visited Nov. 28, 2022).

occurred on the morning of November 30, 2021, while Doe was present in Defendant Hopkin's office, Throne stated that at "no time did the counselors believe the student might harm others based on his behavior, responses and demeanor, which appeared calm." At the time he made this statement, Throne knew it was false. Even so, Throne continued in his letter, stating, "[w]hile both of his parents were present, counselors asked specific probing questions regarding the potential for self-harm or harm to others. His answers, which were affirmed by his parents during the interview, led counselors to again conclude he did not intend on committing either self-harm or harm to others. The student's parents never advised the school district that he had direct access to a firearm or that they had recently purchased a firearm for him."[89]

189. Again, the above assertion was false. In stark contrast to the contents of Throne's letter, Defendant Hopkins determined Doe was suicidal on November 30, 2021, and was fully aware Doe was experiencing a mental health crisis, was obsessed with guns and gun violence, had access to firearms, and was a threat to himself and others. Throne's above statement was deliberately misleading because, when Throne made these assertions, he knew they were false.

---

[89] Oxford Community Schools, "December 4, Update from Supt. Throne" (Letter from Superintendent Throne to Oxford Wildcat Nation, dated December 4, 2021), at page 2, https://www.oxfordschools.org/for_parents___students/2021-22_district_communications/december_4__update_from_supt__throne (last visited Nov. 28, 2022). **Exhibit B.**

190.   On page one of Throne's letter from December 4, 2021, Throne claims he "asked for a third-party investigation be [sic] conducted so we leave no stone unturned, including any and all interaction the student had with staff and students." Towards the end of his letter, Throne reiterated the above statement, claiming, "[a]gain I have personally asked for a third-party review of all the events of the past week because our community and our families deserve a full, transparent accounting of what occurred."[90]

191.   On December 4, 2021, Attorney General Dana Nessel sent an email to then-Superintendent Throne, offering to perform a complimentary review and an independent investigation of the events leading up to the tragic shooting on November 30, 2021, and stating her department was the "perfect agency" to conduct the investigation.[91]

192.   Attorney General Nessel explained she "didn't want to see the school district bring in a private law firm … where they are the client," elaborating that such reviews are "not fully independent investigations."[92]

---

[90] *Id.*
[91] *Nessel offers to conduct AG investigation into Oxford school shooting*, The Detroit News, https://www.detroitnews.com/story/news/local/oakland-county/2021/12/05/oxford-high-school-shooting-nessel-ag-review/8878611002/ (last visited Nov. 1, 2022).
[92] *Id.*

193.    The next day, on December 6, 2021, Defendant Oxford CSD announced it was not going to accept Attorney General Nessel's offer for a complimentary independent investigation.

194.    In or around January 2022, the National Center for School Safety ("NCSS"), located in Ann Arbor, Michigan, offered to assist Oxford High School. NCSS is a national program "focused on improving school safety and preventing school violence."[93]

195.    Despite parents and students at Oxford High School having pled with administrators and members of the school board to accept offers from programs that focus on threat assessments, Defendant Oxford CSD failed to respond to NCSS's complimentary offer.

196.    On January 24, 2022, Oxford High School reopened for in-person learning. In preparation for the return of its students, Defendant Oxford CSD replaced the carpet, added a fresh layer of paint, and blocked off the boys' bathroom in which the school shooting began on November 30, 2021.

197.    On January 24, 2022, students at Oxford High School, including Plaintiffs, returned to the same building, passed under the same doors, and walked through the same hallway in which the tragic shooting took place on November 30, 2021.

---

[93] *National Center for School Safety*, https://www.nc2s.org (last visited Nov. 1, 2022).

198.   To date, each time students at Oxford High School attend class, they return to the same building, pass under the same doors, and walk through the same hallway in which the tragic shooting took place on November 30, 2021.

199.   On April 19, 2022, Attorney General Dana Nessel sent a letter to the Oxford Board of Education, renewing her "offer to perform an independent investigation of the events that transpired on November 30th," the costs of which would be "borne solely by [her] office." Attorney General Nessel requested a response to be communicated by May 20, 2022.[94]

200.   On or around May 10, 2022, Defendant Oxford CSD rejected Attorney General Nessel's offer for a complimentary independent investigation, claiming a third-party review "of the tragedy and associated events of November 2021 [would] not occur until the criminal and civil litigations are complete," explaining "it would be ill-advised for [the Oxford school board] to start a third-party review about what happened that day when [they] don't know all the facts."[95]

201.   During the Oxford school board meeting on May 10, 2022, students and parents voiced their frustrations with Defendant Oxford CSD's decision to refuse

---

[94] Letter from Attorney General Dana Nessel to Oxford Board of Education dated April 19, 2022, page 1, https://www.michigan.gov/ag/-/media/Project/Websites/AG/releases/2022/April/LtrOxfordBdEd41922_751181_7.pdf?rev=4629422cbadc49858106eed32f24c9ca&hash=15936B35B43CCB9215F09543B6383AEF (last visited Nov. 1, 2022). **Exhibit E.**

[95] *Oxford school board rejects AG's 2nd offer to investigate deadly shooting*, WXYZ-TV Detroit, https://www.youtube.com/watch?v=yqNWF91qO5s (last visited Nov. 1, 2022).

Attorney General Nessel's above-mentioned offers and with its lack of transparency.[96]

202.   On May 17, 2022, after denying two complimentary offers and hearing the concerns of its students and parents, Defendant Oxford CSD "agreed upon outside firms for a third-party review of the events surrounding the Oxford High School shooting in November." The Oxford school board "unanimously voted to hire Varnum, a Grand Rapids-based law firm, and Guidepost Solutions to conduct the review."[97]

203.   Students and parents at Oxford High School join Attorney General Nessel in her concerns that Defendant Oxford CSD's decision to hire outside firms, only after refusing multiple complimentary offers of independent third-party reviews, will allow them to "maintain attorney-client privilege with elected members" and will, therefore, have "the ability to stop short of full transparency."[98]

204.   On June 13, 2022, Attorney General Nessel sent a letter to Defendant Oxford CSD, requesting that it "reconsider its rejections of her offer to review the events leading up to the" school shooting on November 30, 2021.[99] In her letter,

---

[96] *Id.*
[97] *Oxford Community Schools hires outside firms for third-party review of shooting*, Michigan Radio (May 18, 2022), https://www.michiganradio.org/education/2022-05-18/oxford-community-schools-hires-outside-firms-for-third-party-review-of-shooting (last visited Nov. 1, 2022).
[98] *Id.*
[99] *Nessel offers Oxford schools weapon-detecting dog, renews effort to review mass shooting*, The Detroit News (June 13, 2022), https://www.detroitnews.com/story/news/local/oakland-

Attorney General Nessel further offered Defendant Oxford CSD "the use of a dog trained to detect explosives and firearms along with a handler at the high school next school year."[100]

205.   On or around June 15, 2022, Defendant Oxford CSD "reportedly rejected Nessel's third offer to revisit the events leading up" to the school shooting.[101] Unsurprisingly, Defendant Oxford CSD also "turned down [Attorney General Nessel's] offer of a free school safety dog, trained and handled by some of the best professionals in the business."[102]

206.   To date, Defendant Oxford CSD has not fulfilled its pledge of full transparency to the students and parents at Oxford High School and to the greater Oxford Community.

207.   As a result, there exists a substantial and unacceptable risk that the Class members' well-established property rights in a free and full public education will again be violated by Defendants and their educations disrupted by violence.

---

county/2022/06/13/nessel-offers-oxford-schools-weapon-detecting-dog-review-shooting/7614773001/ (last visited Nov. 1, 2022).

[100] *Id.*

[101] *Michigan AG Nessel: Oxford School Board Rejects Offer To Provide Weapon Detection Dog*, CBS Detroit (June 15, 2022), https://www.cbsnews.com/detroit/news/michigan-ag-nessel-oxford-school-board-rejects-offer-to-provide-weapon-detection-dog/ (last visited Nov. 1, 2022).

[102] *Id.* (quoting a tweet by A.G. Nessel)

## CLASS ACTION ALLEGATIONS

208.    This action is being brought and may be properly maintained as a class action under Fed. R. Civ. P. 23(b)(1) and (b)(2) on behalf of a class defined as follows:

> *All students of the Oxford Community School District, by their next friends where such students are minors.*

209.    Plaintiffs reserve the right to amend and further clarify their proposed class definition as investigation and discovery proceeds.

210.    As detailed above, named Plaintiffs are members of the proposed class ("Class").  This Court may designate particular claims or issues for class treatment and joint or common trial pursuant to Fed. R. Civ. P. 23 (c)(4)(A) and may designate one or more subclasses pursuant to Fed. R. Civ. P. 23(c)(4)(B) as it finds appropriate.

211.    Excluded from the Class are Defendants, including any subsidiary, affiliate, related entity, or controlled person of Defendants, and Defendants' officers, administrators, directors, agents, and/or employees, as well as any judge, justice, or judicial officer presiding over this matter, and members of their immediate families.

212.    The requirements of Fed. R. Civ. P. 23(a) are satisfied in that:

    a. The Class for whose benefit this action is brought is so numerous that joinder of all Class members is impracticable.  Oxford CSD reports on its website that, as of the 2021 Fall count, there are 430

full-time teachers and a student-teacher ratio of 20:1.[103]
Accordingly, Plaintiffs estimate that the Class would contain
approximately 8,600 students.

b.  Because Defendants have acted with respect to the Class in a manner
that applies generally to each Class member, there are questions of
law or fact common to the members of the Class. Further, there is a
well-defined community of interest in the questions of law and fact
at play in this action, which affect all Class members.

c.  The claims or defenses of the representative parties are typical of the
claims being advanced on behalf of the Class. As students in the
same school district, subject to the same policies, practices, and
customs described herein, all members of the Class have been and/or
continue to be similarly affected by Defendants' wrongful conduct,
in violation of federal and state law. Plaintiffs are unaware of any
interests that conflict with or are antagonistic to the interests of the
Class.

d.  The representative parties will fairly and adequately assert and
protect the interests of the Class. Plaintiffs have retained counsel

---

[103] Oxford Community Schools, "About Our District,"
https://www.oxfordschools.org/district/about_our_district (last visited Nov. 28, 2022). **Exhibit A.**

competent and experienced in this type of litigation. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and named Plaintiffs are aware of their duties and responsibilities to the Class.

213.   Clearly, the Oxford CSD cannot have a separate set of safety and security policies and procedures for each student. The relief being sought herein is indivisible. As such, the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied in that separate actions prosecuted by individual students would create a risk that:

    a.  inconsistent or varying adjudications would establish incompatible standards of conduct for Defendants; and

    b.  adjudications of individual students' claims would be practically dispositive of the interests of other students not party to the individual adjudications.

214.   Further, the requirements of Fed. R. Civ. P. 23(b)(2) are satisfied in that Defendants have acted and refused to act on grounds that apply generally to the Class.

215.   Common questions of fact and law that are shared by the named Plaintiffs and all putative Class members include without limitation the following:

    a.  Whether the actions of Defendants leading up to the school shooting were inconsistent with constitutional safeguards;

56

b.  Whether the actions of Defendants leading up to the school shooting were in accordance with official policy of Defendant Oxford CSD;

c.  Whether official policies of Defendant Oxford CSD created or contributed to the danger of deadly violence at Oxford High School, leading to the school shooting;

d.  Whether Defendant Oxford CSD failed to adequately train, discipline, and supervise all individually-named Defendants, promulgating and maintaining de facto unconstitutional policies, practices, and/or customs;

e.  Whether the actions of Defendants amount to violations of Class members' well-established property right to the full and equal enjoyment of a public education under the Due Process Clause of the Fourteenth Amendment;

f.  Whether Defendants have failed to restore Class members' well-established property right to the full and equal enjoyment of a public education under the Due Process Clause of the Fourteenth Amendment;

g.  Whether Defendants' failure to restore Class members' well-established property right to the full and equal enjoyment of a public education caused Class members to suffer irreparable harm;

57

h.  Whether and how Defendant's policies, practices, and/or customs should be changed to protect Class members' rights; and

i.  Whether the current actions and/or inactions of Defendants continue to create a substantial, material, and unacceptable threat of further violence in Oxford schools, including without limitation another school shooting;

j.  What safety improvements and changes to policies, practices, and customs are appropriate moving forward in Oxford CSD.

216.  Proceeding as a Class in this case not only raises Class-wide common questions, but the common questions identified above can be answered and resolved in a single stroke for all Class members by the Court granting the indivisible relief sought herein.

217.  Although notice to a Class certified under Fed. R. Civ. P. 23(b)(1) or (b)(2) is discretionary (Fed. R. Civ. P. 23(c)(2)(A)), if the Court finds notice to be appropriate, Defendant Oxford CSD's enrollment records will simplify and expedite the process of ascertaining Class membership and sending notice to the Class.

218.  Defendants have acted or failed to act on grounds generally applicable to the entire Class as described herein, making the relief sought in this action appropriate with respect to the Class as a whole.

## COUNT I:
### PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF FOR VIOLATION OF CIVIL RIGHTS UNDER 14TH AMENDMENT DUE PROCESS AND 42 U.S.C. §§ 1983 & 1988
### (By Plaintiffs and the Class Against Defendants Oxford CSD & Weaver)

219.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

220.   As citizens and/or legal residents of the United States, Plaintiffs were entitled to all rights, privileges, and immunities accorded to all citizens and/or legal residents of the State of Michigan and of the United States.

221.   The Fourteenth Amendment of the United States Constitution, as enforced under 42 U.S.C. § 1983, forbids state actors from depriving any person of life, liberty, or property without due process of law.

222.   Based on the provisions of Michigan law regarding public education, all students of Defendant Oxford CSD, including named Plaintiffs and the members of the putative Class, have a constitutionally protected right to a public education, which is protected as a property interest under the Due Process Clause of the Fourteenth Amendment.

223.   Defendants Oxford CSD and Superintendent Weaver must exercise their authority in the operations of the Oxford Community School District to be consistent with constitutional safeguards.

224.   As alleged in this Complaint, Defendants took affirmative state actions that, in accordance with official policy of Defendant Oxford CSD, created the danger of deadly violence at Oxford High School and that caused the shooting at Oxford High School on November 30, 2021, to occur.

225.   Named Plaintiffs and the members of the putative Class were attending and going about their usual days as students when the shooting began on November 30, 2021.

226.   All schools within the Oxford Community School District remained closed for extended periods of time, including but not limited to "DK-8" students, who returned for the first time after the shooting for a half-day on Friday, December 10, 2021. Like the Oxford High School students, students in grades "DK-8," including named Plaintiff E.J., an Oxford Middle School student, and members of the putative Class, were completely deprived of their constitutional right to a public education from November 30, 2021, until each school's respective reopening date.

227.   Oxford High School remained closed, and its surviving students, including named Plaintiffs and the members of the putative Class, were completely deprived of their constitutional right to a public education from November 30, 2021, until January 24, 2022.

228.   Since the reopening of Oxford High School, on January 24, 2022, Defendant Oxford CSD, as well as Throne, the former Superintendent, and

Defendant Weaver, the current Superintendent, have failed to remedy the unconstitutional policies and customs that caused the shooting to occur, therefore, depriving the students of the Oxford CSD, including named Plaintiffs and the members of the putative Class, of the full and equal enjoyment of their property right to a public education.

229. To date, Defendant Oxford CSD has failed to take any measures to restore the property right of its students, including named Plaintiffs and the members of the putative Class, to the full and equal enjoyment of a public education in Oxford CSD.

230. Defendant Oxford CSD's failure to fully restore the property right of students at Oxford High School, including named Plaintiffs and the members of the putative Class, to a public education include but are not limited to the following:

    a. After the shooting, through then-Superintendent Throne, Defendant Oxford CSD promised it would complete a thorough and independent investigation to review its actions and the events leading to the shooting. Since then, Defendant Oxford CSD has denied Attorney General Nessel's offers of a complimentary transparent third-party review; has ignored offers from other organizations, such as NCSS, to provide assistance for the return to school and for the implementation of safety policies and/or procedures; and, while it has hired a private firm, Defendant Oxford CSD has failed to conduct a transparent third-party investigation, as promised;

    b. Defendant Oxford CSD maintains its unconstitutional policy of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others,

so long as the circumstances do not present a "disciplinary" issue. So long as this policy is maintained, Defendant Oxford CSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;

c. Defendant Oxford CSD maintains a policy of failing to train administrators that they can restrict suicidal students from returning to the classroom;

d. Defendant Oxford CSD maintains a policy of failing to train administrators on how to complete a thorough and effective risk assessment for suicidal students;

e. Defendant Oxford CSD maintains a policy of permitting its staff and administrators to refrain from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

f. Since the shooting, Defendant Oxford CSD has engaged in a concerted cover story of its actions leading to the shooting. This includes, and is not limited to, asserting in court proceedings and in that media that it properly returned Doe to the classroom on November 30, 2021, despite knowing he was suicidal, because his case did not present a "disciplinary issue" that would warrant keeping him in the counseling office that day; and

g. Since the shooting, Defendant Oxford CSD has engaged in a concerted cover story of the percentage of and frequency at which students at Oxford High School attend school since the return of in-person classes on January 24, 2022, as many students, including named Plaintiffs and the members of the putative Class, continue to live with the fear of another school shooting.

231. Due to the failure of Defendants Oxford CSD and Weaver to restore the full property interest of their students to a public education, named Plaintiffs and the members of the putative Class have suffered and will continue in the future to suffer

62

irreparable harm, including but not limited to: (a) fright, shock, and terror; (b) loss of trust; (c) conscious pain and suffering; (d) emotional distress; (e) mental anguish; (f) Post-Traumatic Stress Disorder; (g) depression and anxiety; (h) disruption of their lives; and (i) humiliation and/or mortification.

232.   Further, if not remedied, the violations by Defendants Oxford CSD and Weaver detailed herein create a substantial, material, and unacceptable threat of further violence in Oxford schools, including without limitation another school shooting.

233.   To redress and remedy these unconstitutional practices, Plaintiffs request the following prospective and injunctive relief on their own behalf and on behalf of the Class:

      a.   An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately conduct an independent and fully transparent third-party investigation of the events that transpired prior to and during the school shooting on November 30, 2021;

      b.   An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately cease the policy, practice, and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

      c.   An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately reform the policy, practice, and/or custom of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a

"disciplinary" issue. So long as this policy, practice, and/or custom is maintained, Defendant Oxford CSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;

d. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately cease the policy, practice, and/or custom of providing selective information to parents and instead provide fully transparent information to parents and students, especially when such information concerns potential threats of safety and violence to the students and occupants of Oxford CSD schools;

e. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to rely on a certified school threat assessment expert to determine whether a threat is valid or invalid;

f. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to inform parents within twenty-four (24) hours of notice of any threat regarding school safety, regardless of whether that threat has been determined to be valid or invalid;

g. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately resume compliance with MCL § 722.623(a) and report known or suspected acts of child abuse or neglect immediately in accordance with the statute;

h. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators so they understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat to themselves or others;

i. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators on how to conduct a proper risk assessment when students are suicidal;

j. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators to ask students and family members whether a students owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

k. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators and other staff as to when and how to conduct a legal search of student belongings, including backpacks and lockers;

l. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to publicly retract all statements made in the course of its cover story after the shooting, including a retraction of all statements suggesting that Defendants Hopkins and Ejak acted properly in releasing Doe from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

m. All other prospective equitable and injunctive relief this Honorable Court deems necessary to restore the property rights of Plaintiffs and the members of the putative Class to a full public education, as protected by the Due Process Clause of the Fourteenth Amendment.

### COUNT II:
### PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF FOR
### MONELL LIABILITY UNDER 42 U.S.C. § 1983, § 1988
### STATE-CREATED DANGER
### (By Plaintiffs and the Class Against Defendant Oxford CSD)

234.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

235.   As citizens and/or legal residents of the United States, Plaintiffs and the members of the putative Class were entitled to all rights, privileges, and immunities

accorded to all citizens and/or legal residents of the State of Michigan and of the United States.

236.   Pursuant to the Fourteenth Amendment of the United States Constitution, as enforced under the 42 U.S.C. § 1983, and at all times relevant to the Complaint, Plaintiffs and putative Class members had and have a clearly established right to be free from danger created and/or increased by the Defendants Ejak and Hopkins.

237.   At all times relevant to this Complaint, Defendant Oxford CSD failed to adequately train, discipline, and supervise former-Superintendent Throne and Defendants Wolf, Ejak, and Hopkins, promulgating and maintaining de facto unconstitutional customs, policies, and/or practices, rendering Defendant Oxford CSD liable for the constitutional violations alleged herein under *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978).

238.   At all times relevant to this Complaint, Defendant Oxford CSD knew or should have known that the policies, procedures, training, supervision, and discipline of Throne and Defendants Wolf, Ejak, and Hopkins were inadequate to meet the Constitutional duty Defendant Oxford CSD owed to the students at Oxford High School, including named Plaintiffs and the members of the putative Class.

239.   At all times relevant to this Complaint, Defendant Oxford CSD knew or should have  known that the policies, procedures, training, supervision, and

discipline of  Throne and Defendants Wolf, Ejak, and Hopkins failed to  establish, implement, and/or execute adequate policies, procedures, rules, and/or regulations to ensure that the actions or omissions of its above-mentioned teachers, counselors, and other staff members did not create or increase the risk to which  Plaintiffs would be exposed from private acts of violence.

240.   At all times relevant to this Complaint, Defendant Oxford CSD failed to establish, implement, and/or execute adequate policies, procedures, rules, and regulations to ensure that its teachers, counselors, and other staff members refrain from taking actions that create or increase a risk of harm to all students at Oxford High School, including Plaintiffs.

241.   At all times relevant to this Complaint, Defendant Oxford CSD knew or should have  known of a history, custom, propensity, and/or pattern for Throne and Defendants Wolf, Ejak, Hopkins, and other employees of  Oxford High School to fail to properly identify a student with suicidal and homicidal tendencies  and to act in such a way that created a risk of harm to students at Oxford High School and/or increased  a risk of harm to students at Oxford High School, including Plaintiffs.

242.   Defendant Oxford CSD explicitly and implicitly authorized, approved, and/or  knowingly  acquiesced  in  the  deliberate  indifference  of  its  teachers, counselors, and other staff members as to the strong likelihood that constitutional violations, such as those apparent in the instant case, would occur, and Defendant

Oxford CSD pursued policies, practices, and/or customs that were a direct and proximate cause of the deprivations of the constitutional rights of all students at Oxford High School, including Plaintiffs.

243. At all times relevant to this Complaint, Defendant Oxford CSD knew that its policies, procedures, customs, propensities, and/or patterns of supervising a student with suicidal and homicidal tendencies would deprive citizens and/or legal residents, such as Plaintiffs, of their constitutional rights.

244. At all times relevant to this Complaint, Defendant Oxford CSD knew that its policies, procedures, customs, propensities, and/or patterns allowed or provided discretion to principals, counselors, teachers, and other staff to return a student with suicidal and homicidal tendencies to his classroom such that their actions created a risk of harm and/or an increased risk of harm to the students at Oxford High School, including Plaintiffs, prior to involving the liaison police officer and/or other local law enforcement and/or obtaining permission from the same.

245. Defendant Oxford CSD and its administrators and policymakers, including former-Superintendent Throne, Principal Wolf, and Dean of Students Ejak, adopted and maintained policies, procedures, customs, propensities, practices, and/or patterns that were the moving force behind, and the cause-in-fact of, the school shooting on November 30, 2021. These policies, procedures, customs, propensities, practices, and/or patterns include but are not limited to the following:

a. An official policy, practice, and/or custom of preventing staff and administrators from maintaining administrative supervision over students in the counseling office, and of restricting students from returning to the classroom, unless there exists a "disciplinary issue" to justify doing so;

b. A policy, practice, and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

c. A policy, practice, and/or custom of failing to train staff or administrators, including Defendants Ejak and Hopkins, to secure or hold a student in the counseling office, or to otherwise restrict a student from returning to the classroom, where the student is suicidal or is displaying homicidal tendencies, where the student presents a threat of harm to himself/herself or others, and where returning the suicidal student to the classroom environment would create or increase the danger of deadly violence;

d. A policy, practice, and/or custom of failing to train staff or administrators, including Defendant Ejak and Hopkins, in the proper manner in which to interview and/or question a student who is known to be suicidal or who is known to display homicidal tendencies, including but not limited to questions about whether the student owns a deadly weapon, including a firearm, whether the student has access to a deadly weapon, including a firearm, and whether the student has possession of a deadly weapon, including a firearm;

e. A policy, practice, and/or custom of permitting its staff and administrators to refrain from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

f. A policy, practice, and/or custom of failing to train staff or administrators, including Defendant Ejak and Hopkins, in proper methods for completing a risk assessment;

g. A policy, practice, and/or custom of permitting its staff and administrators, including Ejak and Hopkins, disregard and divert student mental health crises when those crises do not fit within Defendant Oxford CSD's definition of a "disciplinary" issue;

h. A policy, practice, and/or custom of permitting its staff and administrators, including Ejak and Hopkins, to refrain from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

i. A policy, practice, and/or custom of discouraging teachers, counselors, and administrators from reporting suspected acts of child abuse or neglect, despite their status as mandatory reporters;

j. A policy, practice, and/or custom of requiring additional and unnecessary procedures to approve a teacher, counselor, or administrator's request to file a report of suspected child abuse or neglect;

k. A policy, practice, and/or custom of requiring additional and unnecessary procedures to contact law enforcement, regarding a threat of violence at school;

l. A policy, practice, and/or custom of adopting and maintaining inadequate and improper search policies; and

m. Any other policy, practice, and/or custom that may become known throughout the course of this litigation.

246. By inadequately training and/or supervising its principals, counselors, and teachers, and by having a custom or policy of deliberate indifference to the constitutional rights of their citizens and/or legal residents and students, Defendant Oxford CSD encouraged and cultivated the conduct that violated Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution, and pursuant to

42 U.S.C. § 1983, thereby increasing the risk that Plaintiffs would be exposed to Doe's acts of violence.

247.   As a direct and/or proximate result of the above-described conduct of Defendant Oxford CSD, Plaintiffs have suffered and will continue in the future to suffer irreparable harm, including but not limited to: (a) fright, shock, and terror; (b) loss of trust; (c) conscious pain and suffering;  (d) emotional distress; (e) mental anguish; (f) Post-Traumatic Stress Disorder; (g) depression and anxiety; (h) disruption of their lives; and (i) humiliation and/or mortification.

248.   Further, if not remedied, the violations by Defendant Oxford CSD detailed herein create a substantial, material, and unacceptable threat of further violence in Oxford schools, including without limitation another school shooting.

249.   To redress and remedy these unconstitutional practices, Plaintiffs request the following prospective and injunctive relief on their own behalf and on behalf of the Class:

> a. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately conduct an independent and fully transparent third-party investigation of the events that transpired prior to and during the school shooting on November 30, 2021;
>
> b. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately cease the policy, practice, and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

c. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately reform the policy, practice, and/or custom of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy, practice, and/or custom is maintained, Defendant Oxford CSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;

d. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately cease the policy, practice, and/or custom of providing selective information to parents and instead provide fully transparent information to parents and students, especially when such information concerns potential threats of safety and violence to the students and occupants of Oxford CSD schools;

e. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to rely on a certified school threat assessment expert to determine whether a threat is valid or invalid;

f. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to inform parents within twenty-four (24) hours of notice of any threat regarding school safety, regardless of whether that threat has been determined to be valid or invalid;

g. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately resume compliance with MCL § 722.623(a) and report known or suspected acts of child abuse or neglect immediately in accordance with the statute;

h. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators so they understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat to themselves or others;

72

i.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators on how to conduct a proper risk assessment when students are suicidal;

j.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators to ask students and family members whether a students owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

k.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators and other staff as to when and how to conduct a legal search of student belongings, including backpacks and lockers;

l.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to publicly retract all statements made in the course of its cover story after the shooting, including a retraction of all statements suggesting that Defendants Hopkins and Ejak acted properly in releasing Doe from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

m. All other prospective equitable and injunctive relief this Honorable Court deems necessary to restore the property rights of Plaintiffs and the members of the putative Class to a full public education, as protected by the Due Process Clause of the Fourteenth Amendment.

## COUNT III:
## PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF FOR VIOLATION OF CIVIL RIGHTS UNDER
## 14TH AMENDMENT AND 42 U.S.C. § 1983, § 1988
## STATE-CREATED DANGER – DELIBERATE INDIFFERENCE
## (By Plaintiffs and the Class Against Defendants Ejak & Hopkins)

250.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

251.   As citizens and/or legal residents of the United States, Plaintiffs were entitled to all rights, privileges, and immunities accorded to all citizens and/or legal residents of the State of Michigan and of the United States.

252.   Pursuant to the Fourteenth Amendment of the United States Constitution, as enforced under the 42 U.S.C. § 1983, and at all times relevant to the Complaint, Plaintiffs had a clearly established right to be free from danger created and/or increased by the Defendants Ejak and Hopkins.

253.   Any reasonable person would be aware of this clearly established constitutional right.

254.   Defendants Ejak and Hopkins, with knowledge of this clearly established right, and acting in deliberate indifference, violated the rights of named Plaintiffs and the members of the putative Class to be free from violence without due process, as secured by the Fourteenth Amendment's Due Process Clause, by taking affirmative acts under color of law to disrupt the status quo and create a danger of severe injury that did not exist in the status quo prior to those affirmative state actions, and by taking affirmative acts that caused severe injuries to Plaintiffs, which would not have happened but-for the affirmative state actions of Defendants Ejak and Hopkins.

255.   At all times relevant to this Complaint, Defendants Ejak and Hopkins were acting under the color of state law and created or increased a state-created danger by substantially increasing the risk of harm to Plaintiffs and in reckless disregard to Plaintiffs, thereby increasing the risk that Plaintiffs would be exposed to Doe's acts of violence.

256.   The actions of Defendants Ejak and Hopkins, under the Fourteenth Amendment to the United States Constitution and pursuant to 42 U.S.C. § 1983 and § 1988, were performed under the color of state law and were objectively unreasonable.

257.   The actions of Defendants Ejak and Hopkins, under the Fourteenth Amendment to the United States Constitution and pursuant to 42 U.S.C. § 1983 and § 1988, were performed knowingly, deliberately, and/or indifferently to Plaintiffs and in reckless disregard to their safety.

258.   Defendants Ejak and Hopkins were acting under the color of state law as employees of Defendant Oxford CSD, a public school district, when they deprived Plaintiffs of their clearly established rights, privileges, and immunities in violation of the Fourteenth Amendment to the United States Constitution and pursuant to 42 U.S.C. § 1983 and § 1988.

259.  Defendants Ejak and Hopkins exhibited deliberate indifference, pursuant to the Fourteenth Amendment to the United States Constitution, by taking

affirmative action(s), which resulted in all students at Oxford High School, including

Plaintiffs, being less safe than they were before the actions of Defendants Ejak and

Hopkins. The actions of Defendants Ejak and Hopkins created the danger and

increased the risk of harm that the students at Oxford High School, including

Plaintiffs, would be exposed to private acts of violence, to wit:

a. Deliberately, intentionally, and recklessly returning Doe to class on November 30, 2021, despite having knowledge of Doe's concerning suicidal or homicidal behavior;

b. Deliberately, intentionally, and recklessly returning Doe to class on November 30, 2021, where he had access to a loaded Sig Sauer 9-millimeter semi-automatic handgun;

c. Deliberately, intentionally, and recklessly deciding to refrain from involving the liaison police officer or other local law enforcement in investigation, despite Doe's concerning behavior;

d. Deliberately, intentionally, and recklessly deciding to refrain from searching Doe's backpack, which contained the shooting weapon and/or involve appropriate police authorities so that a proper and lawful search of Doe's backpack could be performed;

e. Deliberately, intentionally, and recklessly refraining from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

f. Deliberately, intentionally, and recklessly deciding to refrain from reporting to proper police authorities Doe's internet search history for ammunition the day before the shooting;

g. Deliberately, intentionally, and recklessly deciding to refrain from reporting the child abuse and neglect of Doe to Child Protective Services;

h. Interviewing Doe in front and in the presence of Doe's parents, knowing that such an interview would accelerate any violence Doe had planned;

i. Failing to insist on removing Doe from school property after credible threat of Doe's suicidal and/or homicidal ideation;

j. Deliberately choosing to refrain from having appropriate mental health intervention for Doe prior to returning Doe to the classroom with a Sig Sauer 9-millimeter semi-automatic handgun;

k. Demonstrating conduct so reckless as to show a substantial lack of concern for whether any injury would result;

l. Wrongfully causing Plaintiffs to suffer extreme emotional distress;

m. Enforcing the deficient and faulty policies, procedures, and practices, as are set forth in Count II, supra, as well as all others previously described in this Complaint; and

n. Other acts or omissions to be revealed through discovery.

260.   All of the above alleged conduct substantially increased the risk of harm to Plaintiffs, who were safer before Defendants Ejak and Hopkins took the affirmative acts described herein.

261.   As a direct and/or proximate result of the above-described conduct of Defendants Ejak and Hopkins, Plaintiffs have suffered and will continue in the future to suffer irreparable harm, including but not limited to: (a) fright, shock, and terror; (b) loss of trust; (c) conscious pain and suffering;  (d) emotional distress; (e) mental anguish; (f) Post-Traumatic Stress Disorder; (g) depression and anxiety; (h) disruption of their lives; and (i) humiliation and/or mortification.

262.   Further, if not remedied, the violations by Defendants Ejak and

Hopkins detailed herein create a substantial, material, and unacceptable threat of

further violence in Oxford schools, including without limitation another school

shooting.

263.   To redress and remedy these unconstitutional practices, Plaintiffs

request the following prospective and injunctive relief on their own behalf and on

behalf of the Class:

> a.   An order requiring Defendant Oxford CSD and/or Defendant
> Superintendent Weaver to immediately conduct an independent and
> fully transparent third-party investigation of the events that
> transpired prior to and during the school shooting on November 30,
> 2021;
>
> b.   An order requiring Defendant Oxford CSD and/or Defendant
> Superintendent Weaver to immediately cease the policy, practice,
> and/or custom of concealment, misrepresentation, minimization or
> avoidance, and non-escalation to higher authorities, including law
> enforcement, of suspected or known risks of school violence;
>
> c.   An order requiring Defendant Oxford CSD and/or Defendant
> Superintendent Weaver to immediately reform the policy, practice,
> and/or custom of prohibiting administrators from holding students
> out of the classroom, even where they are suicidal and where there
> is probable cause to know that they pose a risk of harm to themselves
> and others, so long as the circumstances do not present a
> "disciplinary" issue. So long as this policy, practice, and/or custom
> is maintained, Defendant Oxford CSD will continue to place
> suicidal students in the classroom even where they pose a threat to
> themselves and others, as happened when Doe was released from
> the counseling office to the classroom on November 30, 2021;
>
> d.   An order requiring Defendant Oxford CSD and/or Defendant
> Superintendent Weaver to immediately cease the policy, practice,

and/or custom of providing selective information to parents and instead provide fully transparent information to parents and students, especially when such information concerns potential threats of safety and violence to the students and occupants of Oxford CSD schools;

e. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to rely on a certified school threat assessment expert to determine whether a threat is valid or invalid;

f. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to inform parents within twenty-four (24) hours of notice of any threat regarding school safety, regardless of whether that threat has been determined to be valid or invalid;

g. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately resume compliance with MCL § 722.623(a) and report known or suspected acts of child abuse or neglect immediately in accordance with the statute;

h. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators so they understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat to themselves or others;

i. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators on how to conduct a proper risk assessment when students are suicidal;

j. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators to ask students and family members whether a students owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

k. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for

79

administrators and other staff as to when and how to conduct a legal search of student belongings, including backpacks and lockers;

l.  An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to publicly retract all statements made in the course of its cover story after the shooting, including a retraction of all statements suggesting that Defendants Hopkins and Ejak acted properly in releasing Doe from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

m. All other prospective equitable and injunctive relief this Honorable Court deems necessary to restore the property rights of Plaintiffs and the members of the putative Class to a full public education, as protected by the Due Process Clause of the Fourteenth Amendment.

## COUNT IV:
## PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF FOR VIOLATION OF CIVIL RIGHTS UNDER
## 14TH AMENDMENT AND 42 U.S.C. § 1983, § 1988
## STATE-CREATED DANGER – DELIBERATE INDIFFERENCE
## (By Plaintiffs and the Class Against Defendant Wolf)

264.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

265.  As citizens and/or legal residents of the United States, Plaintiffs were entitled to all rights, privileges, and immunities accorded to all citizens and/or legal residents of the State of Michigan and of the United States.

266.  Pursuant to the Fourteenth Amendment of the United States Constitution, as enforced under the 42 U.S.C. § 1983, and at all times relevant to the

Complaint, Plaintiffs had a clearly established right to be free from danger created and/or increased by the Defendant Wolf.

267. Any reasonable person would be aware of this clearly established constitutional right.

268. Defendant Wolf, with knowledge of this clearly established right, and acting in deliberate indifference, violated the right of named Plaintiffs and the members of the putative Class to be free from violence without due process, as secured by the Fourteenth Amendment's Due Process Clause, by taking affirmative acts under color of law to disrupt the status quo and create a danger of severe injury that did not exist in the status quo prior to those affirmative state actions, and by taking affirmative acts that caused severe injuries to Plaintiffs, which would not have happened but-for the affirmative state actions of Defendant Wolf.

269. At all times relevant to this Complaint, Defendant Wolf was acting under the color of state law as an employee of Defendant Oxford CSD, a public school district, when he, among other things, acted to maintain school safety; to investigate violent behavior within and threats of violence directed at the public school district; to take action and make decisions regarding school practices and procedures, both formal and informal; and to conduct himself as a school administrator.

270. The actions of Defendant Wolf, under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983 and §1988, were all performed under the color of state law and were objectively unreasonable and performed knowingly, deliberately, and/or indifferently to Plaintiffs in reckless disregard to the safety of Plaintiffs.

271. Defendant Wolf was acting under the color of state law when he deprived Plaintiffs of their clearly established rights, privileges, and immunities in violation of the Fourteenth Amendment of the Constitution of the United States and of 42 U.S.C. §1983 and §1988.

272. Defendant Wolf knew that there were active threats of violence that compromised student safety at Oxford High School throughout the weeks and months leading up to the school shooting on November 30, 2021, and that those active threats had not been formally or fully investigated.

273. As a school administrator, Defendant Wolf had the authority and obligation to maintain school safety and to investigate fully and completely all violence within the Oxford School District and all threats to the safety of the Oxford School District's students, including a full and complete investigation into the identity of the person who had left severed animal heads on the property and within the buildings of the Oxford High School.

274.   Defendant   Wolf   took   affirmative   action(s)   that   created   and substantially increased the danger that Doe's conduct would escalate to actual violence, thus causing severe and grievous injuries to Plaintiffs.

275.   The affirmative actions and conduct of Defendant Wolf in the weeks leading up to the school shooting on November 30, 2021, which created and/or increased the risk of harm to the students at Oxford High School, including Plaintiffs, in reckless disregard for their safety, non-exhaustively include:

  a.  Deliberately, intentionally, and recklessly concealing facts from appropriate law enforcement as to the severed bird head Doe placed in the boys' bathroom mere weeks before the shooting on November 30, 2021;

  b.  Deliberately, intentionally, and recklessly concealing facts from the students and parents at Oxford High School of ongoing violence at the school, and, instead, falsely assuring the students and parents at Oxford High School that there were no threats to school safety that should be of concern within the days and weeks leading up to the shooting;

  c.  Deliberately discouraging students at Oxford High School from taking seriously the threats students had perceived, regarding their safety, and instructing students to stop talking about and/or sharing the threatening information they find on social media;

  d.  Promoting a policy, practice, and/or custom of misrepresentation, minimization or avoidance, and non-escalation of suspected or known risks of school violence; and

  e.  Any and all additional breaches that created or increased the danger of violence at Oxford High School that may become known through the course of this litigation.

276.   The foregoing non-exhaustive list of described actions and conduct of Defendant Wolf was a proximate cause of the Plaintiffs' injuries.

277.   At all relevant times, the actions of Defendant Wolf, by advising all students at Oxford High School, including Plaintiffs, that no credible threat existed, demonstrated conduct so reckless as to demonstrate a substantial lack of concern for whether an injury would result.

278.   At all times relevant herein, Plaintiffs were safer before Defendant Wolf took action and advised all students at Oxford High School, including Plaintiffs, that there was no credible threat. By virtue of his actions, Defendant Wolf each substantially increased the harm to Plaintiffs.

279.   Had Defendant Wolf conducted a reasonable investigation into the threats of violence made towards Oxford High School and against its students, including the severed bird head that had been left in the boys' bathroom, Defendant Wolf would have found that Doe was the perpetrator of the above-mentioned threats and was the individual who severed the bird's head, as such information was readily accessible on Doe's publicly accessible media accounts and pages. At that time, Oxford High School would have removed Doe from school, and the mass school shooting that took place on November 30, 2021, would never have occurred and Plaintiffs would not have sustained the severe injuries they sustained on that day.

280.   The affirmative acts of Defendant Wolf created a state-created danger that substantially increased the special danger of harm to Plaintiffs and all other students at Oxford High School, as can be distinguished from a risk that would have affected the public at large.

281.   The conduct of Defendant Wolf was objectively unreasonable, and he performed such conduct knowingly, deliberately, and with deliberate indifference to the safety of Plaintiffs, causing all students and occupants at Oxford High School to be less safe than they were before Defendant Wolf took the affirmative actions as described above.

282.   But for the affirmative acts of Defendant Wolf, Doe would not have committed the school shooting at Oxford High School on November 30, 2021.

283.   The fact Defendant Wolf decided to refrain from reporting the severed bird head incident to law enforcement and from investigating the active threats of violence that were made towards Oxford High School and against its students—and, instead, Defendant Wolf affirmatively acted to provide a knowingly false sense of security to the students and parents at Oxford High School and, even more shockingly, to tell the students at Oxford High School they were not to talk about or discuss threats made on social media—is shocking to the conscience.

284.   The affirmative acts of Defendant Wolf specifically presented the students at Oxford High School, including Plaintiffs, with a specific risk of dangers.

285.   In comparison with the public, at large, the students at Oxford High School, including Plaintiffs, were specifically at-risk and exposed to the dangers presented due to the affirmative acts of Defendant Wolf in allowing Doe to matriculate through the school environment.

286.   As a direct and/or proximate result of the above-described conduct of Defendant Wolf, Plaintiffs have suffered and will continue in the future to suffer irreparable harm, including but not limited to: (a) fright, shock, and terror; (b) loss of trust; (c) conscious pain and suffering;  (d) emotional distress; (e) mental anguish; (f) Post-Traumatic Stress Disorder; (g) depression and anxiety; (h) disruption of their lives; and (i) humiliation and/or mortification.

287.   Further, if not remedied, the violations by Defendant Wolf detailed herein create a substantial, material, and unacceptable threat of further violence in Oxford schools, including without limitation another school shooting.

288.   To redress and remedy these unconstitutional practices, Plaintiffs request the following prospective and injunctive relief on their own behalf and on behalf of the Class:

> a. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately conduct an independent and

fully transparent third-party investigation of the events that transpired prior to and during the school shooting on November 30, 2021;

b. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately cease the policy, practice, and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

c. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately reform the policy, practice, and/or custom of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy, practice, and/or custom is maintained, Defendant Oxford CSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;

d. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately cease the policy, practice, and/or custom of providing selective information to parents and instead provide fully transparent information to parents and students, especially when such information concerns potential threats of safety and violence to the students and occupants of Oxford CSD schools;

e. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to rely on a certified school threat assessment expert to determine whether a threat is valid or invalid;

f. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to inform parents within twenty-four (24) hours of notice of any threat regarding school safety, regardless of whether that threat has been determined to be valid or invalid;

g. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately resume compliance with MCL § 722.623(a) and report known or suspected acts of child abuse or neglect immediately in accordance with the statute;

h. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators so they understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat to themselves or others;

i. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators on how to conduct a proper risk assessment when students are suicidal;

j. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators to ask students and family members whether a students owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

k. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators and other staff as to when and how to conduct a legal search of student belongings, including backpacks and lockers;

l. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to publicly retract all statements made in the course of its cover story after the shooting, including a retraction of all statements suggesting that Defendants Hopkins and Ejak acted properly in releasing Doe from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

m. All other prospective equitable and injunctive relief this Honorable Court deems necessary to restore the property rights of Plaintiffs and

the members of the putative Class to a full public education, as
protected by the Due Process Clause of the Fourteenth Amendment.

**COUNT V:**
**PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF FOR**
**VIOLATION OF CIVIL RIGHTS UNDER**
**14TH AMENDMENT AND 42 U.S.C. § 1983, § 1988**
**STATE-CREATED DANGER – SUPERVISORY LIABILITY**
**(By Plaintiffs and the Class Against Defendant Wolf)**

289.   Plaintiffs reallege and incorporate by reference the allegations

contained in the previous paragraphs.

290.   At all times relevant to this Complaint, Defendant Wolf was   the

principal at Oxford High School and, as such, directly supervised and oversaw the

actions of Defendants Ejak and Hopkins and encouraged the specific incident of

misconduct or directly participated in the specific incident of misconduct by failing

to expel, discipline, and/or provide proper  supervision for Doe and failing to inform

the liaison police officer or local law enforcement about Doe's violent plans.

291.   By inadequately training and/or supervising their teachers, counselors,

and dean of students; by having a custom or policy of indifference to the

constitutional rights of their citizens and/or legal residents; and/or by failing to

adequately supervise the school shooter, Doe, Defendant Wolf encouraged and

cultivated the conduct that then caused a violation of Plaintiffs' rights under the

Fourteenth Amendments of the United States Constitution.

89

292.   By failing to expel, discipline, search, and/or provide proper supervision for Doe, Defendant Wolf authorized, approved, and/or knowingly acquiesced in the unconstitutional conduct of Defendants Ejak and Hopkins.

293.   As citizens and/or legal residents of the United States, Plaintiffs were entitled to all rights, privileges, and immunities accorded to all citizens and/or legal residents of the State of Michigan and of the United States.

294.   Pursuant to the Fourteenth Amendment of the United States Constitution, as enforced under the 42 U.S.C. § 1983, and at all times relevant to the Complaint, Plaintiffs had a clearly established right to be free from danger created and/or increased by the Defendants Wolf, Ejak and Hopkins.

295.   The actions and omissions of Defendants Wolf, Ejak, and Hopkins, under the Fourteenth Amendment to the United States Constitution and pursuant to 42 U.S.C. §1983 and §1988, were all performed under the color of state law and were objectively unreasonable and performed knowingly, deliberately, and indifferently to Plaintiffs and in reckless disregard for their safety.

296.   Defendants Wolf, Ejak, and Hopkins were acting under the color of state law when they deprived Plaintiffs of their clearly established rights, privileges, and immunities in violation of the Fourteenth Amendment of the Constitution of the United States and of 42 U.S.C. §1983 and §1988.

297.   Defendants Wolf, Ejak, and Hopkins exhibited deliberate indifference, pursuant to the Fourteenth Amendment to the United States Constitution, to a citizen's right to be free from acts that create and/or increase the risk of harm that an individual will be exposed to private acts of violence, to wit:

a.   Deliberately, intentionally, and recklessly returning Doe to class on November 30, 2021, despite having knowledge of Doe's concerning suicidal or homicidal behavior;

b.   Deliberately, intentionally, and recklessly returning Doe to class on November 30, 2021, where he had access to a loaded Sig Sauer 9-millimeter semi-automatic handgun;

c.   Deliberately, intentionally, and recklessly deciding to refrain from involving the liaison police officer or other local law enforcement in investigation, despite Doe's concerning behavior;

d.   Deliberately, intentionally, and recklessly deciding to refrain from searching Doe's backpack, which contained the shooting weapon and/or involve appropriate police authorities so that a proper and lawful search of Doe's backpack could be performed;

e.   Deliberately, intentionally, and recklessly refraining from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a);

f.   Deliberately, intentionally, and recklessly deciding to refrain from reporting Doe's internet search history for ammunition to proper police authorities the day before the shooting;

g.   Deliberately, intentionally, and recklessly deciding to refrain from reporting the child abuse and neglect of Doe to Child Protective Services;

h. Interviewing Doe in front and in the presence of Doe's parents, knowing that such an interview would accelerate any violence Doe had planned;

i. Failing to insist on removing Doe from school property after credible threat of Doe's suicidal and/or homicidal ideation.

j. Deliberately choosing to refrain from having appropriate mental health intervention for Doe prior to returning Doe to the classroom with a Sig Sauer 9-millimeter semi-automatic handgun;

k. Demonstrating conduct so reckless as to show a substantial lack of concern for whether any injury would result;

l. Wrongfully causing Plaintiffs to suffer extreme emotional distress;

m. Enforcing the deficient and faulty policies, procedures, and practices, as are set forth in Count II, supra, as well as all others previously described in this Complaint; and

n. Other acts or omissions to be revealed through discovery.

298. As a direct and/or proximate result of the above-described conduct of Defendant Wolf, Plaintiffs have suffered and will continue in the future to suffer irreparable harm, including but not limited to: (a) fright, shock, and terror; (b) loss of trust; (c) conscious pain and suffering; (d) emotional distress; (e) mental anguish; (f) Post-Traumatic Stress Disorder; (g) depression and anxiety; (h) disruption of their lives; and (i) humiliation and/or mortification.

299. Further, if not remedied, the violations by Defendant Wolf detailed herein create a substantial, material, and unacceptable threat of further violence in Oxford schools, including without limitation another school shooting.

300.   To redress and remedy these unconstitutional practices, Plaintiffs request the following prospective and injunctive relief on their own behalf and on behalf of the Class:

> a.   An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately conduct an independent and fully transparent third-party investigation of the events that transpired prior to and during the school shooting on November 30, 2021;
>
> b.   An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately cease the policy, practice, and/or custom of concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;
>
> c.   An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately reform the policy, practice, and/or custom of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy, practice, and/or custom is maintained, Defendant Oxford CSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe was released from the counseling office to the classroom on November 30, 2021;
>
> d.   An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately cease the policy, practice, and/or custom of providing selective information to parents and instead provide fully transparent information to parents and students, especially when such information concerns potential threats of safety and violence to the students and occupants of Oxford CSD schools;
>
> e.   An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to rely on a certified school threat assessment expert to determine whether a threat is valid or invalid;

f. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to inform parents within twenty-four (24) hours of notice of any threat regarding school safety, regardless of whether that threat has been determined to be valid or invalid;

g. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately resume compliance with MCL § 722.623(a) and report known or suspected acts of child abuse or neglect immediately in accordance with the statute;

h. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators so they understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat to themselves or others;

i. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators on how to conduct a proper risk assessment when students are suicidal;

j. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators to ask students and family members whether a students owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

k. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to immediately secure proper training for administrators and other staff as to when and how to conduct a legal search of student belongings, including backpacks and lockers;

l. An order requiring Defendant Oxford CSD and/or Defendant Superintendent Weaver to publicly retract all statements made in the course of its cover story after the shooting, including a retraction of all statements suggesting that Defendants Hopkins and Ejak acted properly in releasing Doe from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him

94

to the counseling office or other safe location, without returning him to class; and

m. All other prospective equitable and injunctive relief this Honorable Court deems necessary to restore the property rights of Plaintiffs and the members of the putative Class to a full public education, as protected by the Due Process Clause of the Fourteenth Amendment.

## RELIEF REQUESTED

301. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

302. The conduct, actions, and/or inactions of Defendants, as alleged in the above-stated counts and causes of action, constitute violations of Plaintiffs' Constitutional and Federal rights, and the Eastern District of Michigan Southern Division has jurisdiction to hear and adjudicate said claims.

303. In whole or in part, as a result of some or all of the above-mentioned actions and/or inactions of Defendants, Plaintiffs have suffered and continue to suffer irreparable harm due to the above-mentioned violations.

304. Accordingly, in addition to the relief requested in each Court above, Plaintiffs respectfully request this Honorable Court grant the following relief in accordance with 42 U.S.C. § 1983 and § 1988 and Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (c)(1):

a. An order certifying the Class as defined herein;

b. An order appointing the named Plaintiffs as Class Representatives and the undersigned counsel as Class Counsel;

c. An order of all prospective equitable and injunctive relief described in Counts I, II, III, IV, and V of this Complaint;

d. An award of actual attorney fees and costs pursuant to 42 U.S.C. § 1988; and

e. Any further legal and/or other relief that this Court deems equitable or just.

Dated: _____, 2022                Respectfully submitted,

                                       By: */s/ Scott Weidenfeller*
                                       Scott Weidenfeller (P56001)
                                       Manvir S. Grewal, Sr. (P48082)
                                       Carette-Lynn Reynolds (P85970)
                                       GREWAL LAW, PLLC
                                       345 E. Cady St.
                                       3rd Floor
                                       Northville, MI 48167
                                       (517) 393-3000
                                       sweidenfeller@4grewal.com
                                       mgrewal@4grewal.com
                                       creynolds@4grewal.com

                                       Amy Marino (P76998)
                                       MARINO LAW, PLLC
                                       18977 W. 10 Mile Rd., Ste. 100E
                                       Southfield, MI 48075
                                       (248) 797-9944
                                       amy@marinopllc.com

                                       *Attorneys for Plaintiffs & the Putative Class*